John C. Rake, OSB #105808
jrake@lvklaw.com
LARKINS VACURA KAYSER LLP
121 SW Morrison St., Suite 700
Portland, OR 97204
Ph. (503) 222-4424

Stephen B. Murray, Jr. *(pro hac vice forthcoming)*
smurrayjr@murray-lawfirm.com
Arthur M. Murray *(pro hac vice forthcoming)*
amurray@murray-lawfirm.com
Ruston Pritchard *(pro hac vice forthcoming)*
rpritchard@murray-lawfirm.com
MURRAY LAW FIRM
701 Poydras Street, Suite 4250
New Orleans, Louisiana 70130
Telephone: (504) 525-8100
Facsimile: (504) 584-5249

Jack Weaver *(pro hac vice forthcoming)*
jack@weavercurrie.com
WEAVER CURRIE, PC
3554 Round Barn Blvd., Suite 300
Santa Rosa, California 95403
Telephone: (707) 433-4842
Facsimile: (707) 473-9778

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JOHNSON POOLS INC.,<br><br>Plaintiff,<br><br>v.<br><br>BARRETT BUSINESS SERVICES INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**Breach of Contract**<br>**Breach of Fiduciary Duty**<br>**Negligence**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Johnson Pools Inc., doing business as Johnson Pool & Spa, by and through the undersigned counsel, brings this civil action against Defendant and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

**1.**

Plaintiff Johnson Pools Inc., doing business as Johnson Pool & Spa, is a corporation formed in California, with its principal place of business in Windsor, California.

**2.**

Defendant Barrett Business Services Inc. (hereinafter "Defendant BBSI") is incorporated under the laws of Maryland and has its principal place of business in Vancouver, Washington.

**3.**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the parties are citizens of different states.

**4.**

Venue is proper in the District of Oregon as Defendant BBSI has offices and conducts business itself or through its agent(s) in the State of Oregon, County of Multnomah. Additionally, the written agreement between the Plaintiff and Defendant BBSI provides that the parties accept the jurisdiction of the state and federal court sitting in Portland, Oregon. A copy of the agreement is attached as "Exhibit 1".

**FACTS**

**5.**

Plaintiff Johnson Pool & Spa is a pool and spa service company located in Windsor, California.

**6.**

At all relevant times, Plaintiff was a client of Defendant BBSI, as alleged herein below.

**7.**

Defendant BBSI is a Professional Employer Organization ("PEO").

**8.**

A PEO is a type of full-service human resource outsourcing known as co-employment. In this arrangement, the PEO performs various employee administration tasks, such as payroll and benefits administration, on behalf of a business.

**9.**

Through a model called co-employment, the business retains control over day-to-day operations and employee management, while the PEO becomes employee of record for tax and benefits purposes. *See* Exhibit 2 at 5.

**10.**

When an employer uses a PEO to pay its employment taxes and satisfy its employment tax return filing obligations, the PEO is the taxpayer before the IRS. The PEO reports the wages, employment taxes, and credits on behalf of all its employer clients.

**11.**

Defendant BBSI served as PEO for Plaintiff. *See* Exhibit 1.

**12.**

At all relevant times herein complained of, Defendant BBSI was "responsible for the administration of payroll matters with respect to the Employees, the timely payment of wages, and the withholding and timely payment of all applicable federal, state, and local taxes required as a result of [Defendant BBSI's] payment of Employee wages." Exhibit 1 at 2.

**13.**

At all relevant times herein complained of, Defendant BBSI paid wages or compensation to individuals who performed services for Plaintiff.

**14.**

As the administrative employer or PEO for Plaintiff, Plaintiff's federal wages are reported and paid under the Federal ID Number for Defendant BBSI. *See* Exhibit 2.

**15.**

As such, Defendant BBSI used its own taxpayer identification number to process all payroll and payroll tax returns on behalf of Plaintiff.

**Employee Retention Credit (ERC)**

**16.**

The employee retention tax credit, also referred to as the Employee Retention Credit (ERC), was created by the Coronavirus Aid, Relief and Economic Security (CARES) Act, signed into law in March 2020, to encourage businesses to keep employees on their payroll.

**17.**

On or about March 15, 2020, States and local government entities began to issue Orders or other types of proclamations to implement shutdowns to prevent the spread of COVID-19, including the closure of schools and non-essential businesses. Exhibit 2 at 11.

**18.**

The ERC was specifically designed to encourage employers experiencing a decline in gross receipts and/or whose trade or business was fully or partially suspended as a result of a government order related to COVID-19 to keep employees on their payroll through a refundable employment tax credit. *Id*.

**19.**

In general, to qualify for the ERC, an employer must have operated a trade business in 2020 or a calendar quarter in 2021 and meet one of the following tests:

a. The business operations must have been fully or partially suspended by government order due to COVID-19 in 2020 or the first three calendar quarters of 2021 according to Section 2301(c)(2)(A) of the CARES ACT; or

    i. Additionally, that governmental order must have had a more than nominal effect on business operations.

    ii. Solely for purposes of this employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a

nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019). IRS Notice 2021-20, at p. 28, attached as Exhibit 9.

b. Met the Gross Receipts Test per section 2301(c)(2) (B) of the CARES Act.

**20.**

In July of 2020, the Internal Revenue Service ("IRS") provided guidance by which qualifying ERC wages can be reported on Forms 940 and Forms 941. A copy of the IRS guidance is attached as Exhibit 3 and hereby incorporated by reference.

**21.**

According to IRS guidance, third party filers that file aggregate Forms 941, such as a PEO, must complete and file Schedule R if they have clients that are claiming ERCs. Exhibit 3 at 2.

**22.**

PEOs normally use FORM 941, Employer's Quarterly Federal Tax Return, and attach Schedule R detailing credit amounts claimed on behalf of each client. *See* Exhibit 3.

**23.**

Although a PEO provides client-by-client specified information concerning the ERC on the Schedule R it attaches to its employment tax return, a client cannot claim the credit except through the PEO because the client does not deposit, pay or report the employment taxes through its own EIN. *See* Exhibit 3.

**24.**

The IRS guidance also provides that the ERC may be obtained by filing an amended return or claim for refund for the quarters ending in June, September, and December 2020, using Form 941-X. Exhibit 3 at 3.

**Defendant BBSI's ERC Obligations**

**25.**

On October 15, 2012, Plaintiff executed an Agreement for Employer and Staffing Services with Defendant BBSI. *See* Exhibit 1.

**26.**

The Agreement for Employer and Staffing Services sets forth the obligations and responsibilities of Defendant BBSI with respect to payroll administration, tax filings, and payroll tax credit processing on behalf of Plaintiff. *See* Exhibit 1.

**27.**

Defendant BBSI was "responsible for the administration of payroll matters with respect to the Employees, the timely payment of wages, and the withholding and timely payment of all applicable federal, state, and local taxes required as a result of Barrett's payment of Employee wages." Exhibit 1 at 2.

**28.**

Defendant BBSI was responsible for filing the Employee Retention Credit on behalf of Plaintiff.

**29.**

Before filing, Defendant BBSI was obligated to collect from its client any information regarding the client's eligibility for the ERC. A copy of a letter from IRS Associate Chief Counsel to Senator John Cornyn, dated September 29, 2022, is attached as "Exhibit 4".

**30.**

If the IRS requests information regarding the ERC, Defendant BBSI is obligated to either provide this information or collect it from the client and provide the tax records that support the client's eligibility for the ERC. *See* Exhibit 4.

**31.**

BBSI uses this information to claim the credit on its client's behalf on its employment tax return. *See* Exhibit 4**.**

**Plaintiff-Specific Facts**

**32.**

Prior to filing, Plaintiff correctly identified that it qualified for the ERC under the "partial suspension" of operations for the ERC for the following quarters:

a. Quarter 2 of 2020 (Including parts of March 2020)
b. Quarter 3 of 2020
c. Quarter 4 of 2020
d. Quarter 1 of 2021
e. Quarter 2 of 2021 (*See* Exhibit 5)

**33.**

Plaintiff was subject to numerous Sonoma Orders during these quarters, which either fully or partially suspended operations.

**Sonoma Order C19-01**

**34.**

Plaintiff was subject to Sonoma Order C19-01, which shut down all non-essential business as of March 13, 2020 with no defined end date. Exhibit 5 at 1.

**35.**

Plaintiff's retail sites had to completely close, which made up a greater than non-nominal or more than 10% of its business. *Id*.

**36.**

Due to Sonoma Order C19-01, Plaintiff had "[i]mmediate cancellation of in-store events, vendor demos, and municipal/HOA-related gatherings tied to pool service/retail promotions." *See* Exhibit 6.

**37.**

Due to Sonoma Order C19-01, Plaintiff had a more than nominal impact on its business because "[e]vent-driven retail traffic and related staffing eliminated, beginning the reduction that compounded under subsequent SIP [Shelter in Place] orders." *See* Exhibit 6.

**38.**

Plaintiff met the definition of a partial suspension under Sonoma Order C19-01, according to IRS Notice 2021-20, which provides IRS guidance on the CARES Act. Exhibit 5 at 1.

**Sonoma Order C19-03**

**39.**

Plaintiff was subject to Sonoma Order C19-03, effective March 18, 2020 through April 7, 2020, which extended the shelter in place and continued the mandate that ordered non-essential businesses remain closed. Exhibit 5 at 3.

**40.**

"Minimum Basic Operations" were put into effect, which "include[s] the following, provided that employees comply with Social Distancing Requirements as defined in this Section, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences. *Id.*

**41.**

Sonoma Order C19-03 mandated Plaintiff to distance and only operate in a limited capacity. *Id*.

**42.**

Due to Sonoma Order C19-03, Plaintiff "[c]losed pool & spa showrooms to the public; limited retail to MBO only; service/contracting restricted to safety/essential work with 6-ft distancing." *See* Exhibit 6.

**43.**

Due to Sonoma Order C19-03 "[r]etail division shuttered; service crews reduced and reorganized → well over 10% of employees unable to perform normal duties." *See* Exhibit 6.

**44.**

Plaintiff met the definition of a partial suspension according to Notice 2021-20 under Sonoma Order C19-03. Exhibit 5 at 3.

**Sonoma Order C19-05**

**45.**

Plaintiff was also subject to Sonoma Order C19-05, which extended the mandatory shut down of non-essential businesses to May 3rd, 2020. "Minimum Basic Operations" remained in effect. Exhibit 5 at 3.

**46.**

"The Company began implementing policy that conformed with these orders. Most notable the Company was forced to adjust shift and team logistics, having all individuals travel to and from job sites in individual vehicles. This brought additional logistical burden and impact that further exacerbated the material impact to the Company's business." *Id.*

**47.**

Due to Sonoma Order C19-05, Plaintiff had "[o]perational redesign of field/service & warehouse: staggered shifts, per-vehicle headcount limits, on-site spacing, sanitation; retail remained closed to walk-ins." *See* Exhibit 6.

**48.**

Due to Sonoma Order C19-05, Plaintiff had "Crew-density limits and MBO continued—sustained impact >10% of workforce even among "essential" functions.' *See* Exhibit 6.

**49.**

The partial suspension test was met under Sonoma Order C19-05. Exhibit 5 at 3.

**Sonoma Order C19-09**

**50.**

Sonoma Order C19-09, dated May 1, 2020, expanded essential businesses to allow for more education focused businesses to meet the definition. However, this did not apply to Plaintiff, as Plaintiff was not an essential business. Exhibit 5 at 4.

**51.**

Minimum Basic Operations remained in effect. *Id.*

**52.**

Due to Sonoma Order C19-09, "Showrooms still closed to the public; pivot to curbside only, reconfiguring staffing, inventory staging, and customer flow." *See* Exhibit 6.

**53.**

Due to Sonoma Order C19-09, "Retail staff redeployed/limited; continued restrictions left >10% employees unable to perform normal duties." *See* Exhibit 6.

**54.**

The partial suspension test was met under Sonoma Order C19-09. Exhibit 5 at 4.

**Sonoma Order Amendment 3 C19-02**

**55.**

Sonoma Order Amendment 3 C19-02, dated May 23, 2020, allowed Plaintiff to begin operations, but in a severely limited capacity. Exhibit 5 at 4.

**56.**

Under Sonoma Order Amendment 3 C19-02, "Selective expansion did not restore full indoor retail or normal crew logistical distancing controls remained." *See* Exhibit 6.

**57.**

Under Sonoma Order Amendment 3 C19-02, "Even with limited reopenings, >10% of employees remained constrained by capacity/distancing rules." *See* Exhibit 6.

**58.**

Through the Minimum Basic Operations requirements and the restrictions to retail operations, Plaintiff was still materially impacted, thus meeting the definition of the partial suspension test according to Notice 2021-20. Exhibit 5 at 4.

**Sonoma Order C19-14**

**59.**

Sonoma Order C19-14, dated June 5, 2020, allowed businesses to begin operating in a partially suspended capacity. Exhibit 5, at pg. 5.

**60.**

Due to Sonoma Order C19-14, "Retail reopens with capacity/distancing controls and posted protocols; field operations continue under construction/field safety rules." *See* Exhibit 6.

**61.**

Due to Sonoma Order C19-14, "Capacity limits + distancing continued to cap staffing and throughput >10% below normal." *See* Exhibit 6.

**62.**

Additionally, "at this time, the [Plaintiff] began receiving word from their suppliers in California, that their businesses were being subjected to significant impact. Though [Plaintiff] continued to qualify under their own suspension of operations, at this time [Plaintiff] also begins to qualify through the supply chain impact" Exhibit 5 at 5.

**63.**

Plaintiff meets the definition of a partial suspension according to Notice 2021-20 under Sonoma Order C19-14.

**Sonoma Order C19-15**

**64.**

Sonoma Order C19-15, dated June 18, 2020, allowed businesses in the county to operate but distancing and capacity restrictions remained in effect. Exhibit 5 at 6.

**65.**

Plaintiff's showroom was impacted through June 2021. The social distancing mandate remained through this order, which restricted how Plaintiff could interact with customers in its retail locations.[1] *Id.*

**66.**

Due to Sonoma Order C19-15, "Sustained capacity/spacing limits for showrooms; continued vehicle/headcount limits and staggered starts for crews." *See* Exhibit 6.

**67.**

Due to Sonoma Order C19-15, "Constraints on indoor retail/customer interaction and crew logistics kept workforce >10% below normal utilization." *See* Exhibit 6.

**68.**

Plaintiff meets the definition of a partial suspension according to Notice 2021-20 under Sonoma Order C19-15.

**California Blueprint for Safer Economy Mandate**

**69.**

California Blueprint for Safer Economy Mandate, dated August 28, 2020, created a tier system for reopening. Exhibit 5, at pg. 6. Under this structure, Plaintiff remained partially impacted. *Id.*

---

[1] The specific distancing orders the Company become subject to at this point are found below:
County Orders and Guidance are located here:
• https://socoemergency.org/emergency/novel-coronavirus/health-orders/
• http://sonomaedb.org/Business-Assistance/Coronavirus/Business-Management-Plans/
State Orders and Guidance are located here:
• https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf
• https://covid19.ca.gov/industry-guidance/

**70.**

Under this system, Plaintiff had "[s]howroom capacity caps, shopping-by-appointment/spacing controls; swim-school/close-contact services restricted; field crews continued under distancing protocols." *See* Exhibit 6.

**71.**

Under this system, "Tier-based capacity restrictions and distancing persistently constrained staffing and sales throughout (>10% employees affected) until June 15, 2021." *See* Exhibit 6.

**72.**

Plaintiff continued to have a partial suspension of a non-nominal portion of business while Sonoma Country remained in the tier system, through June 15, 2021. Exhibit 5 at 6.

**73.**

The Company also continued to receive word from their suppliers that they too were impacted due to restrictions and to expect delays. *Id.* at 7.

**74.**

Plaintiff met "the definition of a partial suspension according to Notice 2021-20 under this order throughout the tier system. At the time this order expired, the orders moved from mandates to guidance for the Company. At this time, June 15th, the Company ceased to qualify under the partial suspension guidelines." *Id.* at 8.

**ERC Amounts**

**75.**

The amount of the ERC that Plaintiff qualified for each quarter is listed below:

a. Quarter 2 of 2020 is $267,776.

b. Quarter 3 of 2020 is $30,273.

c. Quarter 4 of 2020 is $21,508.

d. Quarter 1 of 2021 is $367,469.

e. Quarter 2 of 2021 is $388,326. *See* Exhibit 7.

**ERC Filing**

**76.**

At time of filing, Defendant BBSI did not request any evidence of the Governmental Orders outlined in Exhibit 5 to provide in support of the ERC.

**77.**

On information and belief, some time in 2023 Defendant BBSI filed a return with the IRS, in which it erroneously submitted Plaintiff's ERC claim.

**78.**

Because Defendant BBSI acts as PEO for numerous other businesses, employment tax returns for all clients of BBSI are included on BBSI's tax return.

**79.**

As such, Plaintiff's ERC Claim was grouped with other businesses on Defendant BBSI's employment tax return, so Plaintiff did not have access to the ERC filing.

**80.**

Instead, Plaintiff had to rely on Defendant BBSI's representations that the ERC claim was correctly filed.

**81.**

On information and belief, Defendant BBSI elected to present Plaintiff's claim under the Gross Receipts test because it allowed easier aggregate filing for BBSI.

**82.**

Plaintiff did not hear back about the ERC filing until, on July 1, 2025, Plaintiff was notified by Defendant BBSI that the Internal Revenue Service (IRS) had selected its ERC claim for audit. Exhibit 8. The IRS requested that the documentation for the ERC claim should be submitted by July 16, 2025. Exhibit 8.

**83.**

The July 1, 2025 letter was the first time documentation was requested for the ERC claim, despite the fact that the original ERC claim was filed in 2023.

**84.**

On July 16, 2025, Plaintiff provided documentation in support of its ERC claim to Defendant BBSI, which Plaintiff assumed BBSI submitted to the IRS.

**85.**

Plaintiff was then notified by Defendant BBSI that the IRS determined that it was not eligible for the ERC for any of the quarters under examination.

**86.**

The reason supplied by the IRS was that "Disallowed Evidence does not show a shut down or Decrease in Gross Receipts (c,d)." Exhibit 2.

**87.**

On October 14, 2025, Duncan Kelm of Arrow Point Tax Services, sent a letter to the IRS on behalf of Plaintiff regarding its ERC rejection. Exhibit 10.

**88.**

Plaintiff pointed out that it never claimed to qualify through the gross receipts test, rather Plaintiff claimed to qualify for partial suspension of a "material" portion of business operations for the period of March 13, 2020 through June 15, 2021. Exhibit 10.

**89.**

Per the redacted copy of Form 886-A, it is clear that Defendant BBSI did not properly submit Plaintiff's ERC Claim under the Partial Suspension test. Instead, the nominal impact claimed qualification is the Gross Receipts test. Exhibit 2.

**90.**

Additionally, Mr. Kelm pointed out that "the taxpayer reason section is incorrect. The Company never claimed eligibility past June 15th, 2021 which clearly is before 2021 Q3. The fact that the below two sentences is the only response received, and that the "Taxpayer Reason" section is clearly incorrect, shows that this case deserves a more detailed review." Exhibit 10.

**91.**

Upon information and belief, BBSI did not present that Plaintiff had a non-nominal impact on business operations due to a greater than 10% impact on work force.

**92.**

By failing to request and supply proper documentation regarding Plaintiff's ERC claim, Defendant BBSI's failed to comply with its contractual obligations and duties and acted negligently.

**93.**

By failing to properly complete Form 941 and/or amended Form 941-X, Defendant BBSI, as Plaintiff's PEO, failed to comply with its contractual obligations and duties and acted negligently.

**94.**

By failing to correct Plaintiff's claim after being notified by the IRS that the claim was being audited, Defendant BBSI failed to comply with its contractual obligations and duties and acted negligently.

**95.**

But for BBSI's failure to properly submit Plaintiff's ERC Claim, the IRS would have properly considered the claim and granted it.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
## AGAINST DEFENDANT BBSI

**96.**

Plaintiff hereby incorporates and realleges the allegations in the preceding paragraphs as though fully alleged herein.

**97.**

Plaintiff and Defendant BBSI entered into a Service Agreement for Employer and Staffing Services. Exhibit 1.

**98.**

Under this Agreement, BBSI undertook the obligation to process requested payroll tax credits on behalf of Plaintiff.

**99.**

Plaintiff did all, or substantially all, of what the agreements required it to do, including but not limited to paying Defendant BBSI all administrative fees and providing notice to BBSI that it qualified for the ERC under the partial suspension of operations test.

**100.**

Defendant BBSI materially breached the Agreement by:

a. Failing to collect any information regarding Plaintiff's eligibility for the ERC;

b. Failing to request, collect, or submit the necessary Sonoma County Health Orders and supporting documentation provided by Plaintiff at the time of the initial filing;

c. Failing to properly complete Schedule R and Form 941 in a manner that accurately reflected Plaintiff's eligibility;

d. Misrepresenting Plaintiff's qualification criteria to the IRS despite Plaintiff's specific qualification under the Partial Suspension test; and

e. Failing to correct Plaintiff's ERC claim upon being notified by the IRS that the claim was being audited.

**101.**

As a direct and proximate result of BBSI's breaches, the IRS denied Plaintiff's ERC claim in the amount of:

a. Quarter 2 of 2020: $267,776

b. Quarter 3 of 2020: $30,273

c. Quarter 4 of 2020: $21,508

d. Quarter 1 of 2021: $367,469

e. Quarter 2 of 2021: $388,326

f. $1,075, 352 Total. Exhibit 7.

**102.**

But for BBSI's failure to accurately file the ERC claim under the correct Partial Suspension criteria, Plaintiff would have received the full credit amount.

**103.**

By reason of Defendant BBSI's breaches of the Agreements, Plaintiff was damaged in an amount not less than $1,075,352.00, plus interest, costs, and reasonable attorney fees as provided for in the Agreements.

## SECOND CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
## AGAINST DEFENDANT BBSI

**104.**

Plaintiff hereby incorporates and realleges the allegations in the preceding paragraphs as though fully alleged herein.

**105.**

Defendant BBSI is a Professional Employer Organization ("PEO").

**106.**

Defendant BBSI served as the PEO and administrative employer for Plaintiff.

**107.**

BBSI placed itself in a position of trust and confidence by accepting and agreeing to perform the subject tax reporting and other services on Plaintiff's behalf under the PEO Agreement. This included the obligation to seek and remit to Plaintiff the ERC. By accepting its role as the payer/reporter before the IRS of Plaintiff's employment tax obligations, BBSI was aware that Plaintiff placed great trust and confidence in BBSI in connection with such matters.

**108.**

In connection with this position of trust and confidence, BBSI owed Plaintiff fiduciary duties to act with the utmost good faith, to act in a manner consistent with Plaintiff's best interests, and to exercise due care.

**109.**

BBSI breached its fiduciary duties by:

a. Failing to collect any information regarding Plaintiff's eligibility for the ERC;

b. Failing to properly present Plaintiff's ERC claim;

c. Filing under the Gross Receipts test for the purpose of making aggregate filing easier;

d. Filing under the Gross Receipts test despite the fact that it knew, or should have known, that test was inapplicable to Plaintiff;

e. Failing to request Plaintiff's partial suspension evidence until after the IRS audit had commenced; and

f. Prioritizing its own administrative convenience over the Plaintiff's right to a $1,075,352.00 tax credit.

**110.**

By reason of Defendant BBSI's breach of fiduciary duty, Plaintiff was damaged in an amount not less than $1,075,352.00, plus interest and costs and Defendant BBSI's failures were a significant factor in causing that harm.

**THIRD CAUSE OF ACTION**

**NEGLIGENCE**

**AGAINST DEFENDANT BBSI**

**111.**

Plaintiff hereby incorporates and realleges the allegations in the preceding paragraphs as though fully alleged herein.

**112.**

As a Professional Employer Organization (PEO) and administrative employer for Plaintiff, BBSI owed Plaintiff a duty to exercise the level of care, skill, and diligence typically exercised by reasonably prudent PEO professionals in similar circumstances.

**113.**

BBSI failed to meet that standard of care by:

a. Failing to conduct a reasonable inquiry into Plaintiff's eligibility before filing tax documents;

b. Failing to properly complete Schedule R and Form 941 in a manner that accurately reflected Plaintiff's eligibility;

c. Negligently preparing and filing Form 941 with incorrect data that did not reflect the reality of the Sonoma County shutdown orders;

d. Failing to maintain and provide the IRS with the supporting documentation Plaintiff had already attempted to provide; and

e. Failing to correct Plaintiff's ERC claim upon being notified by the IRS that the claim was being audited.

**114.**

BBSI's negligence was the sole and substantial factor in the IRS's denial of Plaintiff's ERC claim. But for BBSI's negligence, Plaintiff's claim would have been granted under the partial suspension test. Plaintiff has been damaged in an amount no less than $1,075,352.00, plus interest and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

1. On all causes of action, for actual and compensatory damages of no less than $1,075,352, which shall be proven at time of trial;
2. Pre-judgment and post-judgment interest;
3. For reasonable attorney fees and costs as provided under the agreements and under law, according to proof at time of trial; and
4. For any further relief, the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial on all issues entitled to jury trial as raised in the Complaint.

DATED: October 8, 2026

LARKINS VACURA KAYSER LLP

s/ John C. Rake
John C. Rake, OSB #105808
jrake@lvklaw.com

MURRAY LAW FIRM
Stephen B. Murray, Jr.*(pro hac vice forthcoming)*
smurrayjr@murray-lawfirm.com
Arthur M. Murray*(pro hac vice forthcoming)*
amurray@murray-lawfirm.com
Ruston Pritchard *(pro hac vice forthcoming)*
rpritchard@murray-lawfirm.com

WEAVER CURRIE, PC
Jack Weaver *(pro hac vice forthcoming)*
jack@weavercurrie.com

# AGREEMENT FOR EMPLOYER AND STAFFING SERVICES

**PARTIES:**

BARRETT BUSINESS SERVICES, INC., ("Barrett")
a Maryland Corporation,
1190 Airport Road, Suite 120
Napa CA 94558

Johnson Pools Inc. ("Client")
dba Johnson Pool & Spa
9650 Old Redwood Hwy
Windsor CA 95472

**IT IS HEREBY AGREED:**

**1. RELATIONSHIP OF BARRETT AND CLIENT.**

Barrett hereby agrees to employ those persons whose job classifications are set forth on Fee Schedule "1," and those persons identified on Schedule "13," Part A ("Employees") and who are designated by Client and Barrett as being subject to the terms of this Agreement for Employer and Staffing Services ("Agreement").

**2. BARRETT'S RESPONSIBILITIES AND DUTIES.**

Barrett shall have the right to hire, discipline, and terminate Employees and Barrett shall be in compliance with rules and regulations governing the reporting and payment of federal and state payroll taxes on wages paid under this Agreement. Subject to the terms, conditions, and exceptions, as hereinafter set forth in this Agreement, Barrett shall be in compliance with the following laws and regulations in connection with the Employees: (i) federal income tax withholding provisions of the Internal Revenue Code (IRC); (ii) state and/or local income tax withholding provisions, if applicable; (iii) Federal Insurance Contributions Act (FICA); (iv) Federal Unemployment Tax Act (FUTA); (v) applicable state and federal unemployment provisions; (vi) Consolidated Omnibus Budget Reconciliation Act (COBRA), as it relates to group health plans sponsored solely by Barrett; (vii) Consumer Credit Protection Act, Title III, and all antigarnishment discrimination laws; (viii) Barrett's health insurance coverage sponsored solely by Barrett, IRC ' 125 cafeteria plan and IRC ' 401(k) retirement plan; and (ix) state workers' compensation laws, including providing workers' compensation insurance or self-insurance, completing and filing all required reports, administering and payment of workers' claims. Barrett hereby agrees to indemnify and hold Client harmless from state workers' compensation premium costs and state workers' compensation claims for Employees, for the workers' compensation coverage provided by Barrett, as required by this Section 2. Federal workers' compensation laws, including, without limitation, the Longshore and Harbor Workers' Compensation Act and the

Jones Act compliance shall be the responsibility of Client, unless set forth in a separate written agreement.

Barrett shall be responsible for the administration of payroll matters with respect to the Employees, the timely payment of wages, and the withholding and timely payment of all applicable federal, state, and local taxes required as a result of Barrett's payment of Employee wages.

**3. CLIENT'S RESPONSIBILITIES AND DUTIES.**

Client shall be the employer of the Employees for all purposes other than those specified in Section 2 above, including, but without limiting the generality of the foregoing, compliance with the following: (i) the Occupational Health and Safety Act (OSHA); (ii) Fair Labor Standards Act; (iii) federal and state wage and hour laws; (iv) state workers' compensation law as an employer; (v) the Worker Adjustment and Retraining Notification Act (WARN Act); (vi) the Employee Retirement Income Security Act of 1974 (ERISA), and compliance with all IRC Sections with respect to any employee benefit plan or plans sponsored by Client; (vii) COBRA as it relates to group health plans that are sponsored or co-sponsored by Client; (viii) the National Labor Relations Act and labor agreements; (ix) the Migrant and Seasonal Agricultural Worker Protection Act; (x) Immigration Reform and Control Act (IRCA); (xi) Title VII of the 1964 Civil Rights Act, the Age Discrimination in Employment Act and all other antidiscrimination and fair employment laws; (xii) the Americans With Disabilities Act (ADA); (xiii) the Family and Medical Leave Act of 1993, as amended (FMLA); (xiv) all job site posting and notification requirements for all of the foregoing; (xv) government contracting, or any other aspect of employment relationship which is regulated (for qualification purposes only); and (xvi) any other tax, fee, assessment or charge of any nature, including occupation, business, use, sales, retailer's, value added or excise tax, duty, custom, inspection, or testing fee, imposed now or in the future by any government authority on or measured by (1) any transaction between Barrett and Client, (2) any services provided by Barrett to Client, (3) the conduct of Client's business, or (4) the occupancy, domicile or location of Client, notwithstanding the basis of calculation of such charge or how collected, shall be paid by Client in addition to other amounts due under this Agreement. If Barrett is required to pay any such tax or fee, Client will reimburse Barrett.

Client acknowledges and understands that Barrett relies on Client to provide accurate, timely, and verifiable hours worked and other such information for the purposes of calculating accurate payroll and benefits. It is Client's responsibility to inform Barrett of any individual's job status as "exempt" or "nonexempt" under federal or state wage and hour laws and to be in compliance with all federal and state wage and hour laws.

For purposes of this Agreement, Client shall be the employer of Employees for all purposes, except as specifically set forth in Section 2 and shall bear all responsibility relating thereto. In addition to the foregoing, Client shall be the employer of the Employees for any law, rule, regulation, or order that may come into existence during the term of this Agreement that may impose duties, obligations, or restrictions on employers.

## 4. CLIENT SUPERVISION; PLACEMENT.

Client will be responsible for that portion of the day-to-day supervision and control of Employees to conduct Client's business, without which control Client would be unable to conduct its business and shall determine the general procedures to be followed by the Employees regarding the performance of their duties. Client shall also be responsible for the verification of employment eligibility of the Employees, subject to Barrett's right to confirm or reject the same. Specifically, Client is required to make every reasonable effort to ensure that Employees subject to this Agreement are (i) a citizen or national of the United States; (ii) a lawful permanent resident of the United States; or (iii) an alien authorized to work in the United States. Furthermore, Client shall fully comply with all state and federal laws related to the hiring and retention of Employees. Client has the right to request the removal of Employees upon reasonable notice.

Client will advise the Employees that the only vehicles authorized for use by Employees in connection with services performed for or on behalf of the Client under the terms of this Agreement are: automobiles, trucks, vans, and other authorized four wheel motor vehicles and that the use by Employees of motorcycles, scooters, mopeds, and other motor driven cycles are strictly prohibited. Client acknowledges and agrees that Barrett shall have no liability or obligation to Client, Employee, or any person for any injury or damage to an Employee or by an Employee or to others that may have occurred while an Employee used or was riding (driver or passenger) a motorcycle, scooter, moped, or other motor driven cycle in connection with services performed for or on behalf of the Client. Client shall defend, indemnify, and hold Barrett harmless from any damage, loss, or claim resulting from or arising out of an Employee's use (driver or passenger) of a motorcycle, scooter, moped, or other motor driven cycle in violation of this Section 4.

Except as allowed by compliance with Section 6 regarding insurance coverage, no Employees shall be permitted in or on the private aircraft of the Client in any capacity as an Employee, including as a pilot, passenger, or any other capacity or designation as an employee.

## 5. WORKERS' COMPENSATION INSURANCE; WORKPLACE HEALTH AND SAFETY.

Client agrees that, as defined under applicable state workers' compensation law, it shall do all acts necessary to permit Barrett to comply with all workers' compensation laws and related laws and to provide workers' compensation insurance benefits for the Employees through a qualified insurance writer or writers, or through self-insurance. Client shall (i) establish workers' compensation reporting procedures satisfactory to Barrett, which shall require Client to forward notice of injuries or claims for such injuries immediately to Barrett and the insurance carrier; (ii) cooperate in the workers' compensation insurance application process by providing to Barrett or to the selected insurance company all forms and applications, properly completed and executed and any and all other information required or requested by such insurance company during the application process and thereafter; (iii) cooperate in the administration and processing of workers' compensation

claims, and (iv) complete and file all required reports with regard to all Employees covered under this Agreement. Client shall comply with all health and safety laws, regulations, ordinances, directives, and rules imposed by Barrett, controlling federal, state and local governments, and will immediately report all Employee accidents and injuries to Barrett that result in a job or duty modification or absence by any Employee. Client shall provide the Employees with adequate training, supervision, and instruction to meet the requirements of federal, state, and local laws. Client agrees to comply at its expense with any specific directives from Barrett or any government agency having jurisdiction over the workplace, health, and safety. Client shall provide a safe workplace for the Employees and Client shall provide and ensure use of all required personal protective equipment. Barrett and Barrett's insurance carriers shall have the right to inspect Client's premises to review Client's safety practices at the workplace. In no event shall the right to inspect the workplace or the exercise or nonexercise thereof diminish or affect the Client's obligations, including any of Client's indemnifications of Barrett contained herein, to provide a safe workplace for the Employees and its obligations to Barrett.

**6. LIABILITY INSURANCE.**

Client shall furnish and keep in full force and effect at all times during the term of this Agreement a comprehensive general liability insurance in a responsible company with coverage for bodily injury, personal injury, property damage liability, and medical payment with a per occurrence and general aggregate limit of not less than $1,000,000, which insurance coverage shall be on a primary and noncontributory basis. In the event an Employee is assigned to fill a job function requiring said Employee to operate a vehicle for Client, whether the vehicle is owned by the Client or the Employee, Client shall furnish, for vehicles owned or controlled by Client, and the Client shall cause the Employee to furnish, for vehicles owned or controlled by Employee, vehicle liability insurance insuring against public liability for bodily injury and property damage with a minimum combined single limit of $1,000,000, which insurance coverage shall be on a primary and noncontributory basis. The vehicle liability insurance shall include uninsured motorist coverage and in states where "no-fault" laws apply, Personal Injury Protection (PIP) or equivalent coverage shall be required. Client and/or Employee, as the case may be, shall provide Barrett with proof of insurance in advance of an Employee's use of a vehicle pursuant to this Agreement. Barrett shall be named as an additional insured on all of the above policies and the insurance carrier shall issue a Certificate of Insurance providing for not less than 30 days' advance notice of cancellation or material changes.

If the Client or an affiliate of Client uses or operates a private aircraft in connection with the business activities or operations of the Client, no Employee shall be permitted to be a pilot, passenger, or be engaged in any capacity as an employee in or on such private aircraft, unless and until Client has provided to Barrett proof of appropriate and adequate liability insurance coverage that insures any such Employee for bodily injury, plus property damage and names Barrett as an additional insured. The insurance carrier shall issue a certificate of insurance providing for not less than 30 days' advance notice of cancellation or material changes.

## 7. ADVANCEMENT OR REIMBURSEMENT OF EMPLOYEE EXPENSES.

At the express written request of Client, Barrett, on behalf of Client, will make allowances, advance funds, or reimburse Employees for expenditures made by Employees in connection with services performed for or on behalf of the Client.

Barrett and Client agree that Client shall maintain and administer an accountable plan for all advances, allowances, or reimbursements made to Employees. The Client's accountable plan shall be in compliance with all applicable laws, including, but not limited to, IRC Sections 62 and 274, as amended, and the Regulations thereunder. The accountable plan shall require that the advances, allowances, or reimbursements (i) have the necessary business connection; (ii) be substantiated by adequate records of sufficient evidence, and (iii) paid under the arrangement in excess of the expenses substantiated be returned by the Employee to the Client within a reasonable time. Any advances, allowances, or reimbursed expenses paid to the Employees are considered as made by Client and pursuant to Client's accountable plan. Barrett is Client's paying agent in connection with Client's accountable plan.

Barrett does not and shall not maintain an accountable plan for the Employees that are the subject of this Agreement.

If it is determined that all or a portion of an advance, allowance, or reimbursement does not satisfy the required standards of the Client's accountable plan, then the applicable portion not meeting such standards will be treated as a payment by the Client pursuant to a nonaccountable plan. Amounts treated as paid under a nonaccountable plan are included in the Employee's income and must be reported as wages or other compensation on the Employee's W-2 and are subject to withholding and payment of employment taxes. It shall be the responsibility, obligation, and liability of Client to properly report, withhold, and pay all amounts that are treated as payments under a nonaccountable plan. Barrett shall not have any responsibility, obligation, or liability in connection with reporting or withholding any amounts that are determined to be made pursuant to a nonaccountable plan.

The allocation of responsibility set forth in this Section 7 represents a variance from the compliance, withholding, reporting, and payment responsibilities as outlined in Section 2 above. Client acknowledges the assumption of such responsibilities and liabilities and agrees to take all action necessary to satisfy such responsibilities and liabilities.

In the event there should be any claim, demand, audit, deficiency, notice of proposed adjustment, levy, allegation, suit, including claims for taxes, interest, and penalties, or any action whatsoever relating to advances, allowances, or reimbursements paid to Employees ("Tax Claims") against Barrett or Client by the Internal Revenue Service ("IRS"), any state or local government, or any other party, it shall be the sole and exclusive responsibility and liability of Client to satisfy, comply, and pay all amounts due as asserted in such Tax Claim. Client agrees to defend and indemnify Barrett and hold Barrett

harmless from any and all Tax Claims relating to advances, allowances, and reimbursements paid to Employees.

## 8. CLIENT DISCLOSURES.

Client has made complete disclosure and will continue to disclose to Barrett throughout the term of this Agreement all facets of (i) any sort of government investigation, inquiry, lawsuit, or other adversary proceeding and the current status thereof; (ii) its previous and current employment relationships with the Employees, including, specifically, all benefits provided Employees, all employment agreements, all restrictive agreements, all noncompetition agreements, a complete and current description of all qualified and nonqualified employee benefit plans or agreements, a complete and accurate description of any collective bargaining agreements, labor contracts, negotiations with unions, any relationship defined under IRC ' 414(n), job positions, Employee classifications, employment, and personnel information, and (iii) the place of work, including plant name, address and all states to which each Employee travels or is assigned, prior to such travel or assignment. Barrett, in its sole discretion, and in writing, may accept the employment of a person as an Employee and the state to which such Employee is to be assigned prior to such travel or assignment being covered by this Agreement. Barrett shall deliver a separate Schedule "31" for each state covered by this Agreement. In the event Client fails to timely notify Barrett of the Client's employment and assignment of any person to a place or state, Barrett may, in its sole discretion, in writing, and without limiting its ability to seek any other remedy, elect to retroactively process payroll and perform any other necessary administrative functions normally provided for employees of Client pursuant to this Agreement and may retroactively charge Client for all appropriate charges (including governmental penalties) as if previously agreed to by Barrett. Such election by Barrett shall not retroactively create an employment relationship with Barrett, but Barrett may elect to hire such a person on the date of notification of employment and assignment by Client. Client warrants that all statements and disclosures made in connection with this Agreement are complete and without exception and includes the period covering the last six (6) years. There is no fact peculiar to the Client which the Client has not disclosed to Barrett in writing which adversely affects nor will adversely affect the Client's business, assets, profits, or the Employees covered by this Agreement. Client warrants that it has made such complete disclosure, and shall indemnify, defend, and hold Barrett harmless from any and all damage, costs, claims, expenses, or legal consequences arising from or caused by any inaccurate, incomplete, or incorrect disclosures.

## 9. PAYMENT OF BARRETT FEES.

Client hereby agrees to pay Barrett a fee as determined by Barrett for services performed by Barrett and for all legally required employee costs attributable to an Employee, wages, payroll taxes, insurance and self-insurance costs, external and internal charges and assessments, and benefit costs incurred for or payable to all Employees. Said fee and the payment terms thereof are specified in the Fee Schedule "1" attached hereto, which is hereby made a part of this Agreement. Client's fee obligation to Barrett shall continue during normal periods of Employee absence for vacation, sick leave, legal holidays, and

emergency situations. The fee shall be payable during the entire term of this Agreement, and any unpaid fees shall be immediately due upon termination of this Agreement. Barrett shall be entitled to any savings it is able to create or which may occur during the term of this Agreement without adjustment to Barrett's fees as provided for in Fee Schedule "1." Client recognizes that the failure to make payments when due will result in additional expense to Barrett. Client therefore agrees to pay a late charge in the amount of five percent (5%) of any delinquent payment to compensate Barrett for such additional expenses. In the event that any payment made by Client in the form of a check, draft, or order for the payment of money has been dishonored for lack of funds or credit to pay the same or because payment has been stopped, Client shall pay to Barrett, in addition to the amount of the dishonored payment and the aforementioned late charges, if applicable, a charge equal to the greater of (i) five percent (5%) of the amount of said dishonored payment, or (ii) $500. The charges shall be assessed for each such default, shall be due and payable with such payment without notice or demand being required therefore. The imposition or collection of said charges from time to time shall not be in lieu of any other remedy of Barrett, and the failure to collect the same shall not constitute a waiver of Barrett's right to require such payment for past or future defaults nor Barrett's rights to declare a default of the entire Agreement. An unpaid balance will also be subject to a periodic charge of the lesser of one and one-half percent (1 1/2%) per calendar month or the maximum amount permissible by law, until paid. Time is of the essence of this Agreement. Barrett reserves the right to suspend or terminate all of its obligations and services due to Client under this Agreement until full payment has been made of any amount past due.

**10. CLIENT DEPOSIT.**

When required by Barrett and simultaneously with the execution of this Agreement, Client has deposited with and hereby grants to Barrett a security interest in the deposit described in Fee Schedule "1" for the performance by Client of all of the obligations and conditions required to be performed by Client under this Agreement. The deposit may be commingled with other funds of Barrett and shall bear no interest. In the event that Client does not make a payment which is due in accordance with the terms of this Agreement, Barrett shall have the option, without prejudice to any other remedy which Barrett may have by law or under this Agreement, to draw upon the deposit or so much thereof, as may be necessary to pay Barrett the sum then due from Client to Barrett. Within 24 hours from the time that Barrett draws against the deposit, Client shall restore the deposit to the original amount. In the event that the deposit is not restored to the original amount within said 24-hour period, Barrett may consider the failure to restore said deposit as a breach of this Agreement. In the event any bankruptcy, insolvency, reorganization, or other creditor-debtor proceeding shall be instituted by or against Client, its successors or assigns, the aforesaid deposit shall be first applied to the payment of any obligations or accounts due to Barrett from Client for the time prior to the institution of such proceedings. The deposit shall next be applied to those Client obligations owing to Barrett for obligations subsequent to the institution of such proceedings and the balance of the deposit may be applied to Barrett's direct cost and actual damages and reasonable attorneys fees arising from the said bankruptcy, or other creditor-debtor proceeding. In the event that Client shall fully and

faithfully comply with all of the covenants and agreements contained in this Agreement and pay all of the obligations as they fall due and all other sums payable by Client to Barrett, the deposit shall be returned to Client within 60 days from the date of termination of this Agreement.

**11. INDEMNIFICATION.**

Client agrees to appear, defend, and indemnify Barrett and hold Barrett harmless from any claims of whatever kind or nature made by Employees, third parties, or anyone whomsoever resulting from any act, failure to act, conduct, or default of Employees or Client, including, specifically and without limiting the generality of the foregoing, any and all claims, wages, benefits, penalties, attorneys fees, or other charges or expenses that may result or arise from a Client default of any duties, obligations, or responsibilities of Client under this Agreement or any breach of any representation or warranty by Client. Client agrees that if any claims are made against Barrett by a person or such person's beneficiaries or anyone otherwise alleging to be entitled to recover damages or benefits from injuries, diseases, symptom complexes, or similar conditions arising out of and in the course of employment: (i) for any Employee who initiates a claim pursuant to workers' compensation laws or any other basis that was denied or was not a claim covered by workers' compensation insurance or workers' compensation self-insurance; (ii) for any employee of Client who was not an Employee at the time of the injury, or (iii) for an injury to an Employee while Client is in default of this Agreement, that Client will indemnify, defend, and hold Barrett harmless from such claim or claims. For the limited purpose of the indemnity and duty to defend Barrett contained in the foregoing sentence, Client expressly waives the exclusive remedy provision of the applicable state workers' compensation law, and any other provision of law restricting, limiting, or prohibiting indemnity or contribution. The Client's duty to defend includes the duty to pay reasonable attorney's fees incurred by Barrett in defending such claims, and the Client's duty to indemnify includes the duty to pay any award imposed by an administrative agency or judgment or settlement reached in any dispute or court action. Client shall defend, indemnify, and save Barrett harmless of all liability, loss, damage, claims, or other responsibility incurred by Barrett resulting from Client's failure to provide or maintain the insurance required by this Agreement. Client acknowledges that its business operations and activities, the legitimate performance of which and for which it has engaged the services of Employees, could expose third persons, who are not parties to this Agreement, to potential risk, which risk might entail liability to either Client or Barrett. Client specifically, without reservation, and without limitation on any previous or subsequent provision of this Agreement, agrees to indemnify, hold harmless, and defend Barrett for any such liability to third parties. Each party agrees to notify immediately the other of the assertion or possible assertion of any and all such claims as described above, and to cooperate with each other in the investigation and defense of said claims. With specific regard to this Section, time is of the essence. The obligations of this Section shall survive termination of this Agreement.

## 12. TERM OF AGREEMENT.

The term of the Agreement shall be for one (1) year and shall automatically renew for additional one (1) year periods. The Fee Schedule may be adjusted during the term of the Agreement, subject to either party's right to terminate on 30 days notice if a party does not agree to the adjusted Fee Schedule. Either party may terminate this Agreement at any time and for any reason upon 30 days' written notice.

This Agreement shall terminate effective immediately upon any default of Client, regardless of when notice is given. However, if Client is in default due to failure to timely pay fees, at Barrett's election, the termination date shall be retroactive to the date for which services were last fully paid. As of the appropriate termination date, Barrett will be relieved of all employment related, tax withholding, tax reporting, tax depositing, and any other Barrett obligations under this Agreement with respect to the Employees. If a default is cured and Barrett elects to reaffirm the Agreement, Client shall pay a reinstatement fee of five percent (5%) of the most recent gross billing under this Agreement.

## 13. DEFAULT.

Default by Client is defined as: (i) failure of Client to pay the fees required by this Agreement, when due; (ii) Client's failure to comply within 30 days with any directive of Barrett, when such directive is issued or made necessary by (1) a federal, state, or local government body, department, or agency, (2) an insurance carrier providing coverage to Barrett and/or its employees, and/or (3) specific circumstances which currently or potentially affect Barrett, Client, or the Employees; (iii) direct payment of taxable wages by Client to the Employees for services contemplated by this Agreement, except for those persons that are not subject to the terms and conditions of this Agreement as described at Schedule "13," provided that such persons are not listed as an Employee on Schedule "13," Part A, and those persons who provide independent contractor services to Client; (iv) commission or omission of any act that usurps any right or obligation of Barrett as an employer of the Employees covered by this Agreement; (v) violation by Client of any provision of this Agreement; (vi) any representation, warranty, or covenant made by the Client herein is determined to be inaccurate or untrue; (vii) if petition in Bankruptcy is filed by or against Client, or if Client shall have made an assignment for the benefit of creditors, shall have been voluntarily or involuntarily adjudicated bankrupt by any court of competent jurisdiction, or if a petition is filed for reorganization of Client, if a receiver shall have been appointed for all or a substantial part of Client's business, or if Client shall have permitted or suffered any attachment, levy, or execution to be made or levied against all or a substantial part of the property of Client, or if Client is dissolved, or in the event that Barrett shall deem itself insecure, or upon the nonpayment of taxes on property, or premiums on any insurance required hereunder, or upon any other default of warranty, or information of the Client pertaining to this Agreement is misleading; (viii) Client's decision to go out of business; (ix) Client's decision or actual action in ordering a "plant closing" or a "mass layoff" at any "facility" (with 50 or more full-time employees) at which Employees covered under this Agreement are working, as these terms are defined in the WARN Act (Client hereby undertakes to inform Barrett immediately of any such action or decision constituting

a "mass layoff" or "plant closure," whether or not yet implemented. Client hereby agrees to indemnify, defend and hold Barrett harmless from any and all liability for violation of the WARN Act. It is understood that Client shall be solely and exclusively responsible for all steps necessary to avoid or minimize, or to satisfy, liability under the WARN Act); (x) Client's decision to close a facility at which any Employees covered by this Agreement are engaged in work, whether or not such closing constitutes a violation of the WARN Act; or (xi) Client's decision to lay off more than 25 percent of the work force at any facility at which Employees covered by this Agreement are engaged, unless Client has notified Barrett at least one (1) payroll period in advance of such decision.

Default by Barrett is defined as: (i) failure of Barrett to make payroll and appropriate withholdings in connection with the Employees; (ii) failure of Barrett to maintain workers' compensation insurance or workers' compensation self-insurance for the Employee; or (iii) Barrett's failure to cure any breach or obligation required of this Agreement within 30 days of written notice from Client.

**14. COBRA.**

If Client does not sponsor a group health plan, Barrett will make COBRA continuing coverage available to eligible Employees and qualified beneficiaries as part of its sponsored group health plan(s) subject to COBRA or state continuing coverage obligations as required by such state statutes and regulations. In the event there is a qualifying event under ERISA ' 603 and IRC ' 4980B or state continuing coverage statutes, Client shall be responsible for notifying Barrett as provided in ERISA ' 606(a)(2) and IRC ' 4980B(f)(6)(B) or state continuing coverage statutes, and Barrett shall be responsible for providing any qualified beneficiary with notice of their COBRA continuing coverage rights as required by ERISA ' 606(a)(4) and IRC ' 4980B(f)(6)(D) or state continuing coverage statutes.

Notwithstanding the foregoing, even if Barrett is administering the group health plan, or assisting with administration, for group health plans subject to COBRA that are sponsored by Client where Barrett is not a co-sponsor for such group health plan subject to COBRA or state continuing coverage statutes, Client shall be solely and exclusively responsible and liable in connection with all notice requirements, providing COBRA continuing coverage, and all administration compliance and liability associated with such group health plan subject to COBRA or state continuing coverage statutes. Client shall also be solely responsible for providing such COBRA continuing coverage for Employees or qualified beneficiaries so as to avoid the excise tax under IRC § 4980B. [The definition of employee shall be determined without regard to the service requirement in IRC § 414(n) (2) and (4)]. If Client does not provide COBRA continuing coverage so as to avoid the excise tax under IRC § 4980B or any other claims, Client shall be liable for such tax and such other claims, in full.

In addition, Client agrees that upon termination or expiration of this Agreement, Client will immediately replace all group benefit plans offered by Barrett. Should Client at any time obtain any form of group employee benefit coverage from an insurance carrier, another employee leasing company/professional employer or otherwise, which will provide

group health or life insurance coverage to any of the Employees, Client will assume full responsibility for the continuation of coverage under COBRA for the current COBRA participants in addition to any Employees who may elect COBRA coverage under Barrett's plans during the term of this Agreement, for the remainder of their COBRA eligibility period. Nothing in this provision shall be construed or interpreted as precluding or limiting Barrett's right to pursue damages in a court of law or equity, which arose as a result of Client's failure to obtain and provide insurance as set forth herein.

Client agrees to indemnify and hold Barrett harmless from any liability, expense, or tax which may result from Client's failure to notify Barrett of a qualifying event or failure to provide notice of COBRA continuing coverage or to provide the COBRA continuing coverage as provided in this Section 14.

**15. EMPLOYEE INFORMATION.**

Barrett and Client agree that they have a joint and mutual interest in the integrity of the personnel and other employment information generated by or pursuant to this Agreement for the Employees. Client agrees to undertake at its own expense all reasonable data integrity, verification, maintenance, and preservation procedures requested or directed by Barrett. At all times, Client and Barrett shall own jointly, indivisibly, and nonseverally said information regarding the Employees.

**16. CHANGE OF LAW.**

Notwithstanding any other provision in this Agreement to the contrary, in the event there should be a change in any law, rule, regulation, ordinance, or tax that increases the financial obligations or potential financial obligations of Barrett in carrying out the provisions of this Agreement, then Barrett shall be permitted to amend this Agreement to provide for a pass through of the cost of such financial obligation to Client. Barrett shall provide written notice of the amendment and unless Client shall object thereto, in writing, within 30 days of said notice, the amendment shall become part of this Agreement. If Client objects, Barrett or Client may terminate this Agreement, effective on the 30th day after notice of the amendment.

**17. CLIENT RETIREMENT BENEFIT PLANS.**

If necessary, Client shall modify, amend, terminate, or freeze its retirement benefit plan in order to be compliance with the IRC and any applicable federal, state, and local regulations thereunder. Client shall bear its own expenses attendant to the compliance, administration, modification, amendment, termination, or freezing of its retirement benefit plan. Client shall defend, indemnify, and hold harmless Barrett and its officers, directors, and employees from and against any and all claims, suits, actions, damages, liabilities, fines, taxes, penalties, losses, or interest, including reasonable legal fees, that may arise or result from Client's failure to comply with Section 17 of this Agreement.

Upon completion of the execution of this Agreement between Client and Barrett, Client may apply to adopt into the Barrett sponsored multiple employer 401(k) plan. Client should seek advice from independent legal counsel prior to the adoption of the Barrett sponsored multiple employer 401(k) plan, with respect to any effects of such adoption.

If Client adopts the Barrett plan, Client acknowledges that it has reviewed the adoption agreement and plan for the Barrett plan and agrees to comply with all of the obligations and responsibilities set forth in the terms of said adoption agreement and plan.

If Client chooses to retain its retirement benefit plan, Client shall be solely and exclusively responsible and liable in connection with all requirements, compliance with all laws, including, but not limited to, ERISA, and all administration compliance and liability associated with such retirement plan even if Barrett is administering the retirement plan, or assisting with administration, or providing employer match contributions information. Client shall defend, indemnify, and hold harmless Barrett and its officers, directors, and employees from and against any and all claims, suits, actions, damages, liabilities, fines, taxes, penalties, losses, or interest, including reasonable legal fees, that may arise or result from Client's failure to comply with this provision of Section 17 of this Agreement.

**18. CLIENT COLLECTIVE BARGAINING AGREEMENTS.**

Pursuant to this Agreement, Client has made a complete disclosure of all of its collective bargaining agreements, labor contracts, and negotiations with unions and their bargaining agents. Client warrants to Barrett and agrees to indemnify and hold Barrett harmless for any liability Barrett may incur due to Client's collective bargaining agreement with the union, if any. Specifically, however, Client and Barrett agree that both intend to avoid the incursion of any withdrawal liability for Barrett, as that term is defined under the Multiemployer Pension Plan Act. Accordingly, Client agrees to indemnify, defend, and hold Barrett harmless from any such potential liability, as well as any other liability which might arise purely because of Barrett's role as an employer of the Employees covered by a collective bargaining agreement.

**19. WAIVER OF CONDITIONS.**

Any of the conditions set forth in this Agreement may be waived, in whole or in part, by the party whom the condition benefits, at such party's sole option. Any such waiver shall be in writing, and no such waiver or failure to insist on strict compliance with any covenant, condition, or agreement herein shall operate as a waiver of, or estoppel with respect to any subsequent or other failure.

**20. NOTICE.**

Any notice, request, instruction, or other document or instrument required or permitted by this Agreement shall be in writing and shall be given to either Barrett or Client and shall be deemed to have been given on the date when such notice, request, instruction, or other document or instrument is personally delivered or 48 hours after deposited in the United States Mail, registered or certified, postage prepaid and addressed to the appropriate party at the address set forth on page 1 of this Agreement or to such other address as may be given by notice as provided herein.

**21. SUCCESSORS AND ASSIGNS.**

This Agreement shall be binding upon and inure to the benefit of Barrett and Client and their respective successors, heirs, devisees, transferees, and assigns.

**22. GOVERNING LAW.**

This Agreement shall be governed by and construed in accordance with the laws of the state in which Client and Barrett agree, prior to the time of commencement of work, that each Employee is to be employed. Notwithstanding the foregoing, Barrett and Client agree that the state or federal law of any interested (or otherwise constitutionally permissible) jurisdiction shall apply to any questioned provision of this Agreement, if such law would give effect to the provision.

**23. CONSENT TO JURISDICTION; WAIVER OF IMMUNITIES.**

Client and Barrett hereby irrevocably submit to the exclusive jurisdiction of any state or federal court sitting in Portland, Oregon, in any action or proceeding brought to enforce or otherwise arising out of or relating to this Agreement and irrevocably waive to the fullest extent permitted by law any objection to which they may now have to the laying of venue in any such action or proceeding in any such forum, and hereby further irrevocably waive any claim that any such forum is an inconvenient forum. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law.

**24. ENTIRE AGREEMENT; AMENDMENT.**

This Agreement and the collateral documents and instruments called for herein to consummate this transaction, comprise the entire agreement of the parties and may not be amended or modified, except by written agreement of the parties. No provision of the aforementioned agreement may be waived, except in writing, and only in the specific instance and for the specific purposes for which given.

**25. SCHEDULES AND EXHIBITS.**

The schedules and exhibits attached hereto and referred to herein are part of this Agreement for all purposes. The terms which are defined in this Agreement shall have the same meaning when used in the schedules hereto.

**26. REMEDIES AND DAMAGES.**

If any party defaults in the performance of any term, covenant, condition, or obligation under this Agreement, the nondefaulting party may pursue any and all remedies available to such party. The rights and remedies provided herein are cumulative and not exclusive of any right or remedy provided at law. Client expressly acknowledges that Barrett shall not be liable for Client's loss of business goodwill, profits or other consequential, special or incidental damages.

**27. SEVERABILITY.**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall as to such jurisdiction be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforcement of any such provision in any other jurisdiction. To the extent permitted by applicable law, the parties waive any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

**28. ATTORNEYS FEES.**

In the event it is necessary for any party hereto to institute a proceeding in connection with this Agreement or breach thereof, the prevailing party in such a proceeding shall be entitled to reimbursement for its reasonable attorneys costs, expenses, attorneys fees incurred, or any other money charges, including fees incurred on any appeal or review. If the services of an attorney are required by any party to enforce a judgment rendered in connection with this Agreement, the judgment creditor shall be entitled to reasonable attorneys fees, costs and other expenses, and such fees, costs, and expenses shall be recoverable as a separate item. This provision shall be severable from all other provisions of this Agreement, shall survive any judgment, and shall not be deemed merged into the judgment.

**29. GENDER.**

In construing this instrument and whenever the context hereof so requires, the masculine gender includes the feminine and neuter and the singular includes the plural.

**30. SAFETY INCENTIVE PLAN.**

The Safety Incentive Plan is marked as Schedule "30." Upon execution of this Agreement, Barrett, by checking the appropriate box below, will indicate whether or not the Safety Incentive Plan will be available to the Client. If the Safety Incentive Plan is available, it shall be incorporated in and be made a part of this Agreement. If the Safety Incentive Plan is not available, it shall not be part of this Agreement and have no force or effect.

☑ Safety Incentive Plan Available

☐ Safety Incentive Plan Not Available

**31. SCHEDULE 31 AMENDMENT.**

This Agreement shall be superseded and controlled by the terms of one or more Schedule "31," including any terms of Schedule "31" that are inconsistent with this Agreement. Schedule "31" sets forth terms specific to each state to which this Agreement applies, and each Schedule "31," if more than one, shall apply to Employees employed in the state set forth on the individual Schedule "31."

**32. PERSONAL GUARANTEE.**

The party identified as Guarantor on the signature page of this Agreement, knows that Barrett would not perform employer and staffing services for Client unless Guarantor guarantees Client's performance. Guarantor has requested Barrett to enter into the Agreement with the Client. Guarantor has substantial interest in making sure that Barrett serves said Client. Guarantor guarantees the full performance, including payment of all sums due hereunder and the indemnities of this Agreement by the Client. This guarantee is absolute and without any condition. This guarantee includes, but is not limited to, performance of all obligations under this Agreement, and payment of all fees, attorneys fees and other money charges.

**33. HEADINGS.**

The paragraph and subparagraph headings used in this Agreement are for convenient reference only and are not intended to affect the meaning or construction of any provision of this Agreement.

**34. AUDIT.**

Client specifically grants Barrett the right to audit and/or review any and all of its records relating to the Employees and any other requirement of Client under this Agreement. Reasonable access to these records will be granted during normal business hours upon three (3) days' notice to Client by Barrett.

**35. AUTHORIZATION.**

Barrett and Client each represent and warrant to the other that this Agreement has been duly authorized, executed, and delivered on behalf of each such party and constitutes a valid and binding agreement of said parties.

**36. BINDING EFFECT.**

This Agreement shall not be binding until signed by Barrett's President or by Barrett's President's duly authorized representative.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the day and yearbelow each of their signatures.

Barrett:

Barrett Business Services, Inc.

By ____________________
Signature

Name: ____________________
Print Name of Person Signing Agreement

Title: ____________________
Print Title of Person Signing Agreement

Date: ____________________
Date Person Signed Agreement

Client:

Johnson Pools Inc.
Print Client Name - Same as on Page 1

By [signature]
Signature

Name: Matthew Perezchica
Print Name of Person Signing Agreement

Title: PRESIDENT
Print Title of Person Signing Agreement

Date: OCT. 15, 2012
Date Person Signed Agreement

Guarantor:

Matthew Perezchica
Print Individual Guarantor's Name

[signature]
Signature of Guarantor

OCT. 15, 2012
Date Guarantor Signed Agreement

| To Be Completed by BBSI Headquarters: | |
|---|---|
| Effective date of co-employment | First contract period end date |

**35. AUTHORIZATION.**

Barrett and Client each represent and warrant to the other that this Agreement has been duly authorized, executed, and delivered on behalf of each such party and constitutes a valid and binding agreement of said parties.

**36. BINDING EFFECT.**

This Agreement shall not be binding until signed by Barrett's President or by Barrett's President's duly authorized representative.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the day and yearbelow each of their signatures.

Barrett:

Barrett Business Services, Inc.

By ____________________
Signature

Name: ____________________
Print Name of Person Signing Agreement

Title: ____________________
Print Title of Person Signing Agreement

Date: ____________________
Date Person Signed Agreement

Client:

Johnson Pools Inc.
Print Client Name–Same as on Page 1

By [signature]
Signature

Name: Tina Feeney
Print Name of Person Signing Agreement

Title: CFO
Print Title of Person Signing Agreement

Date: 10/15/12
Date Person Signed Agreement

Guarantor:

Tina Feeney
Print Individual Guarantor's Name

[signature]
Signature of Guarantor

10/15/12
Date Guarantor Signed Agreement

| To Be Completed by BBSI Headquarters: | |
|---|---|
| Effective date of co-employment | First contract period end date |

## FEE SCHEDULE "1"

## PAYMENT RATES AND PAYMENT TERMS

| State | Workers' Compensation Code | Applicable Pay Types (e.g. All, All except X or specific pay types) | Fee (as a % of payroll) |
|---|---|---|---|
| CA | 5027 - Masonry less than $24/hr | ALL | 29.10 |
| CA | 5028 - Masonry $24/hr or more | ALL | 22.91 |
| CA | 5183 - Plumbing less than $24/hr | ALL | 24.21 |
| CA | 5187 - Plumbing $24/hr or more | ALL | 20.60 |
| CA | 5190 - Electrical less than $28/hr | ALL | 26.08 |
| CA | 5348 - Tile, Stone, Mosaic, Terrazzo | ALL | 21.92 |
| CA | 6218 - Excavation NOC less than $24 | ALL | 27.93 |
| CA | 6220 - Excavation NOC $26/hr or more | ALL | 20.33 |
| CA | 8017 - Stores Retail NOC | ALL | 20.68 |
| CA | 9097 - Pool Cleaning/Servicing | ALL | 20.49 |
| CA | 1000 - Owners/Officers | ALL | 10.80 |
| | | | |
| | | | |
| | | | |
| | | | |

Payment Terms

Security deposit: $ n/a

Barrett's fee schedule is conditioned upon the promise of Client to pay all invoices billed at the time which the invoice is received. Unless otherwise approved by Barrett, payment is due via Electronic Funds Transfer (EFT) prior to the distribution of payroll. Any form of payment that is returned for insufficient funds will result in immediate cancellation of this Agreement.

## SCHEDULE "13"

Unless otherwise identified on this Schedule "13," Part A, all persons that can be excluded from being subject to the terms and conditions of this Agreement, as allowed by specific exemption(s) of applicable state workers' compensation laws are, by default, excluded from the application of this Agreement. A typical state workers' compensation law exempts owners, officers, and other identified persons from mandatory workers' compensation coverage. Specific exclusions are defined by the workers' compensation laws governing each State.

PART A: NAMES OF EMPLOYEES WHO, BY DEFAULT COULD HAVE BEEN LEGALLY EXCLUDABLE PERSONS, ARE TO BE INCLUDED UNDER THE TERMS AND CONDITIONS OF THIS AGREEMENT

Section A1 - Included for all terms and provisions of this Agreement:

Section A2 - Included for all terms and provisions of this Agreement with the exception of workers' compensation coverage:

Matthew Perezchica

Tina Feeney

Randy Mund

## SCHEDULE "30"

Safety Incentive Plan

Barrett has implemented a Safety Incentive Plan that rewards safety, as evidenced through lower workers' compensation claims experience. To promote safety in the workplace, Barrett will provide an annual cash safety incentive of actual eligible payroll as outlined below:

| State | Workers' Compensation Code | Eligible Safety Incentive Rate |
|---|---|---|
| CA | 5027 - Masonry less than $24/hr | 4.00% |
| CA | 5028 - Masonry $24/hr or more | 2.74% |
| CA | 5183 - Plumbing less than $24/hr | 2.91% |
| CA | 5187 - Plumbing $24/hr or more | 2.11% |
| CA | 5190 - Electrical less than $28/hr | 2.31% |
| CA | 5348 - Tile, Stone, Mosaic, Terrazzo | 2.28% |
| CA | 6218 - Excavation NOC less than $24 | 2.82% |
| CA | 6220 - Excavation NOC $26/hr or more | 2.11% |
| CA | 8017 - Stores Retail NOC | 1.67% |
| CA | 9097 - Pool Cleaning/Servicing | 2.08% |
| CA | 1000 - Owners/Officers | n/a |
| | | |
| | | |
| | | |
| | | |

This incentive will bear a direct relationship to the successful reduction/maintenance of compensable workers' compensation injuries. The maximum incentive will be reduced on a dollar-for-dollar basis by annual claims costs incurred* to a minimum incentive of $0.

*Actual cash paid (over the life of each claim) for time loss, medical treatment, legal and administrative fees, claims investigations and other direct or indirect costs.

After each completed one-year period, earned safety incentives will be paid within 60 days under the following terms and conditions:

(1) Final payment for actual earned safety incentive is determined if no losses are incurred or following the closure of all claims incurred for the contract period.

Waiver of Right to Safety Incentive. Client hereby waives any and all rights to safety incentives as described above:

(1) For any contract year in which either Client or Barrett terminate this Agreement prior to the end of such year.

(2) If Client is in default of this Agreement.

In the event that additional claim expense is incurred for injuries occurring during a contract period for which a safety incentive payment has already been made, that additional claim expense shall be charged against the then current contract period's earned safety incentive. The amount charged to the current contract period's safety incentive will be limited to the safety incentive amount previously paid associated with the contract period in which the injury occurred.

**SCHEDULE "31"**

**CALIFORNIA**

**1. This Agreement shall be governed by and construed in accordance with the laws of the state of California.**

**2. Addendum to Section 2. Barrett is a Leasing Employer, as the term is defined by California Unemployment Insurance Code § 606.5.**

**3. All reference to workers' compensation shall be to California Labor Code §3200 et seq., the California workers' compensation and insurance law for all Employees whose employment is governed by the laws of California. This Agreement shall be effective for Employees assigned and authorized to work in the state of California.**

**4. To the extent Client or any Employees that are covered by this Agreement are subject to the City and County of San Francisco's Paid Sick Leave Ordinance ("SFPSLO"), it shall be the sole and exclusive duty and obligation of the Client to make such determination, as to its applicability and further to determine whether the Client is a "small business" under SFPSLO. If SFPSLO is applicable, Client shall be in compliance with SFPSLO and perform all functions of administration, recordkeeping, reporting, and payments.**

**5. To the extent Client or any Employees that are covered by this Agreement are subject to the City and County of San Francisco's Health Care Security Ordinance ("SFHCSO"), it shall be the sole and exclusive duty and obligation of the Client to make such determination, as to SFHCSO's applicability and further to determine whether the Client is a "small business" or "large business" for the purpose of the SFHCSO and compliance with the applicable health care expenditure rate schedule.**

**It shall be the Client's obligation to determine what means Client will adopt to satisfy the minimum expenditure requirement of SFHCSO which may include: health insurance, public health programs, health savings accounts, or direct reimbursement to Employees for qualified health expenses.**

**If SFHCSO is applicable, Client shall be in compliance with SFHCSO and perform all functions of administration, recordkeeping, reporting, and documenting hours worked and health care expenditures.**

**6. If the Client requests that Barrett make any payments to or for the benefit of Client or any Employee or perform any other act required under either the SFPSLO (paragraph (4) above) or SFHCSO (paragraph (5) above), such request shall be in writing and such payments made by Barrett and other act or service performed by Barrett for a fee shall be timely paid by Client in accordance with an applicable Barrett invoice.**

**7. The following provisions are applicable to Clients that are licensed by the California Contractors' State License Board:**

**(a) Notwithstanding any other provision of this Agreement, Barrett agrees to provide workers' compensation coverage through a certificate of self-insurance or through a qualified insurance carrier for all persons working for Client who may be deemed employees of Barrett or Client as defined by California Workers' Compensation laws.**

**(b) Barrett will notify the California Contractor's State License Board in writing and by e-mail within seven (7) days of the termination of the Agreement with Client.**

**Department of the Treasury**
**Internal Revenue Service**
**SBSE/Employment Tax**
IRS 300 North Los Angeles St
Los Angeles, CA 90012-3308

**Date:**
07/01/2025
**Taxpayer ID number (last 4 digits):**
2977
**Taxpayer name:**
BARRETT BUSINESS SERVICES INC
**Form number:**
941
**Years:**
202006 - 202109
**Person to contact:**
Jerry Tung
**Employee ID number:**
1000235414
**Contact telephone number:**
213-372-4615
**Contact fax number:**
877-210-1487

Holland & Knight LLP
Daniel Strickland
800 17th Street, NW, Suite 1100
Washington, DC 20006

Dear Daniel Strickland:

We are sending the enclosed material under the provisions of your power of attorney or other authorization we have on file. For your convenience, we have listed the name of the taxpayer to whom this material relates in the heading above.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

Jerry Tung Digitally signed by Jerry Tung Date: 2025.06.30 15:39:15 -07'00'

Revenue Agent

Enclosures:
☒ Letters 5376
☐ Reports
☐ Copy of Determination Letter
☐ Other

**Department of the Treasury**
**Internal Revenue Service**
**[SB/SE]**
300 North Los Angeles
Mail Stop 4504
Los Angeles, CA 90012

BARRETT BUSINESS SERVICES INC
8100 NE PARKWAY DRIVE, SUITE 200
VANCOUVER, WA 98662

**Date:**
07/01/2025
**Person to contact:**
Name: Jerry Tung
Employee ID number: 1000235414
Telephone: 213-372-4615
Fax: 877-210-1487
Hours: 9:00am - 4:30pm
**Taxpayer ID number:**
52-0812977
**Form:**
941
**Tax period(s) ended and Claim amount(s):**
202006, 202009, 202012
202103, 202106, 202109

**Response due date:**
8/4/2025

Dear: Taxpayer

We examined your adjusted or claim for refund return and propose:

Partial disallowance, as shown in the enclosed examination report(s), Form 4666, *Summary of Employment Tax Examination,* Form 4668, *Employment Tax Examination Change Report* or Form 4667, *Examination Changes - Federal Unemployment Tax,* if applicable. You can find an explanation of why we didn't allow your claim in full below or on the attached Form 886-A, *Explanation of Items.* If you accept our findings, sign and return the enclosed Form 2297, *Waiver of Statutory Notification of Claim Disallowance,* and Form 3363, *Acceptance of Proposed Disallowance of Claim for Refund or Credit,* in the enclosed envelope.

**Reason for disallowance**
See attached Form 886-A for reason.

If you disagree with our decision, you can request a meeting or telephone conference with the supervisor of the person identified in the heading of this letter. If you still disagree with our decision, you can request an Appeals conference by filing a small case request or a formal written protest (depending on the amount you owe). The enclosed Publication 5, *Your Appeal Rights and How To Prepare a Protest If You Don't Agree,* explains how to request an Appeals conference.

If you don't respond by the date listed in the heading of this letter, we'll process your case based on the adjustments shown in the enclosed examination report(s) and Form 886-A or the explanations given above.

If you have questions, you can contact the person whose name and telephone number are listed at the top of this letter.

Thank you for your cooperation.

Sincerely,

Derek Lee Digitally signed by Derek Lee Date: 2025.07.01 15:55:24 -07'00'

Derek Lee
Acting Manager on Behalf of Kathleen J. Orange
Acting Area Director, Examination-Employment Tax &
Southwest Area, SBSE

Enclosure(s):
Form 2504 and attachments
Form 886-A
Form 4666
Form 4667
Form 4668
Form 2297
Form 3363
Publication 594
Publication 5
Envelope

cc:

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

Claim For Refund (Employee Retention Credit)

| Tax Periods Under Examination | ERC Per Return* Unpaid | ERC Amount As Adjusted | ERC Amount Disallowed (Allowed) |
|---|---|---|---|
| 202006 | [redacted] | | |
| 202009 | | | |
| 202012 | | | |
| 202103 | | | |
| 202106 | | | |
| 202109 | | | |
| | | | |

ISSUE:

Whether Barrett Business Services is entitled to the Employee Retention Credit (ERC) for the amounts claimed on amended tax return Form 941x for the calendar quarter 202006 thru 202109.

FACTS:

[redacted]

[redacted]

BBSI (NASDAQ: BBSI) is a leading provider of business management solutions, combining human resource outsourcing and professional management consulting to create a unique operational platform that differentiates it from competitors. The Company's integrated platform is built upon expertise in payroll processing, employee benefits, workers' compensation coverage, risk management and workplace safety programs, and human resource administration. BBSI's partnerships help businesses of all sizes improve the efficiency of their operations. [redacted]

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

Per BBSI Web Site

What is a PEO?

And Why It Might Be the Smartest Move for Your Business Running a business comes with challenges—from payroll and compliance to hiring, employee disputes, and benefits administration. That's where a PEO, or Professional Employer Organization, can make all the difference.

A PEO can help you reduce risk, save money, retain talent, and scale with confidence—so you can focus on what you do best: growing your business.

What Does a PEO Do?

A PEO is a partner that helps small and mid-sized businesses manage essential HR and administrative functions. Through a model called co-employment, you retain full control over day-to-day operations and employee management, the PEO becomes the employer of record for tax and benefits purposes.

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

[redacted]

[redacted]

[redacted]

LAW

Summary of Applicable Laws

[redacted]

[redacted]

[redacted]

[redacted]

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer<br>BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)*<br>2977 | Year/Period ended<br>2020, 2021 |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | | Schedule number or exhibit |
|---|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | | Schedule number or exhibit |
|---|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

[redacted]

[redacted]

[redacted]

On March 13, 2020, the President of the United States issued a Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak. On or about March 15, 2020, States and local government entities began to issue Orders or other types of proclamations to implement shutdowns to prevent the spread of COVID-19, including the closure of schools and non-essential businesses. Recognizing the significant economic impact that the closure of schools and businesses would have on the economy, Congress and Trump Administration (including the Department of Treasury and the Internal Revenue Service) worked rapidly to develop a variety of packages to reduce the negative economic impact COVID-19 would have on the country.

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), P.L. 116-136, 134 Stat. 281, enacted on March 27, 2020, was one of the initial pieces of legislation enacted in response to COVID-19. Section 2301 of the CARES Act, as originally enacted, provides for an employee retention credit for eligible employers that pay qualified wages, including certain health plan expenses, to some or all employees after March 12, 2020, and before January 1, 2021. The ERC was specifically designed to encourage employers experiencing a decline in gross receipts and/or whose trade or business was fully or partially suspended as a result of a governmental order related to COVID-19 to keep employees on their payroll through a refundable employment tax credit.

| Form **886-A** (May 2017) | Department of the Treasury – Internal Revenue Service **Explanation of Items** | | Schedule number or exhibit |
|---|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

The CARES Act was subsequently amended and modified by the Certainty and Disaster Tax Relief Act of 2020 (Relief Act), enacted as Division EE of the Consolidated Appropriations Act, 2021, P.L. 116-260, 134 Stat. 1182, on December 27, 2020. Section 206 of the Relief Act adopted amendments and technical changes to section 2301 for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit. Section 206 is effective retroactive to the effective date of section 2301. Section 207 of the Relief Act, which is effective for calendar quarters beginning after December 31, 2020, further amends section 2301 to extend the application of the employee retention credit to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.

The ERC was further extended pursuant to section 3134 of the Internal Revenue Code (Code), enacted by section 9651 of the American Rescue Plan Act of 2021 (the ARP), Pub. L. No. 117-2, 135 Stat. 4 (March 11, 2021). Section 3134 of the Code provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022.

Finally, the ERC was subsequently amended by the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, (IIJA) to terminate the ERC retroactively for all businesses other than recovery startup businesses.

In general, to qualify for the ERC, an employer must have operated a trade or business in 2020 or a calendar quarter in 2021 and meet one of following three scenarios:

1. Their business operations must have been fully or partially suspended by government order due to COVID-19 in 2020 or the first three calendar quarters of 2021.
2. Met the Gross Receipts Test:
   a. For 2020, had a significant decline in gross receipts (defined as period beginning with calendar quarter in which gross receipts are less than 50 percent of gross receipts in the same calendar quarter in 2019 and ending in the calendar quarter after the first calendar quarter in which gross receipts are greater than 80 percent of gross receipts in the same calendar quarter in 2019).
   b. For the first three calendar quarters of 2021, had a decline in gross receipts (defined as quarter in which gross receipts are less than 80 percent of the same calendar quarter in 2019 or through an alternative quarter election rule as set forth in Notice 2021-23).
3. Was a Recovery Startup Business for the 3rd and 4th quarter 2021 only.

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

For wages paid in 2020, the percent of qualified wages eligible for credit equals 50% of qualified wages ($10,000 per employee for the year including certain health care expenses). For employers who averaged 100 or fewer average full-time employees in 2019, qualified wages include only those qualified wages and health care expenses paid to employees providing services and not providing services. For employers who averaged greater than 100 average full-time employees in 2019, qualified wages include those wages (including health care expenses) paid to employees not providing services.

For wages paid in 2021, legislation increased the maximum percentage of qualified wages to 70% ($10,000 per employee per calendar quarter including certain health care expenses) for qualified wages paid between January 1 and June 30, 2021. For 2021, employers who averaged 500 or fewer average full-time employees in 2019, qualified wages include those amounts paid to employees providing services and not providing services. For 2021, employers with greater than 500 average full-time employees in 2019, only wages paid to employees who were not providing services are considered qualified wages.

Summary of Issued Guidance:

With each enactment, Congress authorized the Secretary (or the Secretary's delegate) to provide such regulations or other guidance as may be necessary to carry out the purposes of the credit, including regulations or other guidance: (1) to prevent the avoidance of the purposes of the limitations; (2) to minimize compliance and record-keeping burdens with respect to the credit; (3) to provide for waiver of penalties for failure to deposit amounts in anticipation of the allowance of the credit; (4) to recapture the benefit of the credit in cases where there is a subsequent adjustment to the credit; and (5) to ensure that the wages taken into account for the ERC conform with other credits eligible to be claimed by employers.

This broad grant of authority was provided to Treasury and the Internal Revenue Service to issue guidance (through regulation or other means) in a prompt and expedient manner to provide tax credits to employers that were negatively financially impacted by the pandemic while also ensuring compliance with the limitations and requirements of the Act, as well as legislative intent.

Treasury did not issue regulations addressing entitlement to, or calculation of, the ERC. Rather, consistent with statutory authority allowing the Secretary to issue "other guidance as may be necessary to carry out the purpose of the credit" and consistent with the need to encourage Eligible

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020 2021 |

Employers to keep their employees on their payroll during the COVID-19 pandemic and allow Eligible Employers to claim the credit for qualified wages paid beginning on March 13, 2020, the Service issued guidance in coordination with Treasury in the form of Frequently Asked Questions beginning on April 29, 2020. With each legislative act, the Service continued seeking the highest level of Treasury review and continued updating the postings as the need for answers to frequently asked questions arose.

On March 1, 2021, Notice 2021-20 was issued incorporating the FAQs into more formal guidance. Notice 2021-20 provides guidance on the ERC as it applies to qualified wages paid after March 12, 2020, and before January 1, 2021. As further legislation was enacted, irs.gov was updated to address additional frequently asked questions and additional guidance was provided in subsequent Notices.

The following is a list of guidance issued addressing the ERC:

For Wages Paid After March 12, 2020, and before Jan. 1, 2021
- Notice 2021-20
- Notice 2021-49
- Revenue Procedure 2021-33

For Wages Paid After Dec. 31, 2020, and before July 1, 2021
- Notice 2021-23
- Notice 2021-49
- Revenue Procedure 2021-33

For Wages Paid After June 30, 2021, and before Oct. 1, 2021
- Notice 2021-49
- Revenue Procedure 2021-33

For Wages Paid After Sept. 30, 2021, and before Jan. 1, 2022
- Notice 2021-49
- Notice 2021-65

To the extent that legislation did not modify the original provisions of the ERC, Notice 2021-20 governs the ERC for all periods.

Reliance on IRS Public Guidance

As stated above, Treasury did not issue regulations addressing the ERC. Rather, due to the timing of each enactment and the almost immediate (and often retroactive) modification to the ERC, FAQS and Notices were the chosen form of guidance issued to carry out the purpose of the credit. Each

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number (last 4 digits) 2977 | Year/Period ended 2020, 2021 |

piece of public guidance issued, including FAQs, Notices, Press Releases, Tax Forms and Instructions were coordinated with the highest levels of the Treasury Department. In Skidmore v. Swift & Co., (S Ct 1944) 323 U.S. 134, the Supreme Court set forth the standard for deference to sub-regulatory guidance, which requires consideration of the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements. The Court held that agency rulings, interpretations, and opinions "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

As stated previously, the Federal government's response to the COVID-19 pandemic was swift and continuously evolving. The CARES Act was enacted on March 27, 2020 (only 14 days after the Trump Administration declared a nationwide emergency due to COVID-19 causing the Federal government and state and local entities to implement shutdown orders). Since under the CARES Act, Eligible Employers became entitled to claim the ERC for wages paid after March 12, 2020, the Service worked closely with Congress and the highest levels of the Department of Treasury to develop, and issue published guidance. Subsequent to enactment of the CARES Act, three additional pieces of legislation were enacted to extend, modify and/or retroactively eliminate the ERC for certain taxpayers. With each legislative enactment, the Service was required to issue prompt guidance to taxpayers so as to implement the legislation enabling taxpayers to claim the ERC when available for each calendar quarter.

Pertinent Statute and Notice Provisions:

Section 2301 of the CARES Act allows a credit (employee retention credit or credit) against applicable employment taxes for eligible employers, including tax-exempt organizations, that pay qualified wages, including certain health plan expenses, to some or all employees after March 12, 2020, and before January 1, 2021. Section 206 of the Relief Act adopts amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily relating to who may claim the credit.[1]

Section 207 of the Relief Act amends section 2301 of the CARES Act to extend the application of the employee retention credit to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.

[1] The amendments made by section 206 of the Relief Act take effect as if included in the provisions of the CARES Act to which they relate.

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020. 2021 |

Section 9651 of the ARP Act enacted section 3134 of the Code which provides an employee retention credit for wages paid after June 30, 2021, and before January 1, 2022.

Definition of "Eligible Employer"

The employee retention credit is available only to employers that are eligible employers. Section 2301(c)(2)(A) of the CARES Act defines the term "eligible employer" as any employer carrying on a trade or business during calendar year 2020, and, with respect to any calendar quarter, for which:

(1) the operation of the trade or business carried on during calendar year 2020 is fully or partially suspended due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to COVID-19, or
(2) such calendar quarter is within the period in which the employer had a significant decline in gross receipts, as described in section 2301(c)(2)(B) of the CARES Act.

Governmental Orders

Notice 2021-20 provides guidance on what "orders from an appropriate governmental authority" may be taken into account by an employer for purposes of determining eligibility for the employee retention credit. Notice 2021-20, Q/A- 10 provides that orders, proclamations, or decrees from the Federal government or any State or local government may be taken into account by an employer as "orders from an appropriate governmental authority" only if they limit "commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)" and relate to the suspension of an employer's operation of its trade or business. Orders that are not from the Federal government must be from a State or local government that has jurisdiction over the employer's operations. These orders are referred to as "governmental orders." Whether orders, proclamations or decrees are governmental orders is determined without regard to the level of enforcement of the governmental order.

Statements from a governmental official, including comments made during press conferences or in interviews with the media, do not rise to the level of a governmental order for purposes of the employee retention credit. Additionally, the declaration of a state of emergency by a governmental authority is not sufficient to rise to the level of a governmental order if it does not limit commerce, travel, or group meetings in any manner. Further, such a declaration that limits commerce, travel, or group meetings, but does so in a manner that does not relate to the suspension of an employer's

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer<br>BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)*<br>2977 | Year/Period ended<br>2020, 2021 |

operation of its trade or business does not rise to the level of a governmental order for purposes of the employer's determination of its eligibility for the employee retention credit.

Governmental orders include:

- An order from the city's mayor stating that all non-essential businesses must close for a specified period;
- A State's emergency proclamation that residents must shelter in place for a specified period, other than residents who are employed by an essential business and who may travel to and work at the workplace location;
- An order from a local official imposing a curfew on residents that impacts the operating hours of a trade or business for a specified period;
- An order from a local health department mandating a workplace closure for cleaning and disinfecting.

Recommendations from government officials do not constitute governmental orders.

Full or Partial Suspension of Trade or Business Operations

For purposes of the employee retention credit, "trade or business" has the same meaning as when used in section 162 of the Code other than the trade or business of performing services as an employee. Under section 162(a), an activity does not qualify as a trade or business unless its primary purpose is to make a profit and it is carried on with regularity and continuity.

Notice 2021-20, Q/A- 11 provides that if a governmental order requires non-essential businesses to suspend operations but allows essential businesses to continue operations, an employer that operates an essential business is not considered to have a full or partial suspension of operations if the governmental order allows all of the employer's operations to remain open. However, an employer that operates an essential business may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order. For example, an employer that maintains both essential and non-essential business operations, each of which are more than nominal portions of the business operations, may be considered to have a partial suspension of its operations if a governmental order restricts the operations of the non-essential portion of the business, even if the essential portion of the business is unaffected. In addition, an essential business that is permitted to continue its operations may, nonetheless, be considered to have a partial suspension of its

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

operations if a governmental order requires the business to close for a period of time during normal working hours.

Solely for purposes of this employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).

Notice 2021-20, Q/A-13 provides guidance regarding whether a governmental order that causes the customers of a business to stay at home, or otherwise causes a reduction in demand for its products or services, and the business responds to the lack of demand by suspending some or all of its operations, is considered to rise to the level of a suspension of operations due to a governmental order. Q/A- 13 provides that an employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its products or services is not considered to have a full or partial suspension of its operations due to a governmental order.

Notice 2021-20, Q/A- 15 provides that if an employer's workplace is closed by a governmental order, but the employer is able to continue operations comparable to its operations prior to the closure, including by requiring its employees to telework, the employer's operations are not considered to have been fully or partially suspended as a consequence of a governmental order. However, if the closure of the workplace causes the employer to suspend business operations for certain purposes, but not others, it may be considered to have a partial suspension of operations due to the governmental order.

Notice 2021-20, Q/A- 17 and 18 provide guidance regarding circumstances where an employer's workplace is closed due to a governmental order for certain purposes, but the employer's workplace may remain open for other limited purposes. Q/A-17 provides that the employer's operations would be considered to be partially suspended if, under the facts and circumstances, the operations that are closed are more than a nominal portion of its business operations and cannot be performed remotely in a comparable manner. If all, or all but a nominal portion, of an employer's business operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has

GOVERNMENT POSITION:

Taxpayer is a PEO (Professional Employer Organization), this is evident, and taxpayer agrees they are a PEO.

The government will disallow the Claim basis on the chart attached [redacted]

[redacted]

[redacted]

- [redacted]

[redacted]

- [redacted]

Note BBSI the PEO solely relied on the clients when ERC claims were being filed. [redacted]

| Form 886-A (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer BARRETT BUSINESS SERVICES INC | Tax Identification Number *(last 4 digits)* 2977 | Year/Period ended 2020, 2021 |

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]

TAXPAYERS POSITION:

[redacted] BBSI relied on the client employers' information in making the claims, and BBSI allowed its client employers to maintain their own respective records for substantiating those respective claims for employee retention credits.

CONCLUSION:

The requirements under the CARES Act and subsequent laws allows for "partial suspension" due to governmental order - governmental order test. Under the governmental order test, a taxpayer is an eligible employer when its operation was fully or partially suspended due to governmental order related to COVID-19.

Disruptions to business operations and caused it to become less efficient where there were no orders mandating TP to close or suspend its operations. Modifications to operations that caused the business to become less efficient don't amount to a suspension.

Explanation of why clients' claims were disallowed, including FAQ and updated law.

a) Taxpayer is a business that applied for the ERC based on a partial suspension with more than nominal impact. Taxpayer provided various government order, mainly referencing OSHA, indicating the business was impacted by social distancing and sanitization requirements resulted lowering its efficiency or productivity. However, the records provided do not quantify or substantiate that there was more than a 10% impact from these government orders.

b) Taxpayer is a business that applied for the ERC based on a partial suspension with more than nominal impact. Taxpayer provided various government order, mainly referencing Cal/OSHA, indicating the business was impacted by social distancing and sanitization requirements resulted lowering its efficiency or productivity. However, the records provided do not quantify or substantiate that there was more than a 10% impact from these government orders.

c) Taxpayer is a business that applied for the ERC based on a partial suspension with more than nominal impact. Taxpayer provided various government order, indicating the business was impacted by social distancing and sanitization requirements resulted lowering its efficiency or productivity. However, the records provided do not quantify or substantiate that there was more than a 10% impact from these government orders.

d) Taxpayer is a business that applied for the ERC based on a partial suspension due to supply chain issues. However, the records provided does not show the employer absolutely could not operate without the supplier's product and the supplier was fully or partially suspended themselves do to a government order.

e) This business is an essential business it may be eligible based on the gross receipts test or experienced a partial suspension of operations due to an order from an appropriate governmental authority. IRS will consider you to be partially suspended if more than a

nominal part of your business was suspended by a governmental order. The IRS considers "more than nominal" to be at least 10% reduction in your ability to provide goods or services.

f) Taxpayer has not substantiated its ERC eligibility under any of the applicable requirements, including full or partial suspension with more than nominal impact, Significant Decline in Gross Receipts, or recovery startup business.

g) Taxpayer claims ERC cased on Significant Decline in Gross Receipts and provided a table comparing quarterly sales. Please provide supporting records, such as a General Ledger and business income tax returns reconciled to the figures that were provided to substantiate the actual sales decline.

**https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit**

## Q3. Is being subject to a government order enough to make me eligible for ERC? (added July 28, 2023)

A3. No. You need to demonstrate that the government order was related to COVID-19 and that it resulted in your trade or business being fully or partially suspended.

## Q4. What does it mean to be fully or partially suspended? (updated Sept. 14, 2023)

A4. Whether your business or organization was fully or partially suspended depends on your specific situation. For examples, see Notice 2021-20, Section III.D.

Some examples of who **doesn't** qualify under this eligibility factor:

- If all your employees were able to telework during the pandemic and your business continued to operate, your business wasn't suspended.
- If your customers were affected by a stay-at-home order, but no orders applied to your business operations, you weren't suspended.
- If you voluntarily closed your business or reduced hours of operation, you weren't ordered to suspend.

You could still qualify for ERC based on a decline in gross receipts even if you don't qualify under suspension of operations due to government order.

Remember: You need to be able to prove your claim with a specific government order and show how it suspended all or part of your operations.

## Q5. What does "more than nominal" mean when considering whether my business or organization was partially suspended? (added Sept. 14, 2023)

A5. IRS will consider you to be partially suspended if more than a nominal part of your business was suspended by a governmental order.

The IRS considers "more than nominal" to be at least 10% of your business based on either the gross receipts from that part of the business or the total hours your employees spent working in that part of the business.

If all parts of your business could operate but you had to modify how it operated, then we will consider you to be partially suspended if you can show that the order had more than a nominal effect on your business. We consider "more than a nominal effect" to be at least **a 10% reduction in your ability to provide goods or services in the normal course of your business.**

If you changed business practices to alter behavior, such as making store aisles one-way or requiring customers or employees to wear masks, we won't consider that change to have had a more than a nominal effect on your business operations.

For more details and examples, see Notice 2021-20, Section III.D, Questions 11, 17 and 18.

## Q6. If my business was suspended by a government order for only part of a quarter, am I an eligible employer for the entire quarter? (added Sept. 14, 2023)

A6: You are considered an eligible employer for the entire calendar quarter if your business operations were fully or partially suspended due to a governmental order during a portion of a calendar quarter.

**However, you can claim the ERC only for wages paid during the suspension period, not the whole quarter.**

For examples, see Notice 2021-20, Section III.D, Question 22.

## Q7. Are communications from the Occupational Safety and Health Administration (OSHA) considered a government order for purposes of qualifying for the ERC due to a full or partial suspension of operations? (added Nov. 7, 2023)

A7. Generally, no. An employer **won't be considered eligible for the ERC** just because they followed general guidance or recommendations contained in OSHA communications.

For details on what the IRS considers OSHA communications, see the IRS legal memo AM-2023-007 PDF.

However, if an appropriate government authority – such as a state governor – issued an order that made OSHA recommendations mandatory, the employer may then be able to claim the ERC.

The IRS will consider an employer to be eligible for ERC if they:

- Provide an order from an appropriate government authority mandating compliance with OSHA recommendations, and
- **Demonstrate that implementing the mandatory recommendations** either:
    - Suspended more than a nominal part of the employer's trade or business operations, or
    - Required modifications that had more than a nominal effect on the employer's trade or business operations.

**Modifications that required minor adjustments – such as masking or making store aisles one way to enforce social distancing – most likely did not result in more than a nominal effect on business operations** because those adjustments didn't restrict the employer's ability to provide goods and services in their normal course of business.

For more information and examples, see What does "more than nominal" mean when considering whether my business or organization was partially suspended? earlier in this section and the IRS legal memo AM-2023-007 PDF.

## Q1. Was my business or organization fully or partially suspended if I had a supply chain issue? (updated March 22, 2024)

A1. A supply chain issue by itself does not qualify you for the ERC.

The IRS provided a narrow, limited exception if an employer was not fully or partially suspended but their supplier was. **The exception, however, only applied when the employer absolutely could not operate without the supplier's product and the supplier was fully or partially suspended themselves.**

In addition to having the supplier's governmental order, you will need to show that:

- The government order caused the supplier to suspend operations,
- You couldn't obtain the supplier's goods or materials elsewhere (regardless of cost), and
- It caused a full or partial suspension of your own business operations.

You should be wary of anyone who says you qualify for ERC based on supply chain issues without asking for specific information about how your business or organization was affected,

your supplier's situation and documentation. For more information and examples see legal memo AM-2023-005 PDF.

**LAW:**

JSmith Civil, LLC v. United States (Bank. E.D.N.C.) 2025 WL 2264774

"The ERC contains more traditional and onerous eligibility criteria. It is a "presumption-out" statute, where everyone starts outside of eligibility for the stated relief, and claimants must show why they fit within an satisfy applicable statutory definitions to get "in" and qualify for the relief.

The plain meaning of "full" is complete or total, so a "full suspension" denotes a temporary but complete and entire stoppage of operations. A "partial suspension" then, is a temporary stoppage of a portion of operations.

The key distinction is that "an order" must be compulsory. To qualify as an order, a directive must impose "binding requirements or repercussions for noncompliance"

Court outlines the requirements to be an eligible employer as follows:

- Must establish it was subject to a compulsory governmental mandate limiting commerce, travel or group meetings that was issued because of the pandemic;
- It stopped a meaningful portion of its operations during the relevant quarter; and
- The reason it stopped operating was that the governmental mandate directly required it.
- North Carolina Exec Order 121 was an order, but did not require the debtor to suspend any operations because it was an essential business excluded from the requirements.

Was there a suspension?

- Nothing from guidance and plans issued by or from OSHA, the CDC, and the NCDOL qualify as a government order under the ERC and the debtor is not entitled to rely on them.

- The need to quarantine members of a crew and to conduct enhanced cleaning and other COVID protocols does not rise to the level of a partial suspension.
- General disruptions not due to government orders are insufficient to demonstrate entitlement.

| | Client Name | C.FEIN | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | |
|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | |
| 464 | JOHNSON POOLS INC | 68-0173856 | 267,776.00 | 30,273.00 | 21,508.00 | 367,469.20 | 388,326.00 | Disallowed |
| [redacted] | | | | | | | | |

| | Client Name | C.FEIN | Taxpayer Reasons | Allow/Disallow |
|---|---|---|---|---|
| [redacted] | | | | |
| 464 | JOHNSON POOLS INC | 68-0173856 | The Company qualifies for the Employee Retention Credit for the following quarters: • Q2 2020 – Q3 2021 through partial suspension | Disallowed Evidence does not show a shut down or Decrease in Gross Receipts (c,d). |

[redacted]

# Instructions for Form 941

Department of the Treasury
**Internal Revenue Service**

## (Rev. July 2020)

**Employer's QUARTERLY Federal Tax Return**

Section references are to the Internal Revenue Code unless otherwise noted.

## Future Developments

For the latest information about developments related to Form 941 and its instructions, such as legislation enacted after they were published, go to *IRS.gov/Form941*.

At the time these instructions went to print, Congress was considering changes to some of the recent legislation discussed in these instructions. If new legislation impacts these instructions, updates will be posted to *IRS.gov/Form941*.

## What's New

**Changes to Form 941 (Rev. July 2020) for coronavirus (COVID-19) related tax relief.** The July 2020 revision of Form 941 will be used to report employment taxes beginning with the third quarter of 2020. Form 941 has been revised to allow employers that defer the withholding and payment of the employee share of social security tax on wages paid on or after September 1, 2020, to include the deferral on line 13b. Employers will now report on line 13b the total deferred amount of the employer and employee share of social security tax. Employers will also separately report on line 24 the deferred amount of the employee share of social security tax that is included on line 13b. See the instructions for line 13b for more information about the deferral of the employer and employee share of social security tax.

**Adjusting tax liability for the deferred amount of social security tax that you pay or deposit in the same quarter it was deferred.** See *Adjusting tax liability for the deferred amount of social security tax that you pay or deposit in the same quarter it was deferred*, later, for instructions on how to report your tax liabilities on Form 941, line 16, or on Schedule B (Form 941), Report of Tax Liability for Semiweekly Schedule Depositors, if you defer social security tax and subsequently pay or deposit that deferred amount in the same quarter it was deferred.

**CAUTION** *Don't use the July 2020 revision of Form 941 to report employment taxes for the first or second quarter of 2020. Use the April 2020 revision of Form 941 to report employment taxes for the second quarter of 2020, and use the January 2020 revision of Form 941 to report employment taxes for the first quarter of 2020.*

## Reminders

**Previous changes to Form 941 for COVID-19 related employment tax credits and other tax relief.** The following significant changes were made to Form 941 to allow for the reporting of new employment tax credits and other tax relief related to COVID-19.

- The credit for qualified sick and family leave wages is reported on line 11b and, if applicable, line 13c. The employee share of social security tax on qualified sick and family leave wages is reported on lines 5a(i) and 5a(ii). Qualified sick and family leave wages aren't subject to the employer share of social security tax. Qualified sick and family leave wages not included on lines 5a(i) and 5a(ii) because the wages reported on that line are limited by the social security wage base are included on line 5c. Qualified health plan expenses allocable to qualified sick and family leave wages are reported on lines 19 and 20. See the instructions for line 11b for information about the credit for qualified sick and family leave wages.
- The employee retention credit is reported on line 11c and, if applicable, line 13d. Qualified wages (excluding qualified health plan expenses) for the employee retention credit are reported on line 21 (these amounts should also be included as wages on lines 5a and 5c, and, if applicable, line 5d). Qualified health plan expenses allocable to the qualified wages for the employee retention credit are reported on line 22. See the instructions for line 11c for information about the employee retention credit.
- Employers, including government employers, can defer the deposit and payment of the employer share of social security tax otherwise due during the calendar quarter. The amount of deferral is combined with the deferred amount of the employee share of social security tax on line 13b. See the instructions for line 13b for more information.
- Employers that requested an advance of the sick and family leave credit and/or the employee retention credit would have filed a Form 7200, Advance Payment of Employer Credits Due to COVID-19, for the quarter. The amount of all advances received from Forms 7200 filed for the quarter is reported on line 13f. See the instructions for line 13f for more information.
- The credit for qualified sick and family leave wages (reported on lines 11b and 13c) and the employee retention credit (reported on lines 11c and 13d) are figured on Worksheet 1.

**2020 withholding tables.** The federal income tax withholding tables are included in Pub. 15-T, Federal Income Tax Withholding Methods.

**Social security and Medicare tax for 2020.** The rate of social security tax on taxable wages, except for qualified sick leave wages and qualified family leave wages, is 6.2% (0.062) each for the employer and employee or 12.4% (0.124) for both. Qualified sick leave wages and qualified family leave wages aren't subject to the employer share of social security tax; therefore, the tax rate on these wages is 6.2% (0.062). The social security wage base limit is $137,700.

The Medicare tax rate is 1.45% (0.0145) each for the employee and employer, unchanged from 2019. There is no wage base limit for Medicare tax.

Social security and Medicare taxes apply to the wages of household workers you pay $2,200 or more in cash wages in 2020. Social security and Medicare taxes apply to election workers who are paid $1,900 or more in cash or an equivalent form of compensation in 2020.

**Qualified small business payroll tax credit for increasing research activities.** For tax years beginning after 2015, a qualified small business may elect to claim up to $250,000

of its credit for increasing research activities as a payroll tax credit against the employer share of social security tax. The payroll tax credit election must be made on or before the due date of the originally filed income tax return (including extensions). The portion of the credit used against the employer share of social security tax is allowed in the first calendar quarter beginning after the date that the qualified small business filed its income tax return. The election and determination of the credit amount that will be used against the employer share of social security tax are made on Form 6765, Credit for Increasing Research Activities. The amount from Form 6765, line 44, must then be reported on Form 8974, Qualified Small Business Payroll Tax Credit for Increasing Research Activities. Form 8974 is used to determine the amount of the credit that can be used in the current quarter. The amount from Form 8974, line 12, is reported on Form 941, line 11a. If you're claiming the research payroll tax credit on your Form 941, you must attach Form 8974 to that Form 941. For more information about the payroll tax credit, see Notice 2017-23, 2017-16 I.R.B. 1100, available at *IRS.gov/irb/2017-16_IRB#NOT-2017-23*, and *IRS.gov/ResearchPayrollTC*. Also see *Adjusting tax liability for nonrefundable credits claimed on lines 11a, 11b, and 11c*, later.

**Certification program for professional employer organizations (PEOs).** The Stephen Beck, Jr., ABLE Act of 2014 required the IRS to establish a voluntary certification program for PEOs. PEOs handle various payroll administration and tax reporting responsibilities for their business clients and are typically paid a fee based on payroll costs. To become and remain certified under the certification program, certified professional employer organizations (CPEOs) must meet various requirements described in sections 3511 and 7705 and related published guidance. Certification as a CPEO may affect the employment tax liabilities of both the CPEO and its customers. A CPEO is generally treated for employment tax purposes as the employer of any individual who performs services for a customer of the CPEO and is covered by a contract described in section 7705(e)(2) between the CPEO and the customer (CPEO contract), but only for wages and other compensation paid to the individual by the CPEO. To become a CPEO, the organization must apply through the IRS Online Registration System. For more information or to apply to become a CPEO, go to *IRS.gov/CPEO*.

CPEOs must generally file Form 941 and Schedule R (Form 941), Allocation Schedule for Aggregate Form 941 Filers, electronically. However, CPEOs are permitted to file a paper Form 941 and its accompanying schedules in lieu of electronic submissions for the second, third, and fourth quarters of calendar year 2020. For more information about a CPEO's requirement to file electronically, and the waiver for 2020, see Rev. Proc. 2017-14, 2017-3 I.R.B. 426, available at *IRS.gov/irb/2017-03_IRB#RP-2017-14*, and Notice 2020-35, 2020-25 I.R.B. 948, available at *IRS.gov/irb/2020-25_IRB#NOT-2020-35*.

**Outsourcing payroll duties.** Generally, as an employer, you're responsible to ensure that tax returns are filed and deposits and payments are made, even if you contract with a third party to perform these acts. You remain responsible if the third party fails to perform any required action. Before you choose to outsource any of your payroll and related tax duties (that is, withholding, reporting, and paying over social security, Medicare, FUTA, and income taxes) to a third-party payer, such as a payroll service provider or reporting agent, go to *IRS.gov/OutsourcingPayrollDuties* for helpful information on this topic. If a CPEO pays wages and other compensation to an individual performing services for you, and the services are covered by a contract described in section 7705(e)(2) between you and the CPEO (CPEO contract), then the CPEO is generally treated for employment tax purposes as the employer, but only for wages and other compensation paid to the individual by the CPEO. However, with respect to certain employees covered by a CPEO contract, you may also be treated as an employer of the employees and, consequently, may also be liable for federal employment taxes imposed on wages and other compensation paid by the CPEO to such employees. For more information on the different types of third-party payer arrangements, see section 16 of Pub. 15.

**Aggregate Form 941 filers.** Approved section 3504 agents and CPEOs must complete and file Schedule R (Form 941) when filing an aggregate Form 941. Aggregate Forms 941 are filed by agents approved by the IRS under section 3504. To request approval to act as an agent for an employer, the agent files Form 2678 with the IRS unless you're a state or local government agency acting as an agent under the special procedures provided in Rev. Proc. 2013-39, 2013-52 I.R.B. 830, available at *IRS.gov/irb/2013-52_IRB#RP-2013-39*. Aggregate Forms 941 are also filed by CPEOs approved by the IRS under section 7705. To become a CPEO, the organization must apply through the IRS Online Registration System at *IRS.gov/CPEO*. CPEOs file Form 8973, Certified Professional Employer Organization/Customer Reporting Agreement, to notify the IRS that they started or ended a service contract with a customer. CPEOs must generally file Form 941 and Schedule R (Form 941) electronically. However, CPEOs are permitted to file a paper Form 941 and its accompanying schedules in lieu of electronic submissions for the second, third, and fourth quarters of calendar year 2020. For more information about a CPEO's requirement to file electronically, and the waiver for 2020, see Rev. Proc. 2017-14, 2017-3 I.R.B. 426, available at *IRS.gov/irb/2017-03_IRB#RP-2017-14*, and Notice 2020-35, 2020-25 I.R.B. 948, available at *IRS.gov/irb/2020-25_IRB#NOT-2020-35*. Schedule R (Form 941) has been revised for 2020 to allow for the reporting of the new lines added to Form 941.

Other third-party payers that file aggregate Forms 941, such as non-certified PEOs, must complete and file Schedule R (Form 941) if they have clients that are claiming the qualified small business payroll tax credit for increasing research activities, the credit for qualified sick and family leave wages, or the employee retention credit, or clients deferring the employer or employee share of social security tax.

**TIP** *If both an employer and a section 3504 authorized agent (or CPEO or other third-party payer) paid wages to an employee during a quarter, both the employer and the section 3504 authorized agent (or CPEO or other third-party payer, if applicable) should file Form 941 reporting the wages each entity paid to the employee during the applicable quarter and issue Forms W-2 reporting the wages each entity paid to the employee during the year.*

If a third-party payer of sick pay is also paying qualified sick leave wages on behalf of an employer, the third party would be making the payments as an agent of the employer. The employer is required to do the reporting and payment of employment taxes with respect to the qualified sick leave

wages and claim the credit for the qualified sick leave wages, unless the employer has an agency agreement with the third-party payer that requires the third-party payer to do the collecting, reporting, and/or paying or depositing employment taxes on the qualified sick leave wages. If the employer has an agency agreement with the third-party payer, the third-party payer includes the qualified sick leave wages on the third party's aggregate Form 941, claims the sick leave credit on behalf of the employer on the aggregate Form 941, and separately reports the credit allocable to the employers on Schedule R (Form 941). See section 6 of Pub. 15-A, Employer's Supplemental Tax Guide, for more information about sick pay reporting.

**Work opportunity tax credit for qualified tax-exempt organizations hiring qualified veterans.** Qualified tax-exempt organizations that hire eligible unemployed veterans may be able to claim the work opportunity tax credit against their payroll tax liability using Form 5884-C. For more information, go to *IRS.gov/WOTC*.

**Correcting a previously filed Form 941.** If you discover an error on a previously filed Form 941, make the correction using Form 941-X. Form 941-X is filed separately from Form 941. For more information, see the Instructions for Form 941-X, section 13 of Pub. 15, or go to *IRS.gov/CorrectingEmploymentTaxes*.

**Federal tax deposits must be made by electronic funds transfer (EFT).** You must use EFT to make all federal tax deposits. Generally, an EFT is made using the Electronic Federal Tax Payment System (EFTPS). If you don't want to use EFTPS, you can arrange for your tax professional, financial institution, payroll service, or other trusted third party to make electronic deposits on your behalf. Also, you may arrange for your financial institution to initiate a same-day wire payment on your behalf. EFTPS is a free service provided by the Department of the Treasury. Services provided by your tax professional, financial institution, payroll service, or other third party may have a fee.

For more information on making federal tax deposits, see section 11 of Pub. 15. To get more information about EFTPS or to enroll in EFTPS, go to *EFTPS.gov*, or call 800-555-4477 or 800-733-4829 (TDD). Additional information about EFTPS is also available in Pub. 966.

**CAUTION** *For an EFTPS deposit to be on time, you must submit the deposit by 8 p.m. Eastern time the day before the date the deposit is due.*

***Same-day wire payment option.*** If you fail to submit a deposit transaction on EFTPS by 8 p.m. Eastern time the day before the date a deposit is due, you can still make your deposit on time by using the Federal Tax Collection Service (FTCS) to make a same-day wire payment. To use the same-day wire payment method, you will need to make arrangements with your financial institution ahead of time. Please check with your financial institution regarding availability, deadlines, and costs. Your financial institution may charge you a fee for payments made this way. To learn more about the information you will need to give your financial institution to make a same-day wire payment, go to *IRS.gov/SameDayWire*.

***Timeliness of federal tax deposits.*** If a deposit is required to be made on a day that isn't a business day, the deposit is considered timely if it is made by the close of the next business day. A business day is any day other than a Saturday, Sunday, or legal holiday. The term “legal holiday” for deposit purposes includes only those legal holidays in the District of Columbia. Legal holidays in the District of Columbia are provided in section 11 of Pub. 15.

**Electronic filing and payment.** Businesses can enjoy the benefits of filing tax returns and paying their federal taxes electronically. Whether you rely on a tax professional or handle your own taxes, the IRS offers you convenient programs to make filing and paying easier. Spend less time worrying about taxes and more time running your business. Use e-file and EFTPS to your benefit.

- For e-file, go to *IRS.gov/EmploymentEfile* for additional information. A fee may be charged to file electronically.
- For EFTPS, go to *EFTPS.gov*, or call EFTPS Customer Service at 800-555-4477 or 800-733-4829 (TDD) for additional information.
- For electronic filing of Forms W-2, Wage and Tax Statement, go to *SSA.gov/employer*. You may be required to file Forms W-2 electronically. For details, see the General Instructions for Forms W-2 and W-3.

**CAUTION** *If you're filing your tax return or paying your federal taxes electronically, a valid employer identification number (EIN) is required at the time the return is filed or the payment is made. If a valid EIN isn't provided, the return or payment won't be processed. This may result in penalties. See* Employer identification number (EIN)*, later,* *for information about applying for an EIN.*

***Electronic funds withdrawal (EFW).*** If you file Form 941 electronically, you can e-file and use EFW to pay the balance due in a single step using tax preparation software or through a tax professional. However, don't use EFW to make federal tax deposits. For more information on paying your taxes using EFW, go to *IRS.gov/EFW*.

**Credit or debit card payments.** You can pay the balance due shown on Form 941 by credit or debit card. Your payment will be processed by a payment processor who will charge a processing fee. Don't use a credit or debit card to make federal tax deposits. For more information on paying your taxes with a credit or debit card, go to *IRS.gov/PayByCard*.

**Online payment agreement.** You may be eligible to apply for an installment agreement online if you can't pay the full amount of tax you owe when you file your return. For more information, see *What if you can't pay in full*, later.

**Paid preparers.** If you use a paid preparer to complete Form 941, the paid preparer must complete and sign the paid preparer's section of the form.

**Where can you get telephone help?** For answers to your questions about completing Form 941 or tax deposit rules, you can call the IRS at 800-829-4933 or 800-829-4059 (TDD/TTY for persons who are deaf, hard of hearing, or have a speech disability), Monday–Friday from 7:00 a.m. to 7:00 p.m. local time (Alaska and Hawaii follow Pacific time).

**Photographs of missing children.** The IRS is a proud partner with the *National Center for Missing & Exploited Children® (NCMEC)*. Photographs of missing children selected by the Center may appear in instructions on pages that would otherwise be blank. You can help bring these children home by looking at the photographs and calling 1-800-THE-LOST (1-800-843-5678) if you recognize a child.

# General Instructions:

## Purpose of Form 941

These instructions give you some background information about Form 941. They tell you who must file Form 941, how to complete it line by line, and when and where to file it.

If you want more in-depth information about payroll tax topics relating to Form 941, see Pub. 15 or go to *IRS.gov/EmploymentTaxes*.

Federal law requires you, as an employer, to withhold certain taxes from your employees' pay. Each time you pay wages, you must withhold—or take out of your employees' pay—certain amounts for federal income tax, social security tax, and Medicare tax. You must also withhold Additional Medicare Tax from wages you pay to an employee in excess of $200,000 in a calendar year. Under the withholding system, taxes withheld from your employees are credited to your employees in payment of their tax liabilities.

Federal law also requires you to pay any liability for the employer share of social security and Medicare taxes. This share of social security and Medicare taxes isn't withheld from employees.

## Who Must File Form 941?

If you pay wages subject to federal income tax withholding or social security and Medicare taxes, you must file Form 941 quarterly to report the following amounts.

- Wages you've paid.
- Tips your employees reported to you.
- Federal income tax you withheld.
- Both the employer and the employee share of social security and Medicare taxes.
- Additional Medicare Tax withheld from employees.
- Current quarter's adjustments to social security and Medicare taxes for fractions of cents, sick pay, tips, and group-term life insurance.
- Deferred amount of the employer share of social security tax.
- Deferred amount of the employee share of social security tax.
- Qualified small business payroll tax credit for increasing research activities.
- Credit for qualified sick and family leave wages.
- Employee retention credit.

Don't use Form 941 to report backup withholding or income tax withholding on nonpayroll payments such as pensions, annuities, and gambling winnings. Report these types of withholding on Form 945, Annual Return of Withheld Federal Income Tax. Also, don't use Form 941 to report unemployment taxes. Report unemployment taxes on Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return.

After you file your first Form 941, you must file a return for each quarter, even if you have no taxes to report, unless you filed a final return or one of the exceptions listed next applies.

### Exceptions

Special rules apply to some employers.

- If you received notification to file **Form 944,** you must file Form 944 annually; don't file Form 941 quarterly.
- **Seasonal employers** don't have to file a Form 941 for quarters in which they have no tax liability because they have paid no wages. To tell the IRS that you won't file a return for one or more quarters during the year, check the box on line 18 every quarter you file Form 941. See section 12 of Pub. 15 for more information.
- Employers of **household employees** don't usually file Form 941. See Pub. 926 and Schedule H (Form 1040 or 1040-SR) for more information.
- Employers of **farm employees** don't file Form 941 for wages paid for agricultural labor. See Form 943 and Pub. 51 for more information.

**TIP** *If none of the these exceptions apply and you haven't filed a final return, you must file Form 941 each quarter even if you didn't pay wages during the quarter. Use IRS e-file, if possible.*

### Requesting To File Forms 941 Instead of Form 944, or Requesting To File Form 944 Instead of Forms 941

**Requesting to file Forms 941 instead of Form 944.** Employers that would otherwise be required to file Form 944, Employer's ANNUAL Federal Tax Return, may contact the IRS to request to file quarterly Forms 941 instead of annual Form 944. To request to file quarterly Forms 941 to report your social security and Medicare taxes for the 2020 calendar year, you must either call the IRS at 800-829-4933 between January 1, 2020, and April 1, 2020, or send a written request postmarked between January 1, 2020, and March 16, 2020. After you contact the IRS, the IRS will send you a written notice that your filing requirement has been changed to Forms 941. You must receive written notice from the IRS to file Forms 941 instead of Form 944 before you may file these forms. If you don't receive this notice, you must file Form 944 for calendar year 2020.

**Requesting to file Form 944 instead of Forms 941.** If you're required to file Forms 941 but believe your employment taxes for calendar year 2020 will be $1,000 or less, you may request to file Form 944 instead of Forms 941 by calling the IRS at 800-829-4933 between January 1, 2020, and April 1, 2020, or sending a written request postmarked between January 1, 2020, and March 16, 2020. After you contact the IRS, the IRS will send you a written notice that your filing requirement has been changed to Form 944. You must receive written notice from the IRS to file Form 944 instead of Forms 941 before you may file this form. If you don't receive this notice, you must file Forms 941 for calendar year 2020.

**Where to send written requests.** Written requests should be sent to:

| | | |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service<br>Ogden, UT 84201-0038 | or | Department of the Treasury<br>Internal Revenue Service<br>Cincinnati, OH 45999-0038 |

If you would mail your return filed without a payment to Ogden, as shown under *Where Should You File*, later, send your request to the Ogden address shown above. If you would mail your return filed without a payment to Kansas City, send your request to the address for Cincinnati shown above. For more information about these procedures, see Rev. Proc. 2009-51, 2009-45 I.R.B. 625, available at *IRS.gov/irb/2009-45_IRB#RP-2009-51*.

## What if You Reorganize or Close Your Business?

### If You Sell or Transfer Your Business . . .

If you sell or transfer your business during the quarter, you and the new owner must each file a Form 941 for the quarter in which the transfer occurred. Report only the wages you paid.

When two businesses merge, the continuing firm must file a return for the quarter in which the change took place and the other firm should file a final return.

Changing from one form of business to another—such as from a sole proprietorship to a partnership or corporation—is considered a transfer. If a transfer occurs, you may need a new EIN. See Pub. 1635 and section 1 of Pub. 15 for more information.

Attach a statement to your return with:
- The new owner's name (or the new name of the business);
- Whether the business is now a sole proprietorship, partnership, or corporation;
- The kind of change that occurred (a sale or transfer);
- The date of the change; and
- The name of the person keeping the payroll records and the address where those records will be kept.

### If Your Business Has Closed . . .

If you permanently go out of business or stop paying wages to your employees, you must file a final return. To tell the IRS that Form 941 for a particular quarter is your final return, check the box on line 17 and enter the final date you paid wages. Also attach a statement to your return showing the name of the person keeping the payroll records and the address where those records will be kept.

See *Terminating a business* in the General Instructions for Forms W-2 and W-3 for information about earlier dates for the expedited furnishing and filing of Forms W-2 when a final Form 941 is filed.

If you participated in a statutory merger or consolidation, or qualify for predecessor-successor status due to an acquisition, you should generally file Schedule D (Form 941), Report of Discrepancies Caused by Acquisitions, Statutory Mergers, or Consolidations. See the Instructions for Schedule D (Form 941) to determine whether you should file Schedule D (Form 941) and when you should file it.

## When Must You File?

File your initial Form 941 for the quarter in which you first paid wages that are subject to social security and Medicare taxes or subject to federal income tax withholding. See the table titled *When To File Form 941*, later.

Then you must file for every quarter after that—every 3 months—even if you have no taxes to report, unless you're a seasonal employer or are filing your final return. See *Seasonal employers* and *If Your Business Has Closed*, earlier.

File Form 941 only once for each quarter. If you filed electronically, don't file a paper Form 941. For more information about filing Form 941 electronically, see *Electronic filing and payment*, earlier.

### When To File Form 941

Your Form 941 is due by the last day of the month that follows the end of the quarter.

| The Quarter Includes . . . | Quarter Ends | Form 941 Is Due |
|---|---|---|
| **1.** January, February, March | March 31 | April 30 |
| **2.** April, May, June | June 30 | July 31 |
| **3.** July, August, September | September 30 | October 31 |
| **4.** October, November, December | December 31 | January 31 |

For example, you must generally report wages you pay during the first quarter—which is January through March—by April 30. If you made timely deposits in full payment of your taxes for the quarter, you may file by the 10th day of the 2nd month that follows the end of the quarter. For example, you may file Form 941 by May 10 if you made timely deposits in full payment of your taxes for the 1st quarter.

If we receive Form 941 after the due date, we will treat Form 941 as filed on time if the envelope containing Form 941 is properly addressed, contains sufficient postage, and is postmarked by the U.S. Postal Service on or before the due date, or sent by an IRS-designated private delivery service (PDS) on or before the due date. If you don't follow these guidelines, we will generally consider Form 941 filed when it is actually received. For more information about PDSs, see *Where Should You File*, later.

If any due date for filing falls on a Saturday, Sunday, or legal holiday, you may file your return on the next business day.

## How Should You Complete Form 941?

Type or print your EIN, name, and address in the spaces provided. Also enter your name and EIN on the top of pages 2 and 3. Don't use your social security number (SSN) or individual taxpayer identification number (ITIN). Generally, enter the business (legal) name you used when you applied for your EIN. For example, if you're a sole proprietor, enter "Haleigh Smith" on the "Name" line and "Haleigh's Cycles" on the "Trade name" line. Leave the "Trade name" line blank if it is the same as your "Name."

If you use a tax preparer to fill out Form 941, make sure the preparer shows your business name exactly as it appeared when you applied for your EIN.

**Employer identification number (EIN).** To make sure businesses comply with federal tax laws, the IRS monitors tax filings and payments by using a numerical system to identify taxpayers. A unique nine-digit EIN is assigned to all corporations, partnerships, and some sole proprietors. Businesses needing an EIN must apply for a number and use it throughout the life of the business on all tax returns, payments, and reports.

Your business should have only one EIN. If you have more than one and aren't sure which one to use, write to the IRS office where you file your returns (using the *Without a payment* address under *Where Should You File*, later) or call the IRS at 800-829-4933.

If you don't have an EIN, you may apply for one online by visiting *IRS.gov/EIN*. You may also apply for an EIN by faxing or mailing Form SS-4 to the IRS. If the principal business was created or organized outside of the United States or U.S. territories, you may also apply for an EIN by calling 267-941-1099 (toll call). If you haven't received your EIN by

the due date of Form 941, file a paper return and write “Applied For” and the date you applied in this entry space.

CAUTION *If you’re filing your tax return electronically, a valid EIN is required at the time the return is filed. If a valid EIN isn't provided, the return won't be accepted. This may result in penalties.*

TIP *Always be sure the EIN on the form you file exactly matches the EIN the IRS assigned to your business. Don't use your SSN or ITIN on forms that ask for an EIN. Filing a Form 941 with an incorrect EIN or using another business's EIN may result in penalties and delays in processing your return.*

**If you change your business name, business address, or responsible party...** Notify the IRS immediately if you change your business name, business address, or responsible party.
- Write to the IRS office where you file your returns (using the *Without a payment* address under *Where Should You File*, later) to notify the IRS of any business name change. See Pub.1635 to see if you need to apply for a new EIN.
- Complete and mail Form 8822-B to notify the IRS of a business address or responsible party change. Don't mail Form 8822-B with your Form 941. For a definition of “responsible party,” see the Instructions for Form SS-4.

### Check the Box for the Quarter

Under “Report for this Quarter of 2020” at the top of Form 941, check the appropriate box of the quarter for which you’re filing. Make sure the quarter checked is the same as shown on any attached Schedule B (Form 941), Report of Tax Liability for Semiweekly Schedule Depositors, or Schedule R (Form 941).

CAUTION *Don't use the July 2020 revision of Form 941 to report employment taxes for the first or second quarter of 2020. Use the April 2020 revision of Form 941 to report employment taxes for the second quarter of 2020, and use the January 2020 revision of Form 941 to report employment taxes for the first quarter of 2020.*

### Completing and Filing Form 941

Make entries on Form 941 as follows to enable accurate scanning and processing.
- Use 10-point Courier font (if possible) for all entries if you’re typing or using a computer to complete your form. Portable Document Format (PDF) forms on IRS.gov have fillable fields with acceptable font specifications.
- Don't enter dollar signs and decimal points. Commas are optional. Enter dollars to the left of the preprinted decimal point and cents to the right of it. Don’t round entries to whole dollars. Always show an amount for cents, even if it is zero.
- Leave blank any data field (except lines 1, 2, and 12) with a value of zero.
- Enter negative amounts using a minus sign (if possible). Otherwise, use parentheses.
- Enter your name and EIN on all pages.
- Enter your name, EIN, “Form 941,” and the tax year and quarter on all attachments.
- Staple multiple sheets in the upper left corner when filing.

**Complete all three pages.** You must complete all three pages of Form 941 and sign on page 3. Failure to do so may delay processing of your return.

### Required Notice to Employees About the Earned Income Credit (EIC)

To notify employees about the EIC, you must give the employees one of the following items.
- Form W-2 which has the required information about the EIC on the back of Copy B.
- A substitute Form W-2 with the same EIC information on the back of the employee's copy that is on Copy B of the IRS Form W-2.
- Notice 797, Possible Federal Tax Refund Due to the Earned Income Credit (EIC).
- Your written statement with the same wording as Notice 797.

For more information, see section 10 of Pub. 15, Pub. 596, and *IRS.gov/EIC*.

### Reconciling Forms 941 and Form W-3

The IRS matches amounts reported on your four quarterly Forms 941 with Form W-2 amounts totaled on your yearly Form W-3, Transmittal of Wage and Tax Statements. If the amounts don't agree, you may be contacted by the IRS or the Social Security Administration (SSA). The following amounts are reconciled.
- Federal income tax withholding.
- Social security wages.
- Social security tips.
- Medicare wages and tips.

For more information, see section 12 of Pub. 15 and the Instructions for Schedule D (Form 941).

## Where Should You File?

You’re encouraged to file Form 941 electronically. Go to *IRS.gov/EmploymentEfile* for more information on electronic filing. If you file a paper return, where you file depends on whether you include a payment with Form 941. Mail your return to the address listed for your location in the table that follows.

PDSs can't deliver to P.O. boxes. You must use the U.S. Postal Service to mail an item to a P.O. box address. Go to *IRS.gov/PDS* for the current list of PDSs. For the IRS mailing address to use if you’re using a PDS, go to *IRS.gov/PDSstreetAddresses*. Select the mailing address listed on the webpage that is in the same state as the address to which you would mail returns filed without a payment, as shown next.

### Mailing Addresses for Form 941

| If you're in . . . | Without a payment . . . | With a payment . . . |
|---|---|---|
| Connecticut, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, West Virginia, Wisconsin | Department of the Treasury<br>Internal Revenue Service<br>Kansas City, MO 64999-0005 | Internal Revenue Service<br>P.O. Box 806532<br>Cincinnati, OH 45280-6532 |
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming | Department of the Treasury<br>Internal Revenue Service<br>Ogden, UT 84201-0005 | Internal Revenue Service<br>P.O. Box 932100<br>Louisville, KY 40293-2100 |
| No legal residence or principal place of business in any state | Internal Revenue Service<br>P.O. Box 409101<br>Ogden, UT 84409 | Internal Revenue Service<br>P.O. Box 932100<br>Louisville, KY 40293-2100 |
| **Special filing address** for exempt organizations; federal, state, and local governmental entities; and Indian tribal governmental entities, regardless of location | Department of the Treasury<br>Internal Revenue Service<br>Ogden, UT 84201-0005 | Internal Revenue Service<br>P.O. Box 932100<br>Louisville, KY 40293-2100 |

CAUTION *Your filing address may have changed from that used to file your employment tax return in prior years. Don't send Form 941 or any payments to the SSA.*

## Depositing Your Taxes

CAUTION *You must deposit all depository taxes electronically by EFT. For more information, see* Federal tax deposits must be made by electronic funds transfer (EFT) *under* Reminders*, earlier.*

### Must You Deposit Your Taxes?

You may have to deposit the federal income taxes you withheld and both the employer and employee social security taxes and Medicare taxes.

- **If your total taxes after adjustments and nonrefundable credits (line 12) are less than $2,500 for the current quarter or the prior quarter, and you didn't incur a $100,000 next-day deposit obligation during the current quarter.** You don't have to make a deposit. To avoid a penalty, you must pay any amount due in full with a timely filed return or you must deposit any amount you owe by the due date of the return. For more information on paying with a timely filed return, see the instructions for line 14, later. If you're not sure your total tax liability for the current quarter will be less than $2,500 (and your liability for the prior quarter wasn't less than $2,500), make deposits using the semiweekly or monthly rules so you won't be subject to failure-to-deposit (FTD) penalties.
- **If your total taxes after adjustments and nonrefundable credits (line 12) are $2,500 or more for the current quarter and the prior quarter.** You must make deposits according to your deposit schedule. See section 11 of Pub. 15 for information about payments made under the accuracy of deposits rule and for rules about federal tax deposits.

**Deferring your deposits.** Employers may defer the deposit and payment of the employer share of social security tax that would otherwise be due during the quarter. The deferral applies before any of the nonrefundable credits claimed on line 11a, 11b, or 11c. However, the deferral doesn't reduce the amount of the employer share of social security tax used to figure those nonrefundable credits. The deferral of the employer share of social security tax applies for deposits and payments due on or after March 27, 2020, and before January 1, 2021, as well as deposits and payments due after January 1, 2021, that are required for wages paid during the quarter ending on December 31, 2020. Employers can also defer the withholding and payment of the employee share of social security tax on wages paid on or after September 1, 2020, and on or before December 31, 2020, but only if the amount of social security wages for a biweekly pay period was less than $4,000 (or an equivalent amount for other pay periods). The deferred amount of the employer and employee share of social security tax is reported on line 13b. Employers will also separately report on line 24 the deferred amount of the employee share of social security tax that is included on line 13b. See the instructions for line 13b for more information about the deferral of the employer and employee share of social security tax.

**Reducing your deposits for COVID-19 credits.** Employers eligible to claim the credit for qualified sick and family leave wages and/or the employee retention credit can reduce their deposits by the amount of their anticipated credits. Employers won't be subject to an FTD penalty for reducing their deposits if certain conditions are met. See the instructions for line 11b and line 11c for more information on these credits. This reduction in deposits is in addition to the ability employers have to reduce their deposits by the amount of the employer share of social security tax they defer. For more information on reducing deposits, see Notice 2020-22, 2020-17 I.R.B. 664, available at *IRS.gov/irb/2020-17_IRB#NOT-2020-22*, and *IRS.gov/ETD*. Also see *IRS.gov/ERC* and *IRS.gov/PLC* for more information, including examples, about reducing deposits. See the instructions for line 16, later, for information on adjusting tax liabilities reported on line 16 or Schedule B (Form 941) for nonrefundable credits.

### When Must You Deposit Your Taxes?

### Determine if You're a Monthly or Semiweekly Schedule Depositor for the Quarter

The IRS uses two different sets of deposit rules to determine when businesses must deposit their social security, Medicare, and withheld federal income taxes. These schedules tell you when a deposit is due after you have a payday.

Your deposit schedule isn't determined by how often you pay your employees. Your deposit schedule depends on the total tax liability you reported on Form 941 during the

previous 4-quarter lookback period (July 1 of the second preceding calendar year through June 30 of the preceding calendar year). See section 11 of Pub. 15 for details. If you filed Form 944 in either 2018 or 2019, your lookback period is the 2018 calendar year.

Before the beginning of each calendar year, determine which type of deposit schedule you must use.

- If you reported $50,000 or less in taxes during the lookback period, you're a **monthly schedule depositor**.
- If you reported more than $50,000 of taxes during the lookback period, you're a **semiweekly schedule depositor**.

CAUTION *If you're a monthly schedule depositor and accumulate a $100,000 tax liability on any day during the deposit period, you become a semiweekly schedule depositor on the next day and remain so for at least the rest of the calendar year and for the following calendar year. See* $100,000 Next-Day Deposit Rule *in section 11 of Pub. 15 for more information. The $100,000 tax liability threshold requiring a next-day deposit is determined before you consider any reduction of your liability for nonrefundable credits. See IRS.gov/ETD for more information.*

## What About Penalties and Interest?

### Avoiding Penalties and Interest

You can avoid paying penalties and interest if you do all of the following.

- Deposit or pay your taxes when they are due, unless you meet the requirements discussed in *Notice 2020-22* or *IRS.gov/ETD*, or you have chosen to use the relief provided in Notice 2020-65, 2020-38 I.R.B. 567, available at *IRS.gov/irb/2020-38_IRB#NOT-2020-65*.
- File your fully completed Form 941 on time.
- Report your tax liability accurately.
- Submit valid checks for tax payments.
- Furnish accurate Forms W-2 to employees.
- File Form W-3 and Copy A of Forms W-2 with the SSA on time and accurately.

Penalties and interest are charged on taxes paid late and returns filed late at a rate set by law. See sections 11 and 12 of Pub. 15 for details.

Use Form 843 to request abatement of assessed penalties or interest. Don't request abatement of assessed penalties or interest on Form 941 or Form 941-X.

If you receive a notice about a penalty after you file this return, reply to the notice with an explanation and we will determine if you meet reasonable-cause criteria. Don't attach an explanation when you file your return.

CAUTION *If federal income, social security, and Medicare taxes that must be withheld (that is, trust fund taxes) aren't withheld or aren't deposited or paid to the United States Treasury, the trust fund recovery penalty may apply. The penalty is 100% of the unpaid trust fund tax. If these unpaid taxes can't be immediately collected from the employer or business, the trust fund recovery penalty may be imposed on all persons who are determined by the IRS to be responsible for collecting, accounting for, or paying over these taxes, and who acted willfully in not doing so. For more information, see section 11 of Pub. 15. The trust fund recovery penalty won't apply to any amount of trust fund taxes an employer holds back in anticipation of any credits they are entitled to. It also won't apply to applicable taxes deferred under Notice 2020-65 before May 1, 2021.*

## Adjustment of Tax on Tips

If, by the 10th of the month after the month you received an employee's report on tips, you don't have enough employee funds available to withhold the employee share of social security and Medicare taxes, you no longer have to collect it. Report the entire amount of these tips on line 5b (Taxable social security tips), line 5c (Taxable Medicare wages and tips), and, if the withholding threshold is met, line 5d (Taxable wages and tips subject to Additional Medicare Tax withholding). Include as a negative adjustment on line 9 the total uncollected employee share of the social security and Medicare taxes.

# Specific Instructions:

## Part 1: Answer These Questions for This Quarter

### 1. Number of Employees Who Received Wages, Tips, or Other Compensation

Enter the number of employees on your payroll for the pay period including September 12 or December 12 for the quarter indicated at the top of Form 941. Don't include:

- Household employees,
- Employees in nonpay status for the pay period,
- Farm employees,
- Pensioners, or
- Active members of the Armed Forces.

TIP *For purposes of these instructions, all references to "sick pay" mean ordinary sick pay, not "qualified sick leave wages" that are reported on line 5a(i).*

### 2. Wages, Tips, and Other Compensation

Enter amounts on line 2 that would also be included in box 1 of your employees' Forms W-2. See *Box 1—Wages, tips, other compensation* in the General Instructions for Forms W-2 and W-3 for details. Include sick pay paid by your agent. Also include sick pay paid by a third party that isn't your agent (for example, an insurance company) if you were given timely notice of the payments and the third party transferred liability for the employer's taxes to you.

If you're a third-party payer of sick pay and not an agent of the employer, don't include sick pay that you paid to policyholders' employees here if you gave the policyholders timely notice of the payments. See section 6 of Pub. 15-A for more information about sick pay reporting and the procedures for transferring the liability to the employer.

### 3. Federal Income Tax Withheld From Wages, Tips, and Other Compensation

Enter the federal income tax you withheld (or were required to withhold) from your employees on this quarter's wages, including qualified sick leave wages, qualified family leave wages, and qualified wages (excluding qualified health plan expenses) for the employee retention credit; tips; taxable fringe benefits; and supplemental unemployment compensation benefits. Don't include any income tax withheld by a third-party payer of sick pay even if you reported it on Forms W-2. You will reconcile this difference on Form W-3. Also include here any excise taxes you were required to withhold on golden parachute payments (section 4999). For information on the employment tax treatment of

fringe benefits, see Pub. 15-B, Employer's Tax Guide to Fringe Benefits. For information about supplemental unemployment compensation benefits and golden parachute payments, see section 5 of Pub. 15-A.

If you're a third-party payer of sick pay, enter the federal income tax you withheld (or were required to withhold) on third-party sick pay here.

### 4. If No Wages, Tips, and Other Compensation Are Subject to Social Security or Medicare Tax . . .

If no wages, tips, and other compensation on line 2 are subject to social security or Medicare tax, check the box on line 4. If this question doesn't apply to you, leave the box blank. For more information about exempt wages, see section 15 of Pub. 15. For religious exemptions, see section 4 of Pub. 15-A.

CAUTION *If you're a government employer, wages you pay aren't automatically exempt from social security and Medicare taxes. Your employees may be covered by law or by a voluntary Section 218 Agreement with the SSA. For more information, see Pub. 963, Federal-State Reference Guide.*

### 5a–5e. Taxable Social Security and Medicare Wages and Tips

**5a. Taxable social security wages.** Enter the total wages, including qualified wages (other than qualified health plan expenses) for the employee retention credit; sick pay; and taxable fringe benefits subject to social security taxes you paid to your employees during the quarter. Don't include the qualified sick leave wages reported on line 5a(i) or qualified family leave wages reported on line 5a(ii). For this purpose, sick pay includes payments made by an insurance company to your employees for which you received timely notice from the insurance company. See section 6 of Pub. 15-A for more information about sick pay reporting. See the instructions for line 8 for an adjustment that you may need to make on Form 941 for sick pay.

Enter the amount before payroll deductions. Don't include tips on this line. For information on types of wages subject to social security taxes, see section 5 of Pub. 15.

For 2020, the rate of social security tax on taxable wages, except for qualified sick leave wages and qualified family leave wages, is 6.2% (0.062) each for the employer and employee or 12.4% (0.124) for both. Stop paying social security tax on and entering an employee's wages on line 5a when the employee's taxable wages, including qualified sick leave wages, qualified family leave wages, and tips, reach $137,700 for the year. However, continue to withhold income and Medicare taxes for the whole year on all wages, including qualified sick leave wages, qualified family leave wages, and tips, even when the social security wage base of $137,700 has been reached.

line 5a (column 1)
x 0.124
line 5a (column 2)

**5a(i). Qualified sick leave wages.** Enter the qualified taxable sick leave wages you paid to your employees during the quarter. Qualified sick leave wages aren't subject to the employer share of social security tax; therefore, the tax rate on these wages is 6.2% (0.062). Stop paying social security tax on and entering an employee's wages on line 5a(i) when the employee's taxable wages, including wages reported on line 5a, qualified sick leave wages, qualified family leave wages, and tips, reach $137,700 for the year. See the instructions for line 5c for reporting Medicare tax on qualified sick leave wages, including the portion above the social security wage base.

Qualified sick leave wages are wages for social security and Medicare tax purposes required to be paid under the Emergency Paid Sick Leave Act (EPSLA) as enacted under the *Families First Coronavirus Response Act* (FFCRA). See the instructions for line 11b for information about the credit for qualified sick and family leave wages.

line 5a(i) (column 1)
x 0.062
line 5a(i) (column 2)

***Emergency Paid Sick Leave Act (EPSLA).*** The EPSLA requires certain government employers and private employers with fewer than 500 employees to provide paid sick leave to employees unable to work or telework after March 31, 2020, and before January 1, 2021, because the employee:

1. Is subject to a federal, state, or local quarantine or isolation order related to COVID-19;
2. Has been advised by a health care provider to self-quarantine due to concerns related to COVID-19;
3. Is experiencing symptoms of COVID-19 and seeking a medical diagnosis;
4. Is caring for an individual subject to an order described in (1) or who has been advised as described in (2);
5. Is caring for a child if the school or place of care has been closed, or the childcare provider is unavailable, due to COVID-19 precautions; or
6. Is experiencing any other substantially similar condition specified by the U.S. Department of Health and Human Services.

TIP *Government employers aren't eligible for the credit for qualified sick and family leave wages; however, as with any employer, government employers aren't liable for the employer share of the social security tax on the qualified sick leave wages paid to employees.*

***Limits on qualified sick leave wages.*** The EPSLA provides different limitations for different circumstances under which qualified sick leave wages are paid. For paid sick leave qualifying under (1), (2), or (3) above, the amount of qualified sick leave wages is determined at the employee's regular rate of pay, but the wages may not exceed $511 for any day (or portion of a day) for which the individual is paid sick leave. For paid sick leave qualifying under (4), (5), or (6) above, the amount of qualified sick leave wages is determined at two-thirds the employee's regular rate of pay, but the wages may not exceed $200 for any day (or portion of a day) for which the individual is paid sick leave. The EPSLA also limits each individual to a maximum of up to 80 hours of paid sick leave for the year. Therefore, the maximum amount of paid sick leave wages for the year can't exceed $5,110 for an employee for leave under (1), (2), or (3), and it can't exceed $2,000 for an employee for leave under (4), (5), or

(6). For more information from the Department of Labor on these requirements and limits, see *DOL.gov/agencies/whd/pandemic*.

For more information about qualified sick leave wages, go to *IRS.gov/PLC*.

**5a(ii). Qualified family leave wages.** Enter the qualified taxable family leave wages you paid to your employees during the quarter. Qualified family leave wages aren't subject to the employer share of social security tax; therefore, the tax rate on these wages is 6.2% (0.062). Stop paying social security tax on and entering an employee's wages on line 5a(ii) when the employee's taxable wages, including wages reported on line 5a, qualified sick leave wages, qualified family leave wages, and tips, reach $137,700 for the year. See the instructions for line 5c for reporting Medicare tax on qualified family leave wages, including the portion above the social security wage base.

Qualified family leave wages are wages for social security and Medicare tax purposes required to be paid under the Emergency Family and Medical Leave Expansion Act as enacted under the FFCRA. See the instructions for line 11b for information about the credit for qualified sick and family leave wages.

| | | |
|---|---|---|
| | line 5a(ii) | (column 1) |
| x | 0.062 | |
| | line 5a(ii) | (column 2) |

***Emergency Family and Medical Leave Expansion Act.*** The Emergency Family and Medical Leave Expansion Act requires certain government employers and private employers with fewer than 500 employees to provide paid family leave under the Family and Medical Leave Act of 1993 to an employee who has been employed for at least 30 calendar days. The requirement to provide leave generally applies when an employee is unable to work or telework after March 31, 2020, and before January 1, 2021, due to the need to care for a child because the school or place of care has been closed, or the childcare provider is unavailable, due to COVID-19 related reasons. The first 10 days for which an employee takes leave may be unpaid. During this period, employees may use other forms of paid leave, such as qualified sick leave, accrued sick leave, annual leave, or other paid time off. After an employee takes leave for 10 days, the employer must provide the employee paid leave (that is, qualified family leave wages) for up to 10 weeks. For more information from the Department of Labor on these requirements, possible exceptions, and the limitations discussed below, see *DOL.gov/agencies/whd/pandemic*.

**TIP** *Government employers aren't eligible for the credit for qualified sick and family leave wages; however, as with any employer, government employers aren't liable for the employer share of the social security tax on the qualified family leave wages paid to employees.*

***Rate of pay and limit on wages.*** The rate of pay must be at least two-thirds of the employee's regular rate of pay (as determined under the Fair Labor Standards Act of 1938), multiplied by the number of hours the employee otherwise would have been scheduled to work. The qualified family leave wages can't exceed $200 per day or $10,000 in the aggregate per employee for the year.

For more information about qualified family leave wages, go to *IRS.gov/PLC*.

**5b. Taxable social security tips.** Enter all tips your employees reported to you during the quarter until the total of the tips and taxable wages, including qualified sick leave wages and qualified family leave wages, for an employee reach $137,700 for the year. Include all tips your employee reported to you even if you were unable to withhold the employee tax of 6.2%. You will reduce your total taxes by the amount of any uncollected employee share of social security and Medicare taxes on tips later on line 9; see *Current quarter's adjustments for tips and group-term life insurance*, later. Don't include service charges on line 5b. For details about the difference between tips and service charges, see Rev. Rul. 2012-18, 2012-26 I.R.B. 1032, available at *IRS.gov/irb/2012-26_IRB#RR-2012-18*.

Your employee must report cash tips to you by the 10th day of the month after the month the tips are received. Cash tips include tips paid by cash, check, debit card, and credit card. The report should include charged tips (for example, credit and debit card charges) you paid over to the employee for charge customers, tips the employee received directly from customers, and tips received from other employees under any tip-sharing arrangement. Both directly and indirectly tipped employees must report tips to you. No report is required for months when tips are less than $20. Employees may use Form 4070 (available only in Pub. 1244), or submit a written statement or electronic tip record.

Don't include allocated tips (described in section 6 of Pub. 15) on this line. Instead, report them on Form 8027. Allocated tips aren't reportable on Form 941 and aren't subject to withholding of federal income, social security, or Medicare taxes.

| | | |
|---|---|---|
| | line 5b | (column 1) |
| x | 0.124 | |
| | line 5b | (column 2) |

**5c. Taxable Medicare wages & tips.** Enter all wages, including qualified sick leave wages, qualified family leave wages, and qualified wages (excluding qualified health plan expenses) for the employee retention credit; tips; sick pay; and taxable fringe benefits that are subject to Medicare tax. Unlike social security wages, there is no limit on the amount of wages subject to Medicare tax.

The rate of Medicare tax is 1.45% (0.0145) each for the employer and employee or 2.9% (0.029) for both. Include all tips your employees reported during the quarter, even if you were unable to withhold the employee tax of 1.45%.

| | | |
|---|---|---|
| | line 5c | (column 1) |
| x | 0.029 | |
| | line 5c | (column 2) |

For more information on tips, see section 6 of Pub. 15. See the instructions for line 8 for an adjustment that you may need to make on Form 941 for sick pay.

**5d. Taxable wages & tips subject to Additional Medicare Tax withholding.** Enter all wages, including qualified sick leave wages, qualified family leave wages, and qualified wages (excluding qualified health plan expenses) for the employee retention credit; tips; sick pay; and taxable fringe

benefits that are subject to Additional Medicare Tax withholding. You're required to begin withholding Additional Medicare Tax in the pay period in which you pay wages in excess of $200,000 to an employee and continue to withhold it each pay period until the end of the calendar year. Additional Medicare Tax is only imposed on the employee. There is no employer share of Additional Medicare Tax. All wages that are subject to Medicare tax are subject to Additional Medicare Tax withholding if paid in excess of the $200,000 withholding threshold.

For more information on what wages are subject to Medicare tax, see the chart, *Special Rules for Various Types of Services and Payments*, in section 15 of Pub. 15. For more information on Additional Medicare Tax, go to *IRS.gov/ADMT*. See the instructions for line 8 for an adjustment that you may need to make on Form 941 for sick pay.

Once wages and tips exceed the $200,000 withholding threshold, include all tips your employees reported during the quarter, even if you were unable to withhold the employee tax of 0.9%.

| | | |
|---|---|---|
| | line 5d | (column 1) |
| x | 0.009 | |
| | line 5d | (column 2) |

**5e. Total social security and Medicare taxes.** Add the column 2 amounts on lines 5a–5d. Enter the result on line 5e.

## 5f. Section 3121(q) Notice and Demand—Tax Due on Unreported Tips

Enter the tax due from your Section 3121(q) Notice and Demand on line 5f. The IRS issues a Section 3121(q) Notice and Demand to advise an employer of the amount of tips received by employees who failed to report or underreported tips to the employer. An employer isn't liable for the employer share of the social security and Medicare taxes on unreported tips until notice and demand for the taxes is made to the employer by the IRS in a Section 3121(q) Notice and Demand. The tax due may have been determined from tips reported to the IRS on employees' Forms 4137, Social Security and Medicare Tax on Unreported Tip Income, or other tips that weren't reported to their employer as determined by the IRS during an examination. For additional information, see Rev. Rul. 2012-18, 2012-26 I.R.B. 1032, available at *IRS.gov/irb/2012-26_IRB#RR-2012-18*.

Deposit the tax within the time period required under your deposit schedule to avoid any possible deposit penalty. However, see the instructions for line 13b, later, for information about deferring the employer share of social security due from the Section 3121(q) Notice and Demand. The tax is treated as accumulated by the employer on the "Date of Notice and Demand" as printed on the Section 3121(q) Notice and Demand. The employer must include this amount on the appropriate line of the record of federal tax liability (Part 2 of Form 941 for a monthly schedule depositor or Schedule B (Form 941) for a semiweekly schedule depositor).

## 6. Total Taxes Before Adjustments

Add the total federal income tax withheld from wages, tips, and other compensation (line 3); the total social security and Medicare taxes before adjustments (line 5e); and any tax due under a Section 3121(q) Notice and Demand (line 5f). Enter the result on line 6.

## 7–9. Tax Adjustments

Enter tax amounts on lines 7–9 that result from current quarter adjustments. Use a minus sign (if possible) to show an adjustment that decreases the total taxes shown on line 6 instead of parentheses. Doing so enhances the accuracy of our scanning software. For example, enter "-10.59" instead of "(10.59)." However, if your software only allows for parentheses in entering negative amounts, you may use them.

**Current quarter's adjustments.** In certain cases, you must adjust the amounts you entered as social security and Medicare taxes in column 2 of lines 5a–5d to figure your correct tax liability for this quarter's Form 941. See section 13 of Pub. 15.

***7. Current quarter's adjustment for fractions of cents.*** Enter adjustments for fractions of cents (due to rounding) relating to the employee share of social security and Medicare taxes withheld. The employee share of amounts shown in column 2 of lines 5a–5d may differ slightly from amounts actually withheld from employees' pay due to the rounding of social security and Medicare taxes based on statutory rates. This adjustment may be a positive or a negative adjustment.

***8. Current quarter's adjustment for sick pay.*** If your third-party payer of sick pay that isn't your agent (for example, an insurance company) transfers the liability for the employer share of the social security and Medicare taxes to you, enter a negative adjustment on line 8 for the employee share of social security and Medicare taxes that were withheld and deposited by your third-party sick pay payer on the sick pay. If you're the third-party sick pay payer and you transferred the liability for the employer share of the social security and Medicare taxes to the employer, enter a negative adjustment on line 8 for any employer share of these taxes required to be paid by the employer. The sick pay should be included on line 5a, line 5c, and, if the withholding threshold is met, line 5d.

No adjustment is reported on line 8 for sick pay that is paid through a third party as an employer's agent. An employer's agent bears no insurance risk and is reimbursed on a cost-plus-fee basis for payment of sick pay and similar amounts. If an employer uses an agent to pay sick pay, the employer reports the wages on line 5a, line 5c, and, if the withholding threshold is met, line 5d, unless the employer has an agency agreement with the third-party payer that requires the third-party payer to do the collecting, reporting, and/or paying or depositing employment taxes on the sick pay. See section 6 of Pub. 15-A for more information about sick pay reporting.

***9. Current quarter's adjustments for tips and group-term life insurance.*** Enter a negative adjustment for:

- Any uncollected employee share of social security and Medicare taxes on tips, and
- The uncollected employee share of social security and Medicare taxes on group-term life insurance premiums paid for former employees.

See the General Instructions for Forms W-2 and W-3 for information on how to report the uncollected employee share of social security and Medicare taxes on tips and group-term life insurance on Form W-2.

**Prior quarter's adjustments.** If you need to correct any adjustment reported on a previously filed Form 941, complete and file Form 941-X. Form 941-X is an adjusted

return or claim for refund and is filed separately from Form 941. See section 13 of Pub. 15.

### 10. Total Taxes After Adjustments

Combine the amounts shown on lines 6–9 and enter the result on line 10.

### 11a. Qualified Small Business Payroll Tax Credit for Increasing Research Activities

Enter the amount of the credit from Form 8974, line 12.

CAUTION *If you enter an amount on line 11a, you must attach Form 8974. The December 2017 revision of Form 8974 instructs you to enter the amount from Form 8974, line 12, on Form 941, line 11. For the second, third, and fourth quarters of 2020, the amount from Form 8974, line 12, should be entered on Form 941, line 11a.*

### 11b. Nonrefundable Portion of Credit for Qualified Sick and Family Leave Wages From Worksheet 1

TIP *Form 941 and these instructions use the terms "nonrefundable" and "refundable" when discussing credits. The term "nonrefundable" means the portion of the credit which is limited by law to the amount of the employer share of social security tax. The term "refundable" means the portion of the credit which is in excess of the employer share of social security tax.*

Businesses and tax-exempt organizations with fewer than 500 employees that are required to provide paid sick leave under the EPSLA and/or to provide paid family leave under the Emergency Family and Medical Leave Expansion Act are eligible to claim the credit for qualified sick and family leave wages for the period after March 31, 2020, and before January 1, 2021. Enter the nonrefundable portion of the credit for qualified sick and family leave wages from Worksheet 1, Step 2, line 2j. The credit for qualified sick and family leave wages consists of the qualified sick leave wages, the qualified family leave wages, and the qualified health plan expenses and employer share of Medicare tax allocable to those wages. The nonrefundable portion of the credit is limited to the employer share of social security tax reported on Form 941, lines 5a and 5b, after that share is first reduced by any credit claimed on Form 8974 for the qualified small business payroll tax credit for increasing research activities, or any credit to be claimed on Form 5884-C for the work opportunity credit for qualified tax-exempt organizations hiring qualified veterans.

CAUTION *If you're a third-party payer of sick pay that isn't an agent (for example, an insurance company) and you're claiming the credit for qualified sick and family leave wages for amounts paid to your own employees, the amount of the employer share of social security tax reported on line 5a must be reduced by any adjustment you make on line 8 for the employer share of social security tax transferred to your client. If you received a Section 3121(q) Notice and Demand for tax due on unreported tips (Letter 3263 or Letter 4520) during the quarter, you report the amount for the employer share of social security tax and Medicare tax on Form 941, line 5f. Letter 3263 or Letter 4520 includes an attachment that shows the employer share of social security tax. This amount of the employer share of social security tax can also be reduced by the nonrefundable portion of the credit. See Worksheet 1 to figure your credit.*

Any credit in excess of the remaining amount of the employer share of social security tax is refundable and reported on Form 941, line 13c. For more information on the credit for qualified sick and family leave wages, go to *IRS.gov/PLC*.

**Qualified health plan expenses allocable to qualified sick leave and family leave wages.** The credit for qualified sick leave wages and qualified family leave wages is increased to cover the qualified health plan expenses that are properly allocable to the qualified leave wages for which the credit is allowed. These qualified health plan expenses are amounts paid or incurred by the employer to provide and maintain a group health plan but only to the extent such amounts are excluded from the employees' income as coverage under an accident or health plan. The amount of qualified health plan expenses generally includes both the portion of the cost paid by the employer and the portion of the cost paid by the employee with pre-tax salary reduction contributions. However, qualified health plan expenses don't include amounts that the employee paid for with after-tax contributions. For more information, go to *IRS.gov/PLC*.

TIP *You must include the full amount (both the nonrefundable and refundable portions) of the credit for qualified sick and family leave wages in your gross income for the tax year that includes the last day of any calendar quarter in which a credit is allowed. You can't use the same wages for the employee retention credit and the credits for paid sick and family leave.*

### 11c. Nonrefundable Portion of Employee Retention Credit From Worksheet 1

CAUTION *An employer may not claim the employee retention credit if the employer receives a Small Business Interruption Loan under the Paycheck Protection Program (PPP) that is authorized under the Coronavirus Aid, Relief, and Economic Security (CARES) Act ("Paycheck Protection Loan"). An employer that receives a Paycheck Protection Loan shouldn't claim an employee retention credit. An employer that applied for a Paycheck Protection Loan, received payment, and repaid the loan by May 18, 2020, will be treated as though the employer had not received a covered loan under the PPP for purposes of the employee retention credit.*

Enter the nonrefundable portion of the employee retention credit from Worksheet 1, Step 3, line 3h. The employee retention credit is 50% of the qualified wages you paid to your employees in the quarter. Qualified wages include qualified health plan expenses for the employee retention credit. The nonrefundable portion of the credit is limited to the employer share of social security tax reported on Form 941, lines 5a and 5b, after that share is first reduced by any credit claimed on Form 8974 for the qualified small business payroll tax credit for increasing research activities, or any credit to be claimed on Form 5884-C for the work opportunity credit for qualified tax-exempt organizations hiring qualified veterans, and/or any credit claimed for the nonrefundable portion of the credit for qualified sick and family leave wages.

CAUTION *If you're a third-party payer of sick pay that isn't an agent (for example, an insurance company) and you're claiming the employee retention credit for amounts paid to your own employees, the amount of the employer share of social security tax reported on line 5a must be reduced by any adjustment you make on line 8 for the*

*employer share of social security tax transferred to your client. If you received a Section 3121(q) Notice and Demand for tax due on unreported tips (Letter 3263 or Letter 4520) during the quarter, you report the amount for the employer share of social security tax and Medicare tax on Form 941, line 5f. Letter 3263 or Letter 4520 includes an attachment that shows the employer share of social security tax. This amount of the employer share of social security tax can also be reduced by the nonrefundable portion of the credit. See Worksheet 1 to figure your credit.*

Any credit in excess of the remaining amount of the employer share of social security tax is refundable and reported on Form 941, line 13d. For more information on the employee retention credit, go to *IRS.gov/ERC*.

**TIP** *The employee retention credit for qualified wages paid between March 13, 2020, and March 31, 2020, is claimed on Form 941 for the second quarter of 2020. Don't file Form 941-X for the first quarter of 2020 to claim the employee retention credit for this period.*

**Qualified wages for the employee retention credit.** The tax credit is equal to 50% of qualified wages paid to employees between March 13, 2020, and December 31, 2020. Qualified wages, including qualified health plan expenses, are limited to a maximum of $10,000 for each employee for the cumulative total of all calendar quarters. Qualified wages are wages for social security and Medicare tax purposes paid to certain employees during any period in a quarter in which your operations are fully or partially suspended due to a government order or during a quarter in which you have had a significant decline in gross receipts. The law provides that the significant decline in gross receipts is the period beginning with any quarter in which your gross receipts are less than 50% of what they were in the same calendar quarter in 2019 and ending with the quarter that follows the first quarter beginning after the quarter in which your gross receipts were greater than 80% of what they were in the same calendar quarter in 2019.

The wages and qualified health plan expenses considered in calculating your credit depend on the size of your workforce. Eligible employers that had an average number of 100 or fewer full-time employees during 2019 count wages paid to all their employees and the qualified health plan expenses paid or incurred for all employees during any period in the quarter in which operations are fully or partially suspended due to a government order or during a quarter in which there has been a significant decline in gross receipts. Eligible employers that had an average number of more than 100 full-time employees in 2019 may count only wages paid to employees for time that the employees weren't working, and qualified health plan expenses paid or incurred by the employer allocable to the time those employees weren't working, due to the suspension or significant decline in gross receipts; these eligible employers can count only wages that don't exceed what the employer would have paid that employee for working for the same amount of time during the prior 30 days. More information on the employee retention credit is available at *IRS.gov/ERC*.

***Qualified health plan expenses for the employee retention credit.*** Qualified wages for the employee retention credit include qualified health plan expenses. Qualified health plan expenses are amounts paid or incurred by the employer to provide and maintain a group health plan but only to the extent such amounts are excluded from the employees' income as coverage under an accident or health plan. The amount of qualified health plan expenses taken into account in determining the amount of qualified wages generally includes both the portion of the cost paid by the employer and the portion of the cost paid by the employee with pre-tax salary reduction contributions. However, the qualified health plan expenses shouldn't include amounts that the employee paid for with after-tax contributions. Generally, the qualified health plan expense is the amount that is allocable to the hours for which the employees receive qualified wages for the employee retention credit. However, qualified health plan expenses for purposes of the employee retention credit may include health plan expenses allocable to the applicable periods even if the employer isn't paying any qualified wages to the employee. For more information, see the frequently asked questions for qualified health plan expenses at *IRS.gov/ERC*.

### 11d. Total Nonrefundable Credits

Add lines 11a, 11b, and 11c. Enter the total on line 11d.

### 12. Total Taxes After Adjustments and Nonrefundable Credits

Subtract line 11d from line 10 and enter the result on line 12.

- **If line 12 is less than $2,500 or line 12 on the prior quarterly return was less than $2,500, and you didn't incur a $100,000 next-day deposit obligation during the current quarter.** You may pay the amount with Form 941 or you may deposit the amount. To avoid a penalty, you must pay any amount you owe in full with a timely filed return or you must deposit any amount you owe before the due date of the return. For more information on paying with a timely filed return, see the instructions for line 14, later.
- **If line 12 is $2,500 or more and line 12 on the prior quarterly return was $2,500 or more, or if you incurred a $100,000 next-day deposit obligation during the current quarter.** You must make required deposits according to your deposit schedule. See *Notice 2020-22*, *Notice 2020-65*, and *IRS.gov/ETD* for information about the reduction and deferral of certain deposits. The amount shown on line 12 must equal the "Total liability for quarter" shown on line 16 or the "Total liability for the quarter" shown on Schedule B (Form 941). For more information, see the line 16 instructions, later.

For more information and rules about federal tax deposits, see *Depositing Your Taxes*, earlier, and section 11 of Pub. 15.

**CAUTION** *If you're a semiweekly schedule depositor, you must complete Schedule B (Form 941). If you fail to complete and submit Schedule B (Form 941), the IRS may assert deposit penalties based on available information.*

### 13a. Total Deposits for This Quarter

Enter your deposits for this quarter, including any overpayment from a prior quarter that you applied to this return. Also include in the amount shown any overpayment that you applied from filing Form 941-X, 941-X (PR), 944-X, or 944-X (SP) in the current quarter. Don't include any amount that you don't deposit because you chose to defer the employer or employee share of social security tax. For more information about the deferral, see the line 13b instructions next. Also, don't include any amount you didn't deposit because you reduced your deposits in anticipation of the credit for qualified sick and family leave wages or the employee retention credit, as discussed in *Notice 2020-22*.

### 13b. Deferred Amount of Social Security Tax

Include on line 13b the combined amount of the employer and employee share of social security tax that you're deferring for the quarter.

**Deferred amount of the employer share of social security tax.** Include on line 13b the amount of the employer share of social security tax that you're deferring for the quarter. The CARES Act allows employers, including government employers, to defer the deposit and payment of the employer share of social security tax for deposits and payments due on or after March 27, 2020, and before January 1, 2021, as well as deposits and payments due after January 1, 2021, that are required for wages paid during the quarter ending on December 31, 2020. Generally, your employer share of social security tax is 50% of column 2 of line 5a plus 50% of column 2 of line 5b. However, if you're a third-party payer of sick pay that isn't an agent or if you're an employer that received a Section 3121(q) Notice and Demand during the quarter, see *Figuring the employer share of social security tax for certain employers*, later, for exceptions. Don't include the employee social security tax reported on lines 5a(i) and 5a(ii) as part of the deferred amount of the employer share of social security tax. Don't reduce the amount reported on line 13b by any credits claimed on line 11a, 11b, or 11c or any credit to be claimed on Form 5884-C, line 11, for the work opportunity credit for qualified tax-exempt organizations hiring qualified veterans. However, you can't defer tax that you have already paid; therefore, the maximum amount of social security tax (both the employer and employee share of social security tax) that can be deferred each quarter is the lesser of (1) the total of the employer and employee share of social security tax, or (2) the **excess** of (a) line 10 (reduced by the amount, if any, on line 11a) **over** (b) line 13a. For more information about the deferral of employment tax deposits, including limitations on the maximum amount you can defer, go to *IRS.gov/ETD*.

**TIP** *The deferred amount of the employer share of social security tax is a deferral of deposits and payments, not a deferral of liability. You won't receive a refund or credit of any amount of the employer share of social security tax already deposited or paid for the quarter. However, in determining whether any amount of the employer share of social security tax was already deposited for this purpose, you can consider prior deposits during the quarter as first being deposited for employment taxes other than the employer share of social security tax. Although employers depositing taxes using EFTPS identify the subcategory of separate deposits for the different employment taxes (for example, social security tax and Medicare tax), those entries are for informational purposes only. The IRS doesn't use that information in comparing liabilities reported on the employment tax return and the total deposits made.*

***Figuring the employer share of social security tax for certain employers.*** If you're a third-party payer of sick pay that isn't an agent (for example, an insurance company), the amount of the employer share of social security tax reported on line 5a must be reduced by any adjustment you make on line 8 for the employer share of social security tax transferred to your client, before deciding your employer share of social security tax that can be deferred. If you received a Section 3121(q) Notice and Demand for tax due on unreported tips (Letter 3263 or Letter 4520) during the quarter, you report the amount for the employer share of social security tax and Medicare tax on Form 941, line 5f. Letter 3263 or Letter 4520 includes an attachment that shows the employer share of social security tax. This amount of the employer share of social security tax can also be deferred.

***Paying the deferred amount of the employer share of social security tax.*** One-half of the employer share of social security tax is due by December 31, 2021, and the remainder is due by December 31, 2022. Any payments or deposits you make before December 31, 2021, are first applied against your payment due on December 31, 2021, and then applied against your payment due on December 31, 2022. For example, if your employer share of social security tax for the third quarter of 2020 is $20,000 and you deposited $5,000 of the $20,000 during the third quarter of 2020 and defer $15,000 on line 13b, then you must pay $5,000 by December 31, 2021, and $10,000 by December 31, 2022. However, if your employer share of social security tax for the third quarter of 2020 was $20,000 and you deposited $15,000 of the $20,000 during the third quarter of 2020 and defer $5,000 on line 13b, then you don't need to pay any deferred amount by December 31, 2021, because 50% of the amount that could have been deferred ($10,000) has already been paid and is first applied against your payment that would be due on December 31, 2021. Accordingly, you must pay the $5,000 deferral by December 31, 2022. For additional information, go to *IRS.gov/ETD*.

**Deferred amount of the employee share of social security tax.** In addition to the deferred amount of the employer share of social security tax, include on line 13b the amount of the employee share of social security tax that you're deferring for the quarter. On August 8, 2020, the President issued a Presidential Memorandum directing the Secretary of the Treasury to use his authority pursuant to section 7508A of the Internal Revenue Code to defer the withholding, deposit, and payment of certain payroll tax obligations. In *Notice 2020-65*, the Secretary made relief available under section 7508A to employers required to withhold social security taxes from wages paid to employees. Specifically, under the notice, the due date for withholding and payment of the employee share of social security tax on applicable wages is postponed until the period beginning on January 1, 2021, and ending on April 30, 2021. Applicable wages are social security wages of less than $4,000 in any biweekly pay period (or the equivalent threshold amount for other pay periods), paid on a pay date during the period beginning on September 1, 2020, and ending on December 31, 2020. The determination of whether the deferral of withholding or payment of the employee share of social security tax is available is made on a pay period-by-pay period basis. Nothing prohibits employers from getting employee input on whether to apply the relief to postpone the due date for the withholding and payment of the employee share of social security tax on applicable wages paid to the employee.

You can't defer tax that you have already paid; therefore, the maximum amount of social security tax (both the employer and employee share of social security tax) that can be deferred each quarter is the lesser of (1) the total of the employer and employee share of social security tax, or (2) the **excess** of (a) line 10 (reduced by the amount, if any, on line 11a) **over** (b) line 13a.

**TIP** *If you paid an employee supplemental wages (for example, a bonus or commission) and included the supplemental wages with the employee's regular wages in a single payment (that is, in a single paycheck) for a pay period, but you didn't specifically identify the amount of*

*each, then the entire amount of the payment must be below $4,000 (or equivalent amount for pay periods other than a biweekly pay period) to be eligible for the deferral of the withholding and payment of the employee share of social security tax on the wages. If the entire amount is below $4,000, then you may defer the withholding and payment of the employee share of social security tax on the entire payment of the wages. If you paid the supplemental wages separately from the employee's regular wages (that is, in a separate check), or you combined the wages in a single payment but you specifically identified the amount of each, then the supplemental wages are disregarded for purposes of determining whether the regular wages are below $4,000 (or equivalent amount), but the supplemental wages aren't eligible for the deferral of the withholding and payment of the employee share of social security tax.*

***Paying the deferred amount of the employee share of social security tax.*** The due date for the withholding and payment of the employee share of social security tax is postponed until the period beginning on January 1, 2021, and ending on April 30, 2021. The employer must withhold and pay the total deferred employee share of social security tax ratably from wages paid to the employee between January 1, 2021, and April 30, 2021. If necessary, the employer may make arrangements to otherwise collect the total deferred taxes from the employee. The employer is liable to pay the deferred taxes to the IRS and must do so before May 1, 2021, to avoid interest, penalties, and additions to tax on those amounts. For more information about the deferral of the employee share of social security tax, see *Notice 2020-65*.

**TIP** *If you initially deferred (that is, didn't deposit) the employer or employee share of social security tax and later decide to pay or deposit it in the same quarter, see* Adjusting tax liability for the deferred amount of social security tax that you pay or deposit in the same quarter it was deferred*, later.*

**How to pay the deferred amount of the employer and employee share of social security tax.** You may pay the amount you owe electronically using EFTPS, by credit or debit card, or by a check or money order. The preferred method of payment is EFTPS. For more information, visit *EFTPS.gov*, or call 800-555-4477 or 800-733-4829 (TDD). To pay the deferred amount using EFTPS, select Form 941, the calendar quarter in 2020 to which the payment relates, and the option for payment due on an IRS notice.

To pay by credit or debit card, go to *IRS.gov/PayByCard*. If you pay by check or money order, include a 2020 Form 941-V, Payment Voucher, for the quarter in which you originally deferred the deposit and payment. Darken the circle identifying the quarter for which the payment is being made. The 2020 Form 941-V is on page 5 of Form 941 and is available at *IRS.gov/Form941* (select the link for "All Form 941 Revisions" under "Other Items You May Find Useful"). Make the check or money order payable to “United States Treasury.” Enter your EIN, “Form 941,” and the calendar quarter in which you originally deferred the deposit and payment (for example, “2nd Quarter 2020”).

***Where to send payments.*** Payments should be sent to:

| | | |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service<br>Ogden, UT 84201-0030 | or | Department of the Treasury<br>Internal Revenue Service<br>Kansas City, MO 64999-0030 |

Send your payment to the address above that is in the same state as the address to which you would mail returns filed without a payment, as shown under *Where Should You File*, earlier.

For more information about the deferral of social security tax, go to *IRS.gov/ETD* and see *Notice 2020-65*.

### 13c. Refundable Portion of Credit for Qualified Sick and Family Leave Wages From Worksheet 1

Businesses and tax-exempt organizations with fewer than 500 employees that are required to provide paid sick leave under the EPSLA and/or to provide paid family leave under the Emergency Family and Medical Leave Expansion Act are eligible to claim the credit for qualified sick and family leave wages. Enter the refundable portion of the credit for qualified sick and family leave wages from Worksheet 1, Step 2, line 2k. The credit for qualified sick and family leave wages consists of the qualified sick leave wages, the qualified family leave wages, the allocable qualified health plan expenses, and the employer share of Medicare tax allocable to those wages. The refundable portion of the credit is allowed after the employer share of social security tax is reduced to zero by nonrefundable credits.

### 13d. Refundable Portion of Employee Retention Credit From Worksheet 1

Enter the refundable portion of the employee retention credit from Worksheet 1, Step 3, line 3i. The employee retention credit is 50% of the qualified wages you paid to your employees in the quarter. The refundable portion of the credit is allowed after the employer share of social security tax is reduced to zero by nonrefundable credits.

### 13e. Total Deposits, Deferrals, and Refundable Credits

Add lines 13a, 13b, 13c, and 13d. Enter the total on line 13e.

### 13f. Total Advances Received From Filing Form(s) 7200 for the Quarter

Enter the total advances received from filing Form(s) 7200 for the quarter. If you filed a Form 7200 before the end of the quarter but you haven't received the advance before filing Form 941, don't include that amount. Employers were eligible to file Form 7200 for the quarter if they paid qualified sick leave wages, qualified family leave wages, and/or qualified wages for the employee retention credit and the amount of employment tax deposits they retained wasn't sufficient to cover the cost of qualified sick and family leave wages and the employee retention credit.

**TIP** *Form 7200 may be filed for a quarter up to the earlier of the end of the month after the end of each quarter or filing of Form 941 for the quarter. However, if you file Form 7200 after the end of the quarter, it's possible that it may not be processed prior to the processing of the filed Form 941. Advance payment requests on Form 7200 for a quarter won't be paid after your Form 941 is processed for that quarter. When the IRS processes Form 941, we will correct the amount reported on line 13f to match the amount*

*of advance payments issued or contact you to reconcile the difference before we finish processing Form 941.*

### 13g. Total Deposits, Deferrals, and Refundable Credits Less Advances

Subtract line 13f from line 13e. Enter the result on line 13g.

### 14. Balance Due

If line 12 is more than line 13g, enter the difference on line 14. Otherwise, see Overpayment, later.

**Never make an entry on both lines 14 and 15.**

You don't have to pay if line 14 is under $1. Generally, you should have a balance due only if your total taxes after adjustments and nonrefundable credits (line 12) for the current quarter or prior quarter are less than $2,500, and you didn't incur a $100,000 next-day deposit obligation during the current quarter. However, see section 11 of Pub. 15 for information about payments made under the accuracy of deposits rule.

If you were required to make federal tax deposits, pay the amount shown on line 14 by EFT. If you weren't required to make federal tax deposits (see Must You Deposit Your Taxes, earlier) or you're a monthly schedule depositor making a payment under the accuracy of deposits rule, you may pay the amount shown on line 14 by EFT, credit card, debit card, check, money order, or EFW. For more information on electronic payment options, go to IRS.gov/Payments.

If you pay by EFT, credit card, or debit card, file your return using the *Without a payment* address under Where Should You File, earlier, and don't file Form 941-V, Payment Voucher.

If you pay by check or money order, make it payable to "United States Treasury." Enter your EIN, "Form 941," and the tax period ("1st Quarter 2020," "2nd Quarter 2020," "3rd Quarter 2020," or "4th Quarter 2020") on your check or money order. Complete Form 941-V and enclose with Form 941.

If line 12 is $2,500 or more on both your prior and current quarter Form 941, and you've deposited all taxes when due, the balance due on line 14 should be zero.

**CAUTION** *If you're required to make deposits and instead pay the taxes with Form 941, you may be subject to a penalty. See Must You Deposit Your Taxes, earlier.*

***What if you can't pay in full?*** If you can't pay the full amount of tax you owe, you can apply for an installment agreement online. You can apply for an installment agreement online if:

- You can't pay the full amount shown on line 14,
- The total amount you owe is $25,000 or less, and
- You can pay the liability in full in 24 months.

To apply using the Online Payment Agreement Application, go to IRS.gov/OPA.

Under an installment agreement, you can pay what you owe in monthly installments. There are certain conditions you must meet to enter into and maintain an installment agreement, such as paying the liability within 24 months, and making all required deposits and timely filing tax returns during the length of the agreement.

If your installment agreement is accepted, you will be charged a fee and you will be subject to penalties and interest on the amount of tax not paid by the due date of the return.

### 15. Overpayment

If line 13g is more than line 12, enter the difference on line 15.

**Never make an entry on both lines 14 and 15.**

If you deposited more than the correct amount for the quarter, you can choose to have the IRS either refund the overpayment or apply it to your next return. Check only one box on line 15. If you don't check either box or if you check both boxes, we will generally apply the overpayment to your next return. Regardless of any boxes you check or don't check on line 15, we may apply your overpayment to any past due tax account that is shown in our records under your EIN.

If line 15 is under $1, we will send a refund or apply it to your next return only if you ask us in writing to do so.

## Part 2: Tell Us About Your Deposit Schedule and Tax Liability for This Quarter

### 16. Tax Liability for the Quarter

Check one of the boxes on line 16. Follow the instructions for each box to determine if you need to enter your monthly tax liability on Form 941 or your daily tax liability on Schedule B (Form 941).

**De minimis exception.** If line 12 is less than $2,500 or line 12 on the prior quarterly return was less than $2,500, and you didn't incur a $100,000 next-day deposit obligation during the current quarter, check the first box on line 16 and go to Part 3.

**CAUTION** *If you meet the de minimis exception based on the prior quarter and line 12 for the current quarter is $100,000 or more, you must provide a record of your federal tax liability. If you're a monthly schedule depositor, complete the deposit schedule on line 16. If you're a semiweekly schedule depositor, attach Schedule B (Form 941).*

**Monthly schedule depositor.** If you reported $50,000 or less in taxes during the lookback period, you're a monthly schedule depositor unless the $100,000 Next-Day Deposit Rule discussed in section 11 of Pub. 15 applies. Check the second box on line 16 and enter your tax liability for each month in the quarter. Enter your tax liabilities in the month that corresponds to the dates you paid wages to your employees, not the date payroll liabilities were accrued or deposits were made. Add the amounts for each month. Enter the result in the "Total liability for quarter" box.

Note that your total tax liability for the quarter must equal your total taxes shown on line 12. If it doesn't, your tax deposits and payments may not be counted as timely. Don't reduce your total liability reported on line 16 by the deferred amount of the employer or employee share of social security tax, the refundable portion of the credit for qualified sick and family leave wages, or the refundable portion of the employee retention credit. The deferred amount of the employer or employee share of social security tax reported on line 13b doesn't reflect deferred liabilities, but instead postponed due dates for payment. Don't change your tax

liability on line 16 by adjustments reported on any Forms 941-X.

You're a monthly schedule depositor for the calendar year if the amount of your Form 941 taxes reported for the lookback period is $50,000 or less. The lookback period is the 4 consecutive quarters ending on June 30 of the prior year. For 2020, the lookback period begins July 1, 2018, and ends June 30, 2019. For details on the deposit rules, see section 11 of Pub. 15. If you filed Form 944 in either 2018 or 2019, your lookback period is the 2018 calendar year.

CAUTION *The amounts entered on line 16 are a summary of your monthly tax liability, not a summary of deposits you made. If you don't properly report your liabilities when required or if you're a semiweekly schedule depositor and enter your liabilities on line 16 instead of on Schedule B (Form 941), you may be assessed an "averaged" FTD penalty. See* Deposit Penalties *in section 11 of Pub. 15 for more information.*

***Reporting adjustments from lines 7–9 on line 16.*** If your net adjustment during a month is negative and it exceeds your total tax liability for the month, don't enter a negative amount for the month. Instead, enter "-0-" for the month and carry over the unused portion of the adjustment to the next month.

**Semiweekly schedule depositor.** If you reported more than $50,000 of taxes for the lookback period, you're a semiweekly schedule depositor. Check the third box on line 16.

You must complete Schedule B (Form 941) and submit it with your Form 941. Don't file Schedule B (Form 941) with your Form 941 if you're a monthly schedule depositor.

Don't change your tax liability on Schedule B (Form 941) by adjustments reported on any Forms 941-X.

**Adjusting tax liability for nonrefundable credits claimed on lines 11a, 11b, and 11c.** Monthly schedule depositors and semiweekly schedule depositors must account for nonrefundable credits claimed on lines 11a, 11b, and 11c when reporting their tax liabilities on line 16 or Schedule B (Form 941). The total tax liability for the quarter must equal the amount reported on line 12. Failure to account for the nonrefundable credits on line 16 or Schedule B (Form 941) may cause line 16 or Schedule B (Form 941) to report more than the total tax liability reported on line 12. Don't reduce your monthly tax liability reported on line 16 or your daily tax liability reported on Schedule B (Form 941) below zero.

***Qualified small business payroll tax credit for increasing research activities (line 11a).*** The qualified small business payroll tax credit for increasing research activities is limited to the employer share of social security tax on wages paid in the quarter that begins after the income tax return electing the credit has been filed. In completing line 16 or Schedule B (Form 941), you take into account the payroll tax credit against the liability for the employer share of social security tax starting with the first payroll payment of the quarter that includes payments of wages subject to social security tax to your employees. The credit may be taken to the extent of the employer share of social security tax on wages associated with the first payroll payment, and then to the extent of the employer share of social security tax associated with succeeding payroll payments in the quarter until the credit is used. Consistent with the entries on line 16 or Schedule B (Form 941), the payroll tax credit should be taken into account in making deposits of employment tax. If any payroll tax credit is remaining at the end of the quarter that hasn't been used completely because it exceeds the employer share of social security tax for the quarter, the excess credit may be carried forward to the succeeding quarter and allowed as a payroll tax credit for the succeeding quarter. The payroll tax credit may not be taken as a credit against income tax withholding, Medicare tax, or the employee share of social security tax. Also, the remaining payroll tax credit may not be carried back and taken as a credit against wages paid from preceding quarters.

***Example.*** Rose Co. is an employer with a calendar tax year that filed its timely income tax return on April 15, 2020. Rose Co. elected to take the qualified small business payroll tax credit for increasing research activities on Form 6765. The third quarter of 2020 is the first quarter that begins after Rose Co. filed the income tax return making the payroll tax credit election. Therefore, the payroll tax credit applies against Rose Co.'s share of social security tax on wages paid to employees in the third quarter of 2020. Rose Co. is a semiweekly schedule depositor. Rose Co. completes Schedule B (Form 941) by reducing the amount of liability entered for the first payroll payment in the third quarter of 2020 that includes wages subject to social security tax by the lesser of (1) its share of social security tax on the wages, or (2) the available payroll tax credit. If the payroll tax credit elected is more than Rose Co.'s share of social security tax on the first payroll payment of the quarter, the excess payroll tax credit would be carried forward to succeeding payroll payments in the third quarter until it is used. If the amount of the payroll tax credit exceeds Rose Co.'s share of social security tax on wages paid to its employees in the third quarter, the excess credit would be treated as a payroll tax credit against its share of social security tax on wages paid in the fourth quarter. If the amount of the payroll tax credit remaining exceeded Rose Co.'s share of social security tax on wages paid in the fourth quarter, it could be carried forward and treated as a payroll tax credit for the first quarter of 2021.

***Nonrefundable portion of credit for qualified sick and family leave wages (line 11b).*** The nonrefundable portion of the credit for qualified sick and family leave wages is limited to the employer share of social security tax on wages paid in the quarter that is remaining after that share is first reduced by any credit claimed on Form 941, line 11a, for the qualified small business payroll tax credit for increasing research activities, and/or any credit to be claimed on Form 5884-C, line 11, for the work opportunity credit for qualified tax-exempt organizations hiring qualified veterans. In completing line 16 or Schedule B (Form 941), you take into account the entire quarter's nonrefundable portion of the credit for sick and family leave wages (including the qualified health plan expenses and employer share of Medicare tax allocable to those wages) against the liability for the first payroll payment of the quarter, but not below zero. Then reduce the liability for each successive payroll payment in the quarter until the nonrefundable portion of the credit is used. Any credit for qualified sick and family leave wages that is remaining at the end of the quarter because it exceeds the employer share of social security tax for the quarter is claimed on line 13c as a refundable credit. The refundable portion of the credit doesn't reduce the liability reported on line 16 or Schedule B (Form 941).

***Example.*** Maple Co. is a semiweekly schedule depositor that pays employees every other Friday. In the third quarter of 2020, Maple Co. had pay dates of July 10, July 24, August

7, August 21, September 4, and September 18. Maple Co. paid qualified sick and family leave wages on August 7 and August 21. The nonrefundable portion of the credit for qualified sick and family leave wages for the quarter is $10,000. On Schedule B (Form 941), Maple Co. will use the $10,000 to reduce the liability for the July 10 pay date, but not below zero. If any nonrefundable portion of the credit remains, Maple Co. applies it to the liability for the July 24 pay date, then the August 7 pay date, and so forth until the entire $10,000 is used.

***Nonrefundable portion of employee retention credit (line 11c).*** The nonrefundable portion of the employee retention credit is limited to the employer share of social security tax on wages paid in the quarter that is remaining after that share is first reduced by any credit claimed on Form 941, line 11a, for the qualified small business payroll tax credit for increasing research activities; any credit to be claimed on Form 5884-C, line 11, for the work opportunity credit for qualified tax-exempt organizations hiring qualified veterans; and/or any credit claimed on Form 941, line 11b, for the nonrefundable portion of the credit for qualified sick and family leave wages. In completing line 16 or Schedule B (Form 941), you take into account the entire quarter's nonrefundable portion of the employee retention credit against the liability for the first payroll payment of the quarter, but not below zero. Then reduce the liability for each successive payroll payment in the quarter until the nonrefundable portion of the credit is used. Any employee retention credit that is remaining at the end of the quarter because it exceeds the employer share of social security tax for the quarter is claimed on line 13d as a refundable credit. The refundable portion of the credit doesn't reduce the liability reported on line 16 or Schedule B (Form 941).

***Example.*** Maple Co. is a semiweekly schedule depositor that pays employees every other Friday. In the third quarter of 2020, Maple Co. had pay dates of July 10, July 24, August 7, August 21, September 4, and September 18. Maple Co. paid qualified wages for the employee retention credit on August 7 and August 21. The nonrefundable portion of the employee retention credit for the quarter is $10,000. On Schedule B (Form 941), Maple Co. will use the $10,000 to reduce the liability for the July 10 pay date, but not below zero. If any nonrefundable portion of the credit remains, Maple Co. applies it to the liability for the July 24 pay date, then the August 7 pay date, and so forth until the entire $10,000 is used.

**TIP** *You may reduce your deposits by the amount of the nonrefundable and refundable portions of the credit for qualified sick and family leave wages, the nonrefundable and refundable portions of the employee retention credit, and any deferred employment taxes, as discussed earlier under [Reducing your deposits for COVID-19 credits](#).*

**Adjusting tax liability for the deferred amount of social security tax that you pay or deposit in the same quarter it was deferred.** If you defer the employer and/or employee share of social security tax and subsequently pay or deposit that deferred amount in the same quarter it was deferred, you should report the amount of the payment or deposit on Form 941, line 16, or on Schedule B (Form 941) on the date of the payment or deposit and not the date of liability. You shouldn't include any portion of the deferred amount of social security taxes already paid or deposited by the end of the quarter on Form 941, line 13b.

For example, if you're a monthly schedule depositor that has an employment tax liability of $1,000 every month in 2020 and you defer $200 of the employer's share of social security tax from your July liability, but deposit your deferred amount of $200 together with your $1,000 deposit for your August tax liability, you would report $800 for your July tax liability ($1,000 minus $200) and $1,200 for your August liability ($1,000 plus $200) on line 16. Don't include the $200 deferral on Form 941, line 13b.

## Part 3: Tell Us About Your Business

In Part 3, answer only those questions that apply to your business. If the questions don't apply, leave them blank and go to Part 4.

### 17. If Your Business Has Closed . . .

If you go out of business or stop paying wages, you must file a final return. To tell the IRS that a particular Form 941 is your final return, check the box on line 17 and enter the final date you paid wages in the space provided. For additional filing requirements, including information about attaching a statement to your final return, see *If Your Business Has Closed*, earlier.

### 18. If You're a Seasonal Employer . . .

If you hire employees seasonally—such as for summer or winter only—check the box on line 18. Checking the box tells the IRS not to expect four Forms 941 from you throughout the year because you haven't paid wages regularly.

Generally, we won't ask about unfiled returns if at least one taxable return is filed each year. However, you must check the box on line 18 on every Form 941 you file. Otherwise, the IRS will expect a return to be filed for each quarter.

Also, when you complete Form 941, be sure to check the box on the top of the form that corresponds to the quarter reported.

**CAUTION** *The amounts entered on lines 19 through 23 are amounts that you use on Worksheet 1 to figure the credit for qualified sick and family leave wages and the employee retention credit. If you're claiming these credits, you must enter the applicable amounts.*

### 19. Qualified Health Plan Expenses Allocable to Qualified Sick Leave Wages

Enter the qualified health plan expenses allocable to qualified sick leave wages. This amount is also entered on Worksheet 1, Step 2, line 2b.

### 20. Qualified Health Plan Expenses Allocable to Qualified Family Leave Wages

Enter the qualified health plan expenses allocable to qualified family leave wages. This amount is also entered on Worksheet 1, Step 2, line 2f.

### 21. Qualified Wages for the Employee Retention Credit

Enter the qualified wages for the employee retention credit (excluding the amount of any qualified health plan expenses allocable to these wages). This amount is also entered on Worksheet 1, Step 3, line 3a.

### 22. Qualified Health Plan Expenses Allocable to Wages Reported on Line 21

Enter the qualified health plan expenses for the employee retention credit. These expenses are generally allocable to the wages reported on Form 941, Part 3, line 21. However, in some circumstances, qualified health plan expenses for purposes of the employee retention credit are treated as allocable to qualified wages for the employee retention credit even if no wages are paid to the employees during the applicable period (for example, when you furlough an employee because your operations are fully or partially suspended due to a government order but you continue to pay qualified health plan expenses). For more information, go to *IRS.gov/ERC*. The amount from line 22 is also entered on Worksheet 1, Step 3, line 3b.

### 23. Credit From Form 5884-C, Line 11, for This Quarter

If applicable, enter the credit to be claimed on line 11 of Form 5884-C for the work opportunity credit for qualified tax-exempt organizations hiring qualified veterans for this quarter. Entering an amount here doesn't change your requirement to file Form 5884-C separately from Form 941. You're entering the amount here to notify us that you will file Form 5884-C for the quarter and therefore reduce the amount of the employer share of social security tax that is available to be reduced by the nonrefundable portion of the credit for qualified sick and family leave wages and the nonrefundable portion of the employee retention credit.

### 24. Deferred Amount of the Employee Share of Social Security Tax Included on Line 13b

Enter the deferred amount of the employee share of social security tax that you included on line 13b. The IRS will use this information to determine the amount of the employer share of social security tax that is included on line 13b.

## Part 4: May We Speak With Your Third-Party Designee?

If you want to allow an employee, a paid tax preparer, or another person to discuss your Form 941 with the IRS, check the "Yes" box in Part 4. Enter the name, phone number, and the five-digit personal identification number (PIN) of the specific person to speak with—not the name of the firm that prepared your tax return. The designee may choose any five numbers as his or her PIN.

By checking "Yes," you authorize the IRS to talk to the person you named (your designee) about any questions we may have while we process your return. You also authorize your designee to do all of the following.

- Give us any information that is missing from your return.
- Call us for information about processing your return.
- Respond to certain IRS notices that you've shared with your designee about math errors and return preparation. The IRS won't send notices to your designee.

You're not authorizing your designee to bind you to anything (including additional tax liability) or to otherwise represent you before the IRS. If you want to expand your designee's authorization, see Pub. 947.

The authorization will automatically expire 1 year from the due date (without regard to extensions) for filing your Form 941. If you or your designee wants to terminate the authorization, write to the IRS office for your location using the *Without a payment* address under *Where Should You File*, earlier.

## Part 5: Sign Here (Approved Roles)

Complete all information and sign Form 941. The following persons are authorized to sign the return for each type of business entity.

- **Sole proprietorship—**The individual who owns the business.
- **Corporation (including a limited liability company (LLC) treated as a corporation)—**The president, vice president, or other principal officer duly authorized to sign.
- **Partnership (including an LLC treated as a partnership) or unincorporated organization—**A responsible and duly authorized partner, member, or officer having knowledge of its affairs.
- **Single-member LLC treated as a disregarded entity for federal income tax purposes—**The owner of the LLC or a principal officer duly authorized to sign.
- **Trust or estate—**The fiduciary.

Form 941 may be signed by a duly authorized agent of the taxpayer if a valid power of attorney has been filed.

**Alternative signature method.** Corporate officers or duly authorized agents may sign Form 941 by rubber stamp, mechanical device, or computer software program. For details and required documentation, see Rev. Proc. 2005-39, 2005-28 I.R.B. 82, available at *IRS.gov/irb/2005-28_IRB#RP-2005-39*.

### Paid Preparer Use Only

A paid preparer must sign Form 941 and provide the information in the *Paid Preparer Use Only* section of Part 5 if the preparer was paid to prepare Form 941 and isn't an employee of the filing entity. Paid preparers must sign paper returns with a manual signature. The preparer must give you a copy of the return in addition to the copy to be filed with the IRS.

If you're a paid preparer, enter your Preparer Tax Identification Number (PTIN) in the space provided. Include your complete address. If you work for a firm, enter the firm's name and the EIN of the firm. You can apply for a PTIN online or by filing Form W-12. For more information about applying for a PTIN online, go to *IRS.gov/PTIN*. You can't use your PTIN in place of the EIN of the tax preparation firm.

Generally, don't complete this section if you're filing the return as a reporting agent and have a valid Form 8655 on file with the IRS. However, a reporting agent must complete this section if the reporting agent offered legal advice, for example, advising the client on determining whether its workers are employees or independent contractors for federal tax purposes.

## How To Get Forms, Instructions, and Publications

You can view, download, or print most of the forms, instructions, and publications you may need at *IRS.gov/Forms*. Otherwise, you can go to *IRS.gov/OrderForms* to place an order and have them mailed to you.

## Worksheet 1. Credit for Qualified Sick and Family Leave Wages and the Employee Retention Credit

*Keep for Your Records*

**Determine how you will complete this worksheet**

If you paid both qualified sick and family leave wages and qualified wages for purposes of the employee retention credit this quarter, complete Step 1, Step 2, and Step 3. If you paid qualified sick and family leave wages this quarter but you didn't pay any qualified wages for purposes of the employee retention credit this quarter, complete Step 1 and Step 2. If you paid qualified wages for purposes of the employee retention credit this quarter but you didn't pay any qualified sick and family leave wages this quarter, complete Step 1 and Step 3.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Step 1.** | | **Determine the employer share of social security tax this quarter after it is reduced by any credit claimed on Form 8974 and any credit to be claimed on Form 5884-C** | | | | |
| | 1a | Enter the amount of social security tax from Form 941, Part 1, line 5a, column 2 | 1a | ______ | | |
| | 1b | Enter the amount of social security tax from Form 941, Part 1, line 5b, column 2 | 1b | ______ | | |
| | 1c | Add lines 1a and 1b | 1c | ______ | | |
| | 1d | Multiply line 1c by 50% (0.50) | 1d | ______ | | |
| | 1e | If you're a third-party payer of sick pay that isn't an agent and you're claiming credits for amounts paid to your employees, enter the employer share of social security tax included on Form 941, Part 1, line 8 (enter as a positive number) | 1e | ______ | | |
| | 1f | Subtract line 1e from line 1d | 1f | ______ | | |
| | 1g | If you received a Section 3121(q) Notice and Demand during the quarter, enter the amount of the employer share of social security tax from the notice | 1g | ______ | | |
| | 1h | **Employer share of social security tax.** Add lines 1f and 1g | | | 1h | ______ |
| | 1i | Enter the amount from Form 941, Part 1, line 11a (credit from Form 8974) | 1i | ______ | | |
| | 1j | Enter the amount to be claimed on Form 5884-C, line 11, for this quarter | 1j | ______ | | |
| | 1k | **Total nonrefundable credits already used against the employer share of social security tax.** Add lines 1i and 1j | | | 1k | ______ |
| | 1l | **Employer share of social security tax remaining.** Subtract line 1k from line 1h | | | 1l | ______ |
| **Step 2.** | | **Figure the sick and family leave credit** | | | | |
| | 2a | Qualified sick leave wages reported on Form 941, Part 1, line 5a(i), column 1 | 2a | ______ | | |
| | 2a(i) | Qualified sick leave wages included on Form 941, Part 1, line 5c, but not included on Form 941, Part 1, line 5a(i), column 1, because the wages reported on that line were limited by the social security wage base | 2a(i) | ______ | | |
| | 2a(ii) | Total qualified sick leave wages. Add lines 2a and 2a(i) | 2a(ii) | ______ | | |
| | 2b | Qualified health plan expenses allocable to qualified sick leave wages (Form 941, Part 3, line 19) | 2b | ______ | | |
| | 2c | Employer share of Medicare tax on qualified sick leave wages. Multiply line 2a(ii) by 1.45% (0.0145) | 2c | ______ | | |
| | 2d | **Credit for qualified sick leave wages.** Add lines 2a(ii), 2b, and 2c | | | 2d | ______ |
| | 2e | Qualified family leave wages reported on Form 941, Part 1, line 5a(ii), column 1 | 2e | ______ | | |
| | 2e(i) | Qualified family leave wages included on Form 941, Part 1, line 5c, but not included on Form 941, Part 1, line 5a(ii), column 1, because the wages reported on that line were limited by the social security wage base | 2e(i) | ______ | | |
| | 2e(ii) | Total qualified family leave wages. Add lines 2e and 2e(i) | 2e(ii) | ______ | | |
| | 2f | Qualified health plan expenses allocable to qualified family leave wages (Form 941, Part 3, line 20) | 2f | ______ | | |
| | 2g | Employer share of Medicare tax on qualified family leave wages. Multiply line 2e(ii) by 1.45% (0.0145) | 2g | ______ | | |
| | 2h | **Credit for qualified family leave wages.** Add lines 2e(ii), 2f, and 2g | | | 2h | ______ |
| | 2i | **Credit for qualified sick and family leave wages.** Add lines 2d and 2h | | | 2i | ______ |
| | 2j | **Nonrefundable portion of credit for qualified sick and family leave wages.** Enter the smaller of line 1l or line 2i. Enter this amount on Form 941, Part 1, line 11b | | | 2j | ______ |
| | 2k | **Refundable portion of credit for qualified sick and family leave wages.** Subtract line 2j from line 2i and enter this amount on Form 941, Part 1, line 13c | | | 2k | ______ |
| **Step 3.** | | **Figure the employee retention credit** | | | | |
| | 3a | Qualified wages (excluding qualified health plan expenses) for the employee retention credit (Form 941, Part 3, line 21) | 3a | ______ | | |
| | 3b | Qualified health plan expenses allocable to qualified wages for the employee retention credit (Form 941, Part 3, line 22) | 3b | ______ | | |
| | 3c | Add lines 3a and 3b | 3c | ______ | | |
| | 3d | **Retention credit.** Multiply line 3c by 50% (0.50) | | | 3d | ______ |
| | 3e | Enter the amount of the employer share of social security tax from Step 1, line 1l | 3e | ______ | | |
| | 3f | Enter the amount of the nonrefundable portion of the credit for qualified sick and family leave wages from Step 2, line 2j | 3f | ______ | | |
| | 3g | Subtract line 3f from line 3e | 3g | ______ | | |
| | 3h | **Nonrefundable portion of employee retention credit.** Enter the smaller of line 3d or line 3g. Enter this amount on Form 941, Part 1, line 11c | | | 3h | ______ |
| | 3i | **Refundable portion of employee retention credit.** Subtract line 3h from line 3d and enter this amount on Form 941, Part 1, line 13d | | | 3i | ______ |

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

OFFICE OF THE CHIEF COUNSEL

September 29, 2022

Number: **2023-0001**
Release Date: 3/31/2023

CONEX-117116-22

UIL: 3504.00-00, 3134.00-00

The Honorable John Cornyn
United States Senator
5001 Spring Valley Road, Suite 1125E
Dallas, TX 75244

Attention:

Dear Senator Cornyn:

I'm responding to your July 18, 2022, inquiry on behalf of your constituent, of . He asked about his company filing independently for the employee retention credit (ERC). He explained that his company uses a professional employer organization (PEO) to pay employment taxes and to file employment tax returns. You asked for a response to concerns.

There is no requirement that an employer, including the taxpayer, use a PEO to pay employment taxes and satisfy employment tax return filing obligations. mentions that many small employers choose to work with PEOs for the sake of convenience. The terms of the contract between a PEO and its clients govern their relationship. However, these clients are generally responsible for making sure that the PEO filed their tax returns and made their tax deposits and employment tax payments. This is true even if a PEO agrees to perform these acts. In many cases, both the PEO and the client remain liable if the third party fails to perform any required action.[1]

Also, the Internal Revenue Service (IRS) has rules and regulations in place to help protect the interests of employees, employers, and PEOs. These rules help ensure the proper withholding and payment of employment taxes. As required by statute, the IRS issued guidance on the procedures PEOs use to claim the ERC on behalf of their clients. The ERC may only be claimed with respect to the qualified wages reported for clients on the Form 941 filed by the PEO, and only provided the employers are eligible for the ERC. (See Notice 2021-20, 2021-11 I.R.B. 922).

[1] See Internal Revenue Code (Code) section 3504 and Treas. Reg. 31.3504-2. Different rules apply to arrangements involving Certified Professional Employer Organizations, but those types of organizations were not mentioned in the letter.

When an employer uses a PEO to pay its employment taxes and satisfy its employment tax return filing obligations, the PEO is the taxpayer before the IRS. The PEO reports the wages, employment taxes, and credits on behalf of all its employer clients. If there is a refund owed to the PEO after applying the PEO's total credit amount for all clients to the PEO's total aggregate tax liability reported for all clients, the IRS will release the refund directly to the PEO. The IRS uses this process because the PEO deposits, pays, and reports the employment taxes under its own employer identification number (EIN) against which the PEO is claiming the ERC. How the PEO distributes the refund amounts to its clients is a contractual matter between the PEO and its clients.

As written by Congress, the ERC hinges on the depositing, payment, and reporting of employment taxes. A PEO is obligated to collect from its client any information regarding the client's eligibility for the ERC, including whether the client filed Form 7200, Advance Payment of Employer Credits Due to COVID-19, and received advanced payments. Either the PEO or the client may maintain the records which substantiate the client's eligibility for the ERC. However, if the client maintains the records, and if the IRS requests this information, the PEO must get it from the client and provide the tax records that support the client's eligibility for the ERC. The PEO uses this information to claim the credit on its client's behalf on the PEO's employment tax return. PEOs normally use Form 941, Employer's Quarterly Federal Tax Return,[2] and attach Schedule R detailing credit amounts claimed on behalf of each client.

Although a PEO provides client-by-client specified information concerning the ERC on the Schedule R it attaches to its employment tax return, a client can't claim the credit except through the PEO because the client doesn't deposit, pay, or report the employment taxes under its own EIN. In other words, when the client hires the PEO, the PEO becomes the taxpayer for the IRS's purposes. The IRS accepts the information concerning the qualified wages reported by the PEO for their clients on Form 941 and only the PEO can claim the ERC. After the IRS processes the ERC, the PEO is responsible for making sure each of its clients receives any credit or overpayment (including any ERC refund) owed to the client.

In accordance with their liability under the Code and applicable regulations, the client and the PEO will each be liable for employment taxes owed because of any improper ERC claim for employment taxes reported on the federal employment tax return the PEO filed claiming the credit. This joint liability isn't solely for the claiming of the ERC. In general, the client and the PEO are both liable for paying the client's employment taxes, filing returns, and making deposits and payments for the taxes reported.

---

[2] Employers who need to make a change or adjustment to a previously filed Form 941 use Form 941-X, Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund, to make those changes and adjustments. The same procedures (and the reasons for these procedures) apply whether the PEO files Form 941 to claim the ERC for its clients or Form 941-X to adjust the ERC amounts it previously claimed for its clients.

I hope this information is helpful. If you have questions, please call me at or a member of your staff may contact , general attorney, at .

Sincerely,

Rachel Leiser Levy, Associate Chief Counsel
Employee Benefits, Exempt Organizations,
and Employment Tax

ArrowPoint TAX SERVICES

arrowpointtaxes.com
(707) 382-3905

# Johnson Pool and Spa

# ERC – Qualification and Evidence Support

**Johnson Pool and Spa (the "Company") in accordance through the qualifies under the "partial suspension" of operations for the Employee Retention Credit from Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), and in reference to IRS Notice 2021-20, Notice 2021-23, and Notice 2021-49, qualifies for the Employee Retention Credit ("ERC") through the "partial suspension" of business operations from March 13th 2020 – June 15th 2021.**

**The Company was subject to mandates from the following state, and local governments:**

- **State of California**
- **County of Sonoma**
- **City of Santa Rosa**
- **City of Windsor**

**The Company is a pool and spa distributor, retailer, contractor, and servicing company**

**Timeline:**

- [[March 13th, 2020]] [[Sonoma Order C19-01]]
  - https://socoemergency.org/order-of-the-health-officer-of-the-county-of-sonoma-c19-01/
  - Effective date within order:
    - *This Order shall become effective at 11:00 a.m. on March 13, 2020 and will continue to be in effect until it is earlier rescinded, superseded, or amended in writing by the Health Officer or by the State Public Health Officer.*
  - Social distancing requirement making it impossible to operate in normal capacity operate or interact with clients
    - The business immediately implemented policy that conformed with the orders including shutting down many of the ongoing work being performed
  - The main impact to the business was to their two retail sites which had to completely close and make up greater than a non-nominal part of the Company's business operations
  - Defines Essential Services initially as 14 industries
    - https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf
    - The Company was only deemed essential for their contracting work they perform. The other divisions were forced to shelter and close
      - Service

ArrowPoint TAX SERVICES

arrowpointtaxes.com
(707) 382-3905

        - Retail
    - The Company is not able to work remotely. All retail sales and service are in person
    - ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order***
- [[March 17th, 2020]] [[Sonoma Order C19-03]]
    - https://socoemergency.org/order-of-the-health-officer-shelter-in-place/
    - Sonoma County Health official shelter in place order
    - Complete Shelter in place for all **non-essential services with the addition of shelter in place, social distancing requirements, and complete lock down of almost all economic operations**
    - Essential businesses were mandated to only operate with Minimum Basic Operations ("MBO") as defined below
        - *For the purposes of this Order, "Minimum Basic Operations" include the following, provided that employees comply with Social Distancing Requirements as defined in this Section, to the extent possible, while carrying out such operations:*
            - *The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.*
            - *The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.*
    - This order brought additional restrictions to the division of contracting not previously required
    - Additional text citing social distancing and lock down orders – Added to the MBO mandate which limited how even essential businesses could operate in Sonoma County
        - *All individuals currently living within Sonoma County (the "County") are ordered to shelter at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person when they are outside their residence. All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses, all as defined in Section 10. Individuals experiencing homelessness are exempt from this Section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to utilize Social Distancing Requirements in their operation).*
        - *All businesses with a facility in the County, except Essential Businesses as defined below in Section 10, are required to cease all activities at facilities located within the County except Minimum Basic Operations, as defined in Section 10. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses are strongly encouraged to remain open. To the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements as defined in Section 10 below, including, but not limited to, when any customers are standing in line.*
        - *All public and private gatherings of any number of people occurring outside a household or living unit are prohibited, except for the limited purposes as expressly permitted in Section 10. Nothing in this Order prohibits the gathering of members of a household or living*
    - Text citing reference to business qualifying as essential service, Section 10.f.iv

- *Businesses that are necessary to supply agriculture, food, and beverage cultivation, processing, and distribution;*
- In the same C19-03 order a blanket statement defining further essential services allowable but stating these actions are only permitted if social distancing requirements are able to be followed
  - *For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of "Essential Infrastructure," including, but not limited to, **public works construction, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness), airport operations, water, sewer, gas, electrical, oil refining, roads and highways, public transportation , solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), ***provided that they can carry out those services or that work in compliance with social distancing requirements as defined this Section***
- The Company is still mandated to distance and only operate in a limited capacity with their retail and servicing businesses remaining shuttered
- ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order***

- [[March 31st, 2020]] [[Sonoma Order C19-05]]
  - https://socoemergency.org/order-of-the-health-officer-shelter-in-place-extended/
  - Extends shelter in place from April 1st to May 3rd
  - Classifies again that all businesses are now subject to Minimum Basic Operations in Section 13.a.iv, which states what is allowed
    - *To perform work providing essential products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations*
  - No language specifically addressed the Company, however the business felt they were able to continue operating as long as MBOs were met for their contracting business
    - *For the purposes of this Order, "Minimum Basic Operations" include the following, provided that employees comply with social distancing requirements as defined in this Section, to the extent possible, while carrying out such operations:*
    - *The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.*
    - *The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.*
  - The MBO requirements remained in effect and were increased in terms of the requirements for a business to operate
  - The Company employed social distancing and adjusted operations to remain compliant with the mandate and were such, impacted
  - The Company began implementing policy that conformed with these orders. Most notable the Company was forced to adjust shift and team logistics, having all individuals travel to and from job sites in individual vehicles. This brought additional logistical burden and impact that further exacerbated the material impact to the Company's business.
  - ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order***

- [[May 1st, 2020]][[Sonoma Order C19-09]]
    - https://socoemergency.org/amendment-to-health-order-no-c19-09-shelter-in-place/
    - Expanded essential businesses to allow for more education focused businesses to meet definition, no impact to The Company
    - **Extended the order with business restrictions to continue. Expanded the definition of MBO**
        - *For the purposes of this Order, "Minimum Basic Operations" include the following activities when they cannot be performed remotely, provided that there are only the minimum number of persons on-site and persons comply with Social Distancing and Hygiene Requirements as defined this Section:*
        - *The minimum necessary activities to maintain and protect the value of the business's inventory and facilities; ensure security, safety, and sanitation; process payroll and employee benefits; and related functions.*
        - *The minimum necessary activities to facilitate owners, personnel, and contractors of the business being able to continue to work remotely from their residences, and to ensure that the business can deliver its service remotely.*
        - *Retail or wholesale curbside pickup, shipping, or delivery of goods, including but not limited to bookstores, jewelry stores, toy stores, clothing stores, shoe stores, home and furnishing stores, sporting goods stores, antique stores, music stores. Shopping malls and storefront shall remain closed to the public. Retail or wholesale businesses operating under this subsection shall prepare, post, and implement a Social Distancing Protocol at each of their facilities at which they are maintaining operations. This provision shall only apply to the sale of goods and does not apply to provision of services.*
    - ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order***
- [[May 23rd, 2020]] [[Sonoma Order Amendment 3 C19-02]]
    - https://socoemergency.org/amendment-no-3-to-health-order-no-c19-09/
    - This order allows for some non-essential business to re-open but changes nothing about the impact to essential businesses.
    - At this time the Company was able to begin operations in a severely limited capacity in both their servicing and retail departments
    - Through the MBOs and the outright restrictions on their retail operations the business still is materially impacted by these orders
    - The company continues to be impacted by the capacity and distancing mandates and must operate with their adjusted shifts and lab facility.
    - ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order***
- [[June 5th, 2020]] [[Sonoma Order C19-14]]
    - https://socoemergency.org/order-of-the-health-officer-c19-14-stay-well-sonoma-county/
    - The stay-at-home order continues, but allows businesses to begin to operate in a partially suspended capacity
        - *Purpose and Intent. The intent of this Order is to ensure that people continue to shelter in their places of residence to slow the spread of COVID-19 to the maximum extent possible and mitigate the impact on delivery of critical healthcare services. All provisions of this Order must be interpreted to effectuate this intent. This Order also adopts the State of California's Stay- at-Home Order's*

*designations for Allowed Business, Essential Infrastructure, and outdoor recreation, and thus allows a limited number of additional activities to resume while the Health Officer continues to assess the transmissibility and clinical severity of COVID-19. This Order also clarifies when Face Coverings are required, as set forth in Section 20 below. Failure to comply with any of the provisions of this Order constitutes an imminent threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both.*

- *Businesses. All businesses except for Allowed Businesses, defined below, and businesses designated by the State Public Health Officer as Essential Critical Infrastructure Workers (https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf) are required to cease all activities except for Minimum Basic Operations, as defined in this Section. All businesses operating in the County shall continue to prepare, post, and implement a Social Distancing Protocol at each of their facilities at which they are maintaining operations, as specified in this Section.*

- Also, at this time, the Company began receiving word from their suppliers in California, that their businesses were being subjected to significant impact. Though the Company continued to qualify under their own suspension of operations, at this time the Company also begins to qualify through the supply chain impact
  - The Company delivery time increased by close to 5x normal, due to their suppliers impacts related directly to health orders limiting their ability to operate
- Below are emails received by the Company at the time of this health order
  - *I just wanted to reach out and let you know that I still don't have any new information on the reopening of the factory in Mexico. Our executive staff is working non-stop with the Government to meet the requirements of manufacturing while practicing social distancing. I know it is very difficult to not have anything to communicate with customers who have deposits. The minute I have any additional information I will get it out to you. – Watkins Manufacturing 6/10/2020*
  - *For LTL (Common Carrier) shipments, each order must be for a minimum of 4 Replacement Covers (so we can palletize them), and up to a maximum of 20 Replacement Covers (2 pallets of 10 each). Multiple orders of 20 can be placed (though they will likely not ship together), and lead-times will be extended. – Watkins Manufacturing 6/17/2020*
  - *As the order volume rate has increased over the previous weeks, we once again need to adjust our lead-times. Effective on orders entered June 25th, promise dates will be assigned at a 20-week lead time. We do expect the order volume rate to continue to increase in the very near term and as a result we plan to adjust our lead-times in real-time. Our plan moving forward is to adjust our promise dates as necessary dependent on volume and will communicate to dealers if we need to use dates beyond 24 weeks. Our manufacturing, engineering and sourcing teams are all working diligently on projects to increase our daily capacity. These new lead-time numbers do not assume completion of these projects, and as they come online, we will "re-date" open orders to reflect the improvements. The projects range in scope and impact but every opportunity is being pursued to improve our delivery commitments. We are confident in our products, our people and in our dealers. There is no team better suited to address these new challenges then we have in our own teams and trusted dealer networks. Thanks once again for your continued patience, commitment and innovation. We understand these changes have a big impact on your business and appreciate your partnership. – Jacuzzi Manufacturing 6/25/2020*

ArrowPoint TAX SERVICES

arrowpointtaxes.com
(707) 382-3905

- ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order.***
- [[June 18th, 2020]] [[Sonoma Order C19-15]]
  - https://socoemergency.org/order-of-the-health-officer-c19-15-stay-well-sonoma-county/
  - Through this order all businesses were allowed to operate but distancing and capacity restrictions remained in effect
  - These orders would impact the showroom through June 2021
  - The social distancing mandate remained through this order which restricted how the Company could interact with customers in their two retail locations
    - *All businesses, including public agencies, operating in the County shall comply with local and state orders and guidance, including preparing, posting, and implementing a Social Distancing Protocol (https://socoemergency.org/wp-content/uploads/2020/05/Appendix-A_05-01-2020extended.pdf) at all facilities operating in the County, as well as requiring all employees to perform a self-check for COVID-19 symptoms and temperature check before reporting to work site or other assignment away from their residence. Employers should use the free Sonoma County SoCo COVID-19 Check Application at the link below, and soon to be available on the SoCoEmergency website. An alternative system may be utilized as long as it meets the same purpose of employee and employer assessments and as long as it allows the electronic reporting of equivalent data to be reported to the County in aggregate form.*
  - The specific distancing orders the Company become subject to at this point are found below:
    - *County Orders and Guidance are located here:*
      - *https://socoemergency.org/emergency/novel-coronavirus/health-orders/*
      - *http://sonomaedb.org/Business-Assistance/Coronavirus/Business-Management-Plans/*
    - *State Orders and Guidance are located here:*
      - *https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf*
      - *https://covid19.ca.gov/industry-guidance/*
  - ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order***
- [[August 28th, 2020]] [[California Blueprint for Safer Economy Mandate]]
  - https://www.gov.ca.gov/2020/08/28/governor-newsom-unveils-blueprint-for-a-safer-economy-a-statewide-stringent-and-slow-plan-for-living-with-covid-19/
  - Creates Tier System to reopen
  - Effective August 28, 2020 – June 15th 2021 (Forward looking)
  - Created a pathway and uniform metrics to reopen partially or fully
  - "Each county will fall into one of four colored tiers – Purple (Widespread), Red (Substantial), Orange (Moderate) and Yellow (Minimal) – based on how prevalent COVID-19 is in each county and the extent of community spread. That color will indicate how sectors can operate.
  - Under this structure, the Company remains partially impacted in all tiers.
  - They continue to have a partial suspension of a non-nominal portion of business while Sonoma County remains in the tier system. The tiers ended on June 15th in Sonoma County

- The Company also continued to receive word from their suppliers that they too were impacted due to restrictions and to expect delays
  - *I spoke with shipping again and they said that the truck only had room for three spas. Since those were the oldest ones three, those are the ones we shipped. We are planning on shipping the rest this week. – Jacuzzi Manufacturing 11/17/2020*
  - *I wanted to make sure everyone was aware of the recent changes with cover colors. As many of you are aware, waiting on covers for completed tubs has slowed down shipments recently, as our cover supplier is facing challenges meeting the huge increase in demand in the industry. As we continue to expand our manufacturing capacity and turn out tubs quicker, the best solution for our supplier is to also increase their output. In order to do that, we need to limit our cover offering to black only. This will allow them to produce faster and will allow us to ship your completed tubs faster. I know this is not ideal, but hopefully we will be able to return to offering multiple colors soon as we continue to work through the backlog and start to receive them in time to ship tubs. The announcement below was sent out through the Dealer Community email distribution list on 02/23. If you are not receiving these emails please let me know! We communicate vital information through the Dealer Community emails and I want to make sure everyone is reading these announcements. – Watkins Manufacturing 3/2/2021*

| County | 30-Aug | 7-Sep | 14-Sep | 21-Sep | 28-Sep | 5-Oct | 12-Oct | 20-Oct | 26-Oct | 2-Nov | 9-Nov | 16-Nov | 24-Nov | 28-Nov | 1-Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contra Costa | Purple | Purple | Purple | Purple | Red | Red | Red | Red | Orange | Orange | Red | Purple | Purple | Purple | Purple |
| Marin | Purple | Purple | Red | Red | Red | Red | Red | Red | Orange | Orange | Orange | Red | Red | Red | Red |
| Napa | Red | Red | Red | Red | Red | Red | Red | Orange | Orange | Orange | Orange | Purple | Purple | Purple | Purple |
| Sacramento | Purple | Purple | Purple | Purple | Red | Red | Red | Red | Red | Red | Purple | Purple | Purple | Purple | Purple |
| San Francisco | Red | Red | Red | Red | Orange | Orange | Orange | Yellow | Yellow | Yellow | Yellow | Red | Red | Purple | Purple |
| Santa Clara | Purple | Red | Red | Red | Red | Red | Orange | Orange | Orange | Orange | Orange | Purple | Purple | Purple | Purple |
| Solano | Purple | Purple | Purple | Red | Red | Red | Red | Red | Red | Red | Red | Purple | Purple | Purple | Purple |
| **Sonoma** | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple |

| County | 8-Dec | 15-Dec | 22-Dec | 29-Dec | 4-Jan | 11-Jan | 19-Jan | 25-Jan | 2-Feb | 9-Feb | 16-Feb | 23-Feb | 2-Mar | 9-Mar | 13-Mar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contra Costa | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | red |
| Marin | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red | Red | Red |
| Napa | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | red | red | Red |
| Sacramento | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple |
| San Francisco | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red | Red |
| Santa Clara | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red | Red |
| Solano | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red |
| **Sonoma** | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red |

| County | 16-Mar | 23-Mar | 30-Mar | 6-Apr | 13-Apr | 20-Apr | 27-Apr | 4-May | 11-May | 18-May | 25-May | 1-Jun | 8-Jun | 15-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contra Costa | Red | Red | Red | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | orange | orange | orange |
| Marin | Red | Orange | Orange | orange | orange | orange | orange | Orange | Orange | Orange | Orange | yellow | yellow | yellow |
| Napa | Red | Red | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | orange | yellow | yellow |
| Sacramento | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | orange | orange | orange |
| San Francisco | Red | Orange | Orange | Orange | Orange | Orange | Orange | Yellow | Yellow | Yellow | Yellow | yellow | yellow | yellow |
| Santa Clara | Red | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Yellow | Yellow | yellow | yellow | yellow |
| Solano | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | orange | orange | orange |
| **Sonoma** | Red | Red | Red | Orange | Orange | Orange | Orange | Orange | orange | Orange | Orange | Orange | Orange | Orange |

- Definition of four California tiers
  - Purple
    - Widespread cases with 100% closure for indoor businesses
    - Modifications for essential businesses
  - Red
    - Substantial impact with 75% closure for indoor businesses
    - Modifications for essential businesses
  - Orange
    - Moderate impact with 50% closure for indoor businesses
    - Modifications for essential businesses
  - Yellow

ArrowPoint TAX SERVICES

arrowpointtaxes.com
(707) 382-3905

- Minimal impact with some businesses subject to 50% closure standard
- Modifications for essential businesses
- https://www.kcra.com/article/covid-19-yellow-tier-covid-restrictions-what-is-allowed/36269752#
- Sonoma County remained in the Orange Tier throughout the Blueprint
  - *The new public health order effective June 15, 2021 supersedes all prior health orders. The order has limited restrictions, only related to masking and mega-events, as well as settings serving children and youth pending an expected update to the K-12 schools guidance by the Centers for Disease Control and Prevention.*
  - *Restrictions that ended on June 15, 2021 include:*
    - *Physical distancing*
    - *Capacity limits on businesses*
    - *County tier system*
- ***The Company meets the definition of a partial suspension according to Notice 2021-20 under this order throughout the tier system. At the time this order expired, the orders moved from mandates to guidance for the Company. At this time, June 15th, the Company ceased to qualify under the partial suspension guidelines.***

ArrowPoint TAX SERVICES

arrowpointtaxes.com
(707) 382-3905

The Company qualifies for the Employee Retention Credit for the following quarters:

- Q2 2020 (Including parts of March 2020) – through partial suspension
- Q3 2020 – through partial suspension
- Q4 2020 – through partial suspension
- Q1 2021 – through partial suspension
- Q2 2021 – through partial suspension

X_________________________________

Matt Perezchica

Johnson Pool and Spa

(707) 573-8107

mattp@johnsonpoolandspa.com

X_________________________________

Duncan Kelm

Tax Consultant

Arrow Point

707.382.3905

duncan@arrowpointtaxes.com

| Jurisdiction | Order / Citation | Effective Dates (in scope) | Operative Requirement (abridged) | Operational Change Required | Materiality Path (>10%) | Materiality Threshold Met? | Source (link) |
|---|---|---|---|---|---|---|---|
| Sonoma County (Health Officer) | C19-01 — Moratorium on Large Gatherings | Mar 13, 2020 | Cancels mass gatherings ≥250; violation enforceable as a misdemeanor. | Immediate cancellation of in-store events, vendor demos, and municipal/HOA-related gatherings tied to pool service/retail promotions. | Event-driven retail traffic and related staffing eliminated, beginning the reduction that compounded under subsequent SIP orders. | Yes (as precursor; compounded with SIP) | Link |
| Sonoma County (Health Officer) | C19-03 — Shelter-in-Place (SIP) | Mar 18 – Apr 7, 2020 | All residents shelter at home; non essential businesses cease on site operations except "Minimum Basic Operations" (MBO). Essential businesses must follow 6 ft distancing. | Closed pool & spa showrooms to the public; limited retail to MBO only; service/contracting restricted to safety/essential work with 6 ft distancing. | Retail division shuttered; service crews reduced and reorganized → well over 10% of employees unable to perform normal duties. | Yes | Link |
| State of California (Governor) | Executive Order N 33 20 — Statewide Stay at Home | Mar 19, 2020 (statewide) | Residents must heed State Public Health directives; operations limited to Essential Critical Infrastructure sectors. | Reinforced SIP closures; limited Johnson Pools to essential/safety work; non essential in store retail halted statewide. | State overlay corroborated county shutdown of non essential operations affecting >10% of employees. | Yes | Link |
| Sonoma County (Health Officer) | C19-04 — Order Closing Parks, Beaches, and Access Points | Mar 23, 2020 (with later amendments) | Closed public parks/open spaces to reduce crowding; incorporated N 33 20 and SIP references. | Suspended public site work (municipal/HOA/open space pool facilities) and limited crew access/logistics for certain outdoor service jobs. | Paused public site contracts and field work segments—adding to >10% workforce unable to perform normal duties. | Yes | Link |
| Sonoma County (Health Officer) | C19-05 — SIP Extended; Social Distancing Protocol (Appendix A) | Mar 31 – May 3, 2020 | Supersedes/extends SIP; **requires all operating businesses to prepare, post, and implement a Social Distancing Protocol**. | Operational redesign of field/service & warehouse: staggered shifts, per vehicle headcount limits, on site spacing, sanitation; retail remained closed to walk ins. | Crew density limits and MBO continued—sustained impact >10% of workforce even among "essential" functions. | Yes | Link |
| Sonoma County (Health Officer) | C19-09 — SIP Extended with Limited Additions (incl. curbside) | May 1 – May 23, 2020 (then amended) | Continues SIP; allows **retail curbside pickup/shipping**; businesses must maintain posted Social Distancing Protocols. | Showrooms still closed to the public; pivot to curbside only, reconfiguring staffing, inventory staging, and customer flow. | Retail staff redeployed/limited; continued restrictions left >10% employees unable to perform normal duties. | Yes | Link |
| Sonoma County (Health Officer) | Amendment No. 3 to C19-09 — Phased reopen (limited) | Effective May 23, 2020 | Phased additions while SIP remained; maintained distancing protocol obligations and limits. | Selective expansion did not restore full indoor retail or normal crew logistics; distancing controls remained. | Even with limited reopenings, >10% of employees remained constrained by capacity/distancing rules. | Yes (ongoing) | Link |
| Sonoma County (Health Officer) | C19-14 — "Stay Well Sonoma County" | Jun 5 – Jun 17, 2020 | Maintains shelter at home intent; **all operating businesses must prepare, post, implement Social Distancing Protocols** and comply with State sector guidance. | Retail reopens with capacity/distancing controls and posted protocols; field operations continue under construction/field safety rules. | Capacity limits + distancing continued to cap staffing and throughput >10% below normal. | Yes (partial but >10%) | Link |
| Sonoma County (Health Officer) | C19-15 — Updated Stay Well Order | Jun 18, 2020 onward (superseded later) | Continues distancing/hygiene mandates; requires posted protocols and daily symptom checks; aligns with State guidance. | Sustained capacity/spacing limits for showrooms; continued vehicle/headcount limits and staggered starts for crews. | Constraints on indoor retail/customer interaction and crew logistics kept workforce >10% below normal utilization. | Yes (continuing) | Link |
| State of California (CDPH/Governor) | Blueprint for a Safer Economy — Color Tier Framework | Aug 31, 2020 – Jun 15, 2021 | Risk based **Purple/Red/Orange/Yellow** tiers set capacity/indoor operation limits by sector (e.g., retail/showrooms). | Showroom capacity caps, shopping by appointment/spacing controls; swim school/close contact services restricted; field crews continued under distancing protocols. | Tier based capacity restrictions and distancing persistently constrained staffing and sales throughput (>10% employees affected) until June 15, 2021. | Yes (through June 15, 2021) | Link |
| State of California (CDPH) | Beyond the Blueprint — Retirement of Color Tiers | Effective Jun 15, 2021 | State rescinds tier system; ends physical distancing and capacity limits (with limited exceptions for mega events). | Restored normal indoor retail and staffing models; ended tier based constraints that had limited deployment of >10% of employees. | End point of partial suspension; operations no longer materially restricted by State/County mandates. | N/A after 6/15/2021 | Link |

| FEIN | Claim Type | Client Number | Client Name | 2019 EE Count (NA means they were not a BBSI client in 2019) | NAIC | Start Date w/ BBSI | Address 1 | Address 2 | City | State | Zip | Q2 2020 Amount | Q3 2020 Amount | Q4 2020 Amount | Q1 2021 Amount | Q2 2021 Amount | Q3 2021 Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68-0173856 | Refund claim | 902138 | JOHNSON POOLS INC | 89 | 236220 | 10/17/2012 | 9650 OLD REDWOOD HWY | | WINDSOR | CA | 95492 | 267,776 | 30,273 | 21,508 | 367,469 | 388,326 | - |

BBSI

Dear Client,

We are writing to inform you that the Internal Revenue Service (IRS) has selected your company's Employee Retention Credit (ERC) claim for audit.

The following information identifies the specific entity selected:

- **Client Name**: JOHNSON POOLS INC
- **FEIN**: 68-0173856

The IRS has selected the following quarter(s) of your ERC claim for review:

**Q2 2020 Q3 2020 Q4 2020 Q1 2021 Q2 2021**

As part of the audit process, the IRS has requested the following documentation for each quarter identified above:

- *Any governmental order to suspend the employer's business operations.*
- *Any records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order or whether a governmental order had more than a nominal effect on its business operations.*
- *Any records the employer used to determine it had experienced a significant decline in gross receipts.*
- *Any records of which employees received qualified wages and in what amounts.*
- *In the case of a large eligible employer, work records and documentation showing that wages were paid for time an employee was not providing services.*
- *Documentation to show how the employer determined the amount of allocable qualified health plan expenses.*
- *Documentation related to the determination of whether the employer is a member of an aggregated group treated as a single employer for purposes of the employee retention credit and, if so, how the aggregation affects the determination and allocation of the credit.*
- *Copies of any completed Forms 7200 that the employer submitted to the IRS.*
- *Records of information provided to the third-party payer regarding the employer's entitlement to credit claimed on the federal employment tax return, including whether the employer's industry is considered essential or not.*

The IRS has requested that the documentation be submitted by **July 16, 2025**. Please make every effort to meet this deadline. If you are unable to do so, please let us know how much time will be needed. We are in contact with the IRS auditor and will inquire about extending this deadline on your behalf. We will notify you as we have more information.

**8100 NE Parkway Drive Vancouver, WA 98662 360.828.0700 www.BBSI.com**

BBSI

Please note that **BBSI does not provide legal or tax advice**. If you would like to involve your own tax and/or legal advisors in responding to the IRS, please contact our tax counsel listed below. They will coordinate with you to connect your advisors directly with the IRS auditor assigned to your case.

*Daniel G. Strickland*
*Partner*
*Holland & Knight LLP*
*(202) 469-5592*
*Daniel.Strickland@hklaw.com*

To assist you in preparing your response, our primary client contact will be provided access to a secure Box folder. The primary contact may assign access to additional client contacts or advisors within Box. We will pre-populate the Box folder for you to include:

- A copy of this letter
- The ERC agreement or contract addendum previously signed by your company
- Your Company's payroll reports for the quarter(s) selected for audit
- An audit response template you and your advisors may use to organize your documentation and response

Please upload all additional requested materials directly to this Box folder. If you have any questions about using the folder or compiling your documentation, our team is available to support you.

Once all documents are uploaded to the Box folder and you are ready for them to be provided to the IRS, please send an email to our tax counsel (*Daniel.Strickland@hklaw.com*) with your Company's FEIN in the subject line and include the following statement:

> "All of the documents requested by the IRS have been uploaded to our Box folder. They are ready to be transmitted by BBSI to the IRS. Please transmit all of the documents in the Box folder to the IRS on our behalf."

We recommend beginning this process promptly to avoid unnecessary delays. Thank you for your attention to this matter.

Sincerely,

BBSI

# Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act

Notice 2021-20

## I. PURPOSE

This notice provides guidance on the employee retention credit provided under section 2301 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), as amended by section 206 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act), which was enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (December 27, 2020). The guidance provided in this notice addresses the employee retention credit as it applies to qualified wages paid after March 12, 2020, and before January 1, 2021. This notice does not address the changes made by section 207 of the Relief Act that apply to the employee retention credit for qualified wages paid after December 31, 2020. The Department of the Treasury (Treasury) and the Internal Revenue Service (IRS) will address the modifications made by section 207 of the Relief Act applicable to calendar quarters in 2021 in future guidance.

## II. BACKGROUND

Section 2301 of the CARES Act allows a credit (employee retention credit or credit) against applicable employment taxes for eligible employers, including tax-exempt organizations, that pay qualified wages, including certain health plan expenses, to some

or all employees after March 12, 2020, and before January 1, 2021. Section 206 of the Relief Act adopts amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily relating to who may claim the credit.[1] Section 207 of the Relief Act amends section 2301 of the CARES Act to extend the application of the employee retention credit to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.[2]

Following the enactment of the CARES Act, the IRS posted Frequently Asked Questions (FAQs) on IRS.gov to aid taxpayers in calculating and claiming the employee retention credit. As of the publication date of this notice, the FAQs have not been updated to reflect the changes made by the Relief Act. This notice incorporates the information provided in the FAQs and addresses additional issues, including the amendments to section 2301 of the CARES Act made by section 206 of the Relief Act. This notice also identifies instances in which section 206 of the Relief Act made

[1] The amendments made by section 206 of the Relief Act take effect as if included in the provisions of the CARES Act to which they relate.

[2] Section 207 of the Relief Act makes substantial changes to the employee retention credit that apply to qualified wages paid during the first and second quarter of 2021. Among other changes, section 207 of the Relief Act (1) makes the employee retention credit available for eligible employers paying qualified wages that are paid after December 31, 2020, and before July 1, 2021; (2) increases the maximum credit amount that may be claimed per employee (making it equal to 70 percent of $10,000 of qualified wages paid to an employee per calendar quarter); (3) expands the category of employers that may be entitled to claim the credit; (4) modifies the gross receipts test; (5) modifies the definition of qualified wages; (6) broadens the denial of double benefit rule and applies it to sections 41, 45A, 45P, 51, and 1396 of the Code; and (7) changes the eligibility to receive advance payments and limits the amount of the advances.

changes to section 2301 of the CARES Act that resulted in rules that are substantially similar to the interpretation provided in the FAQs.

The remainder of this Section II provides a summary of the relevant provisions of section 2301 of the CARES Act, as amended by section 206 of the Relief Act, as they apply to qualified wages paid in 2020. References to section 2301 of the CARES Act include the amendments made by section 206 of the Relief Act, unless otherwise noted. This Section II also includes an overview of the options for employers to defer the deposit and payment of the employer's share of social security tax under section 2302 of the CARES Act and to defer the withholding and payment of the employee's share of social security tax under Notice 2020-65, as modified by Notice 2021-11, which may affect the amount that an employer can request as an advance payment of the credit. Section III of this notice provides guidance in Q/A format regarding the application of section 2301 of the CARES Act. Any term defined in this Section II or within a Q/A in Section III applies to all Q/A's in Section III.

### A. Claiming the Employee Retention Credit and Accessing Funds in Anticipation of the Credit

An employer that is an eligible employer as defined in section 2301(c)(2) of the CARES Act and that, after March 12, 2020, and before January 1, 2021, pays qualified wages, as defined in section 2301(c)(3) of the CARES Act, is entitled to claim the employee retention credit against the taxes imposed on employers by section 3111(a) of the Internal Revenue Code (Code) (employer's share of the Old Age, Survivors, and Disability Insurance (social security tax)), after these taxes are reduced by any credits

claimed under section 3111(e) and (f) of the Code,[3] sections 7001 and 7003 of the Families First Coronavirus Response Act (FFCRA), Pub. L. No. 116-127, 134 Stat. 178 (March 18, 2020),[4] and section 303(d) of the Relief Act.[5] Eligible employers subject to the Railroad Retirement Tax Act (RRTA) are entitled to take the employee retention credit against the taxes imposed on employers by section 3221(a) of the Code (Tier 1 tax under the RRTA) that are attributable to the rate in effect under section 3111(a) of the Code, after these taxes are reduced by any credits allowed under sections 7001 and 7003 of the FFCRA and section 303(d) of the Relief Act.

---

[3] Section 3111(e) of the Code permits qualified tax-exempt organizations that hire qualified veterans to claim a credit against the employer's share of social security tax imposed under section 3111(a) of the Code. Section 3111(f) of the Code permits a qualified small business to elect to apply part or all of its research credit available under section 41 against the tax imposed under section 3111(a) of the Code.

[4] Under sections 7001 and 7003 of the FFCRA, employers with fewer than 500 employees that provide paid sick and family leave, up to specified limits, to employees unable to work or telework due to certain circumstances related to COVID-19 may claim tax credits. The FFCRA, as amended by the COVID-related Tax Relief Act of 2020 (COVID Relief Act), provides employers with fewer than 500 employees (eligible FFCRA employers) refundable tax credits that reimburse them for the cost of providing paid sick and family leave wages to employees unable to work or telework for reasons related to COVID-19 under the Emergency Paid Sick Leave Act (EPSLA) and the Emergency Family and Medical Leave Expansion Act (Expanded FMLA), respectively. The credits are allowed against the employer's share of social security tax imposed under section 3111(a) of the Code, and so much of the taxes imposed on employers under section 3221(a) of the Code as are attributable to the rate in effect under section 3111(a) of the Code. The FFCRA required eligible FFCRA employers to provide paid leave to such employees for periods after March 31, 2020, and before January 1, 2021. The COVID Relief Act extended the period for which tax credits are available for employers providing paid sick and family leave that otherwise would meet the requirements of the FFCRA until March 31, 2021, although the requirement that employers provide the leave expired on December 31, 2020. See Section 286 of the COVID Relief Act, which was enacted as Subtitle B of Title II of Division N of the Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat.1182 (Dec. 27, 2020).

[5] Section 303(d) of the Relief Act relates to a separate, unrelated employee retention credit for certain tax-exempt organizations affected by qualified natural disasters. Section 303(d)(3)(C)(iii) of the Relief Act added a reference to section 303(d) to section 2301(b)(2) of the CARES Act, which impacts the ordering of the credits.

Section 2301(b)(3) of the CARES Act provides that if the amount of the credit exceeds the applicable employment taxes (reduced by any credits claimed under section 3111(e) and (f) of the Code, sections 7001 and 7003 of the FFCRA, or section 303(d) of the Relief Act) for any calendar quarter, then the excess is treated as an overpayment and refunded to the employer under sections 6402(a) or section 6413(b) of the Code.

Eligible employers report their total qualified wages for purposes of the employee retention credit and claim the employee retention credit (including any refund in excess of the employer portion of social security tax) on their federal employment tax returns; for most employers, this is the quarterly Form 941, *Employer's Quarterly Federal Tax Return*.[6]

Section 2301(k) of the CARES Act instructs the Secretary of the Treasury (or the Secretary's delegate) to waive the penalty under section 6656 of the Code for failure to deposit the employer share of social security tax in anticipation of the allowance of the refundable credit under the CARES Act. In addition, section 2301(l)(1) and (2) of the CARES Act provides for the advance payment of the credit (subject to the limitations of

[6] Some eligible employers will use other federal employment tax returns, such as the Form 944, *Employer's Annual Federal Tax Return*, Form 943, *Employer's Annual Federal Tax Return for Agricultural Employees*, or Form CT-1, *Employer's Annual Railroad Tax Return*, to report the amount of total qualified wages paid.

the credit and based on information the Secretary requires) and the reconciliation of the advance payment at the time of filing the employment tax return.

Notice 2020-22, 2020-17 I.R.B. 664, provides eligible employers relief from the failure to deposit penalty imposed by section 6656 of the Code for an employer's failure to timely deposit employment taxes to the extent the amounts not deposited are equal to or less than the amount of refundable tax credits to which the eligible employer is entitled under the FFCRA and the CARES Act.[7] Under the notice, an eligible employer will not be subject to a penalty under section 6656 for failing to deposit employment taxes in a calendar quarter if (1) the eligible employer paid qualified wages to its employees in the calendar quarter prior to the time of the required deposit, (2) the amount of employment taxes that the employer does not timely deposit, reduced by the amount of employment taxes not deposited in anticipation of the credits claimed under sections 7001 and 7003 of the FFCRA, is less than or equal to the amount of the employer's anticipated employee retention credit for the calendar quarter as of the time of the required deposit, and (3) the employer did not seek payment of an advance credit by filing Form 7200, *Advance Payment of Employer Credits Due to COVID-19*, with respect to the anticipated credits it relied upon to reduce its deposits. Accordingly, in anticipation of receiving the employee retention credit, eligible employers can (1) reduce

[7] Treasury and IRS will address the application of Notice 2020-22 in relation to the employee retention credit available for quarters in 2021 in future guidance.

their deposits of federal employment taxes, including withheld taxes, that would otherwise be required, up to the amount of the anticipated credit, and (2) request an advance of the amount of the anticipated credit that exceeds the reduced federal employment tax deposits by filing Form 7200. Reductions in deposits and advance payments are accounted for on the eligible employer's employment tax return.

**B. Definition of "Eligible Employer"**

The employee retention credit is available only to employers that are eligible employers. Section 2301(c)(2)(A) of the CARES Act defines the term "eligible employer" as any employer carrying on a trade or business during calendar year 2020, and, with respect to any calendar quarter, for which (1) the operation of the trade or business carried on during calendar year 2020 is fully or partially suspended due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to COVID-19, or (2) such calendar quarter is within the period in which the employer had a significant decline in gross receipts, as described in section 2301(c)(2)(B) of the CARES Act.

Section 2301(c)(2)(B)(i) of the CARES Act provides that the period during which an employer experiences a significant decline in gross receipts begins with the first calendar quarter beginning after December 31, 2019, for which gross receipts (within the meaning of section 448(c) of the Code) for the calendar quarter are less than 50 percent of gross receipts for the same calendar quarter in the prior year. Section 2301(c)(2)(B)(ii) of the CARES Act provides that the period during which an employer experiences a significant decline in gross receipts ends with the calendar quarter that

follows the first calendar quarter beginning after a calendar quarter described in section 2301(c)(2)(B)(i) of the CARES Act for which gross receipts of the employer are greater than 80 percent of gross receipts for the same calendar quarter in the prior year.

Section 2301(c)(2)(C)(i) of the CARES Act provides that in the case of an organization described in section 501(c) of the Code and exempt from tax under section 501(a) of the Code (a tax-exempt organization), sections 2301(c)(2)(A)(i) (relating to the requirement of carrying on a trade or business) and 2301(c)(2)(A)(ii)(I) (relating to a full or partial suspension of the operation of a trade or business due to a governmental order) apply to all operations of the organization. Section 2301(c)(2)(C)(ii) of the CARES Act provides that, in the case of a tax-exempt organization, any reference to gross receipts in section 2301 of the CARES Act is treated as a reference to gross receipts within the meaning of section 6033 of the Code. Therefore, tax-exempt organizations should refer to the definition of gross receipts under section 6033 of the Code to determine whether they experienced a significant decline in gross receipts under section 2301 of the CARES Act.[8]

Section 2301(f) of the CARES Act provides that the employee retention credit does not apply to the Government of the United States, the government of any State or

---

[8] Prior to the changes made by the Relief Act, section 448(c) of the Code applied to determine gross receipts of tax-exempt organizations under section 2301 of the CARES Act. Although the Relief Act changed the definition of gross receipts applicable to tax-exempt organizations to reference the definition under section 6033 of the Code, the result under section 2301 of the CARES Act, as revised by the Relief Act, is substantially the same as the interpretation of "gross receipts" applicable to tax-exempt organizations in the FAQs posted on IRS.gov in 2020.

political subdivision thereof, or any agency or instrumentality of those governments. Accordingly, these entities are not eligible employers.

Prior to the Relief Act amendments, section 2301(j) of the CARES Act provided that an eligible employer that received a covered loan under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102 of the CARES Act (a Paycheck Protection Program loan or PPP loan) would not be eligible for the employee retention credit. Section 206 of the Relief Act amended section 2301 of the CARES Act to permit an employer that received a PPP loan to be eligible to claim an employee retention credit under section 2301 of the CARES Act by striking section 2301(j) of the CARES Act, effective retroactive to the original effective date of the CARES Act.

### C. Definition of "Qualified Wages"

Section 2301(a) of the CARES Act provides that the credit amount is equal to 50 percent of qualified wages with respect to each employee for each applicable calendar quarter in 2020.

For purposes of determining "qualified wages," section 2301(c)(5)(A) of the CARES Act provides that the term "wages" generally means wages as defined in section 3121(a) of the Code and compensation as defined in section 3231(e) of the Code. Section 2301(c)(5)(B) of the CARES Act provides that "wages" include amounts paid by an eligible employer to provide and maintain a group health plan (as defined in section 5000(b)(1) of the Code), but only to the extent that the amounts are excluded from the gross income of employees by reason of section 106(a) of the Code. Amounts

treated as wages under section 2301(c)(5)(B) of the CARES Act are treated as paid with respect to any employee (and with respect to any period) to the extent the amounts are properly allocable to the employee (and to the period), and, except as otherwise provided by the Secretary of the Treasury (Secretary), the allocation will be treated as proper if made on the basis of being pro rata among periods of coverage. References to "allocable qualified health plan expenses" or "qualified health plan expenses" in this notice are to the health plan expenses described in section 2301(c)(5)(B) of the CARES Act.[9]

Section 2301(c)(3)(A) of the CARES Act provides different definitions of "qualified wages" depending on the size of the employer, which is measured by the average number of full-time employees (within the meaning of section 4980H of the Code) employed by the eligible employer during 2019.

Section 2301(c)(3)(A)(i) of the CARES Act provides that if an eligible employer averaged more than 100 employees during 2019 (large eligible employer), qualified wages are those wages paid by the eligible employer with respect to which an employee is not providing services due to circumstances described in section 2301(c)(2)(A)(ii)(I) of the CARES Act (relating to a full or partial suspension of the

[9] The Relief Act removed the term "qualified health plan expenses" from the definition of qualified wages under section 2301(c)(3) of the CARES Act and included health plan expenses as part of the definition of wages in section 2301(c)(5) of the CARES Act. The result under section 2301 of the CARES Act, as revised by the Relief Act, is substantially the same as the interpretation provided in the FAQs posted on IRS.gov in 2020.

operation of a trade or business due to a governmental order) or section 2301(c)(2)(A)(ii)(II) of the CARES Act (relating to a significant decline in gross receipts). For large eligible employers, section 2301(c)(3)(B) of the CARES Act limits qualified wages that may be taken into account to the amount that the employee would have been paid for working an equivalent duration during the 30 days immediately preceding the period in which the qualified wages are paid or incurred.

Section 2301(c)(3)(A)(ii) of the CARES Act provides that if an eligible employer averaged 100 or fewer employees in 2019 (small eligible employer), qualified wages are those wages paid by the eligible employer with respect to an employee during any period described in section 2301(c)(2)(A)(ii)(I) of the CARES Act (relating to a calendar quarter for which the operation of a trade or business is fully or partially suspended due to a governmental order) or during a calendar quarter within the period described in section 2301(c)(2)(A)(ii)(II) of the CARES Act (relating to a significant decline in gross receipts).

The flush language in section 2301(c)(3)(A) of the CARES Act provides that qualified wages do not include any wages taken into account for purposes of the credits under sections 7001 or 7003 of the FFCRA.

Section 2301(b)(1) of the CARES Act limits the amount of qualified wages with respect to any employee that may be taken into account under section 2301(a) of the CARES Act to $10,000 for all calendar quarters in 2020. Therefore, the maximum credit amount with respect to each employee for all four calendar quarters in 2020 is $5,000.

### D. Election Not to Take Certain Wages into Account and Coordination with PPP Loan

Section 2301(g)(1) of the CARES Act provides that section 2301 of the CARES Act does not apply to qualified wages paid by an eligible employer to the extent the employer elects not to take them into account for purposes of section 2301 of the CARES Act (at such time and in such manner as the Secretary may prescribe). Section 2301(g)(2) of the CARES Act provides that the Secretary, in consultation with the Administrator of the Small Business Administration, will issue guidance providing that payroll costs paid during the covered period for a PPP loan will not fail to be treated as qualified wages under section 2301 of the CARES Act, if an employer makes an election under section 2301(g)(1) of the CARES Act, to the extent that the PPP loan of the eligible employer is not forgiven by reason of a decision under section 7A(g) of the Small Business Act.[10]

Related to section 2301(g)(2) of the CARES Act, section 206(e)(2) of the Relief Act provides a special rule for employers that filed an employment tax return before December 27, 2020. Section 206(e)(2)(A) of the Relief Act provides that those employers may elect to treat any "applicable amount" as an amount paid in the fourth

[10] Section 7A(g) of the Small Business Act (15 U.S.C. 636(a)) sets forth the timing rule for lenders that receive an application for loan forgiveness from eligible recipients that received a Paycheck Protection Program loan. Specifically, section 7A(g) of the Small Business Act requires lenders to provide a decision regarding forgiveness no later than 60 days after the date on which the lender receives an application of loan forgiveness from an eligible recipient. The Relief Act added section 2301(g)(2) to the CARES Act when it struck section 2301(j) of the CARES Act, discussed above.

calendar quarter of 2020. Section 206(e)(2)(B) of the Relief Act defines the "applicable amount," in part, as the amount of wages that are permitted to be treated as qualified wages under guidance issued pursuant to section 2301(g)(2) of the CARES Act (relating to the decision not to forgive a loan under section 7A(g) of the Small Business Act), that were paid in the first, second, or third calendar quarter of 2020, and that were not taken into account by the taxpayer in calculating the employee retention credit for such calendar quarter (special fourth quarter rule).[11]

**E. Aggregation Rules**

Section 2301(d) of the CARES Act provides that all persons treated as a single employer under section 52(a) or (b) of the Code, or section 414(m) or (o) of the Code, will be treated as a single employer for purposes of the employee retention credit. While this notice describes the aggregation rules under sections 52(a) and (b) and 414(m) and (o) in general terms, it does not provide separate guidance on the substantive requirements of those aggregation rules or otherwise interpret those rules.

**F. Other Rules Related to the Employee Retention Credit**

Section 2301(e) of the CARES Act provides that rules similar to section 280C(a) of the Code apply for purposes of the employee retention credit. Section 280C(a) of the Code generally disallows a deduction for the portion of wages or salaries paid or

[11] The special fourth quarter rule also applies to the applicable amount described in section 2301(c)(5)(B) of the CARES Act, which is qualified health plan expenses.

incurred equal to the sum of certain credits determined for the taxable year. Accordingly, a similar deduction disallowance applies under section 2301(e) of the CARES Act with regard to the employee retention credit, such that an employer's deduction for qualified wages, including qualified health plan expenses, is reduced by the amount of the employee retention credit.

Section 2301(e) of the CARES Act also provides that rules similar to the rules of section 51(i)(1) of the Code (relating to the work opportunity credit) apply for purposes of the employee retention credit. Section 51(i)(1) provides that wages paid to “related individuals” (within the meaning of section 51(i)(1)) may not be taken into account for determining the credit under section 51(a) of the Code. Accordingly, wages paid to related individuals may not be taken into account for determining qualified wages for the employee retention credit. Similarly, section 2301(h)(1) of the CARES Act provides that an employee will not be included for purposes of computing the employee retention credit for any period that an employer is allowed a work opportunity credit under section 51 with respect to that employee for that period.

Section 2301(h)(2) of the CARES Act states that any wages taken into account in determining the employee retention credit will not be taken into account for purposes of determining the credit allowed under section 45S of the Code (relating to paid and family medical leave).

Finally, section 2301(h)(3) of the CARES Act provides that the employee retention credit is treated as a credit described in section 3511(d)(2) of the Code.[12]

### G. Regulations and Guidance

Section 2301(l) of the CARES Act requires the Secretary to issue forms, instructions, regulations, and guidance, as necessary, to allow for the advance payment of the credit, provide for reconciliation of the advance payment at the time of filing the employment tax return, and to apply the credit to third-party payers. Section 2301(l) of the CARES Act also gives the Secretary authority to issue guidance on the application of the definition of a "significant decline in gross receipts" in the case of any employer that was not carrying on a trade or business for all or part of the same calendar quarter in the prior year and to prevent avoidance of the purposes of the limitations applicable to the employee retention credit.

### H. Deferral Under Section 2302 of the CARES Act

Section 2302 of the CARES Act provides that employers may defer the deposit and payment of the employer's share of social security tax and the portion of Tier 1 tax

---

[12] Section 3511 provides rules for Certified Professional Employer Organizations (CPEOs) and their customers with regard to employment taxes on wages paid by the CPEO to the customer's employees. Section 3511(d) provides the following rules for certain credits specified in section 3511(d)(2): (1) credits with respect to a customer's work site employee apply to the customer, not the CPEO; (2) the customer, not the CPEO, takes into account wages and employment taxes paid by the CPEO with respect to the work site employee and for which the CPEO receives payment from the customer; and (3) the CPEO must furnish the customer and the Secretary with any information necessary for the customer to claim the credits.

under the RRTA that is equivalent to the employer's share of social security tax for the period of March 27, 2020, through December 31, 2020. Section 2302 does not impact an employer's eligibility to claim the employee retention credit. However, because an employer may defer deposits under section 2302 before reducing deposits in anticipation of claiming the credit, the deferral may affect the amount that an employer may request as an advance of the credit.

### I. Deferral Under Notice 2020-65 as Modified by Notice 2021-11

Notice 2020-65, 2020-38 I.R.B. 567, as modified by Notice 2021-11, 2021-6 I.R.B. 827, permits employers to postpone the withholding and payment of the employee's share of social security tax or the employee's share of Tier 1 tax under the RRTA that is equivalent to the employee's share of social security tax with respect to applicable wages (as defined in Notice 2020-65) paid to an employee on a pay date during the period beginning on September 1, 2020, and ending on December 31, 2020. Deferral under Notice 2020-65, as modified by Notice 2021-11, during the third or fourth quarter of 2020 does not impact an employer's eligibility to claim the employee retention credit. However, because an employer may defer deposits of the employee's share of social security tax before reducing deposits in anticipation of claiming the credit, the deferral may affect the amount that an employer may request as an advance of the credit.

## III. GUIDANCE

This Section III provides guidance in Q/A format on the following topics:

A. Eligible Employers

B. Aggregation Rules

C. Governmental Orders

D. Full or Partial Suspension of Trade or Business Operations

E. Significant Decline in Gross Receipts

F. Maximum Amount of Employer's Employee Retention Credit

G. Qualified Wages

H. Allocable Qualified Health Plan Expenses

I. Interaction with Paycheck Protection Program (PPP) Loans

J. Claiming the Employee Retention Credit

K. Special Issues for Employees: Income and Deduction

L. Special Issues for Employers: Income and Deduction

M. Special Issues for Employers: Use of Third-Party Payers

N. Substantiation Requirements

**A. Eligible Employers**

**Question 1**: What is a "trade or business" for purposes of the employee retention credit?

**Answer 1**: For purposes of the employee retention credit, "trade or business" has the same meaning as when used in section 162 of the Code other than the trade or business of performing services as an employee. Under section 162, an activity does not qualify as a trade or business unless its primary purpose is to make a profit and it is carried on with regularity and continuity. The facts and circumstances of each case

determine whether an activity is a trade or business. A taxpayer does not necessarily need to make a profit in any particular year in order to be in a trade or business as long as a good faith profit motive is present.

For purposes of the employee retention credit, a tax-exempt organization described in section 501(c) of the Code that is exempt from tax under section 501(a) of the Code is deemed to be engaged in a "trade or business" with respect to all operations of the organization.

**Question 2**: How does an organization determine if it is considered an "instrumentality" of the Federal government, or of a State or local government, for purposes of the employee retention credit?

**Answer 2**: In general, for employment tax purposes, the IRS considers six factors in determining whether an organization is a government instrumentality. The six factors that are used to determine whether an organization is an instrumentality are:

- whether the organization is used for a governmental purpose and performs a governmental function;
- whether performance of the organization's function is on behalf of one or more States or political subdivisions;
- whether there are any private interests involved, or whether the States or political subdivisions involved have the powers and interests of an owner;
- whether control and supervision of the organization is vested in a public authority or authorities;

- if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and
- the degree of financial autonomy and the source of its operating expenses.

See Rev. Rul. 57-128, 1957-1 C.B. 311. No one factor is determinative; instrumentality status is based on all the facts and circumstances. These same factors apply to identify an instrumentality of the Federal government, or of a State or local government, for purposes of the employee retention credit.

**Question 3**: Are tribal governments and tribal entities eligible for the employee retention credit?

**Answer 3**: Yes. Any tribal government or tribal entity that operates a trade or business may be an eligible employer for purposes of the employee retention credit if it otherwise satisfies the eligibility requirements to claim the credit.

As a general rule, whether activities constitute a trade or business for purposes of the employee retention credit is determined under section 162 of the Code. However, because tribal governments are not subject to income tax under the Code and, therefore, are generally not otherwise required to determine whether an activity of the tribe constitutes the carrying on of a trade or business under section 162, the Treasury Department and IRS have concluded that the section 162 standards are not the appropriate bases for determining whether a tribal government is carrying on a trade or business for purposes of the employee retention credit. Instead, solely for purposes of the employee retention credit, a tribal government is treated as carrying on trade or business activities, and all activities conducted by the tribal government will be

considered part of such trade or business activities, without the need for further analysis of whether those activities meet a particular standard for identifying trade or business operations. In addition, solely for purposes of the employee retention credit, any entity that a tribal government reasonably believes shares the same tax status as the tribal government (tribal entity employer) may also consider all of its activities as trade or business activities. Any entity other than a tribal government or a tribal entity employer must determine whether its activities constitute carrying on a trade or business under section 162 for purposes of determining eligibility for the employee retention credit.

**Question 4**: Are employers in U.S. Territories eligible for the employee retention credit?

**Answer 4**: Yes. If an employer in a U.S. Territory otherwise qualifies for the employee retention credit then the employer is entitled to claim the credit. Section 2301(c)(5)(A) of the CARES Act provides that qualified wages are, in general, wages as defined in section 3121(a) of the Code for purposes of the Federal Insurance Contributions Act (FICA) tax. Payments of wages by employers in U.S. Territories are wages within the meaning of section 3121(a). Accordingly, eligible employers include employers in the U.S. Territories that pay qualified wages and otherwise meet the requirements for the credit.

**Question 5**: Are self-employed individuals eligible for the employee retention credit?

**Answer 5**: Self-employed individuals are not eligible for the employee retention credit with respect to their own self-employment earnings. However, a self-employed

individual who employs other individuals in the self-employed individual's trade or business and who otherwise meets the requirements to be an eligible employer may be eligible for the employee retention credit with respect to qualified wages the self-employed individual pays to the employees.

**Question 6**: Are household employers eligible for the employee retention credit?

**Answer 6**: No. Household employers are not considered to operate a trade or business and, therefore, are not eligible for the employee retention credit with respect to their household employees. However, household employers who are also employers operating a trade or business and who generally report employment taxes attributable to their household employees on the same federal employment tax return used to report the employment taxes attributable to the employees of the trade or business, may be eligible for the employee retention credit, but only with respect to the trade or business employees and their qualified wages paid with respect to the trade or business.

**B. Aggregation Rules**

**Question 7**: What is the general impact of the aggregation rules that treat certain entities as a single employer?

**Answer 7**: All entities that are members of a controlled group of corporations or trades or businesses under common control under sections 52(a) or (b) of the Code, members of an affiliated service group under section 414(m) of the Code, or otherwise aggregated under section 414(o) of the Code are treated as a single employer for purposes of applying the employee retention credit. As a result, employers required to

be aggregated are treated as a single employer for purposes of the following rules applicable to the employee retention credit:

- Determining whether the employer has a trade or business operation that was fully or partially suspended due to orders related to COVID-19 from an appropriate governmental authority;
- Determining whether the employer experiences a significant decline in gross receipts;
- Determining whether the employer averaged more than 100 full-time employees; and
- Determining the maximum credit amount per employee.

The aggregation rules under section 52(a) and (b) generally apply to determine which entities are treated as a single employer for purposes of the tax credits available to an employer under section 51 of the Code, as well as for other Code provisions.

Under section 52(a), corporate taxpayers that are members of a controlled group of corporations are treated as a single employer. A controlled group of corporations may be either a parent-subsidiary controlled group, a brother-sister controlled group, or a combined group of corporations.[13] The section 52(b) aggregation rules apply to

[13] A parent-subsidiary controlled group of corporations is one or more chains of corporations where the common parent corporation owns more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the value of all classes of stock of each corporation. A brother-sister controlled group of corporations is two or more corporations where (1) five

partnerships, trusts, estates, corporations, or sole proprietorships in trades or businesses under common control. Under this rule, entities are treated as a single employer if they are under common control applying rules similar to the parent-subsidiary or brother-sister controlled group rules or the rules for a combined group of corporations.

Section 414(m)(1) provides that employees of members in an affiliated service group under section 414(m)(2) and (5) are treated as employed by a single employer for purposes of employee benefit requirements listed in section 414(m)(4).[14] In addition, section 414(o) generally provides that the Secretary shall prescribe regulations necessary to prevent avoidance of any of the employee benefit requirements listed in section 414(m)(4) through the use of separate organizations or other arrangements. Many Code provisions, particularly those addressing employee benefits, apply the aggregation rules of section 414(m) and (o). For example, section 414(t) generally

---

or fewer persons who are individuals, estates, or trusts own at least 80 percent of the total combined voting power of all classes of stock entitled to vote, or the total value of shares of all classes of stock of each corporation; and (2) the same five or fewer persons, taking into account ownership only to the extent that it is identical with respect to each corporation, own more than 50 percent of the total voting power of all classes of stock entitled to vote, or total value of shares of all classes of stock of each corporation. A combined group of corporations is three or more corporations, each of which is a member of either a parent-subsidiary or a brother-sister controlled group, and at least one of which is both the common parent of a parent-subsidiary controlled group and also a member of a brother-sister controlled group. See Treas. Reg. § 1.52-1.

[14] There are three types of affiliated service groups described in section 414(m). The first and second types of affiliated service groups are described under section 414(m)(2) and require a combination of common ownership and performance of services among certain organizations. The third type of affiliated service group is described under section 414(m)(5), requires no common ownership, and aggregates employers based on the performance of management functions by one organization for another organization (and related organizations).

provides that the aggregation rules in section 414(m) and (o) apply to various Code provisions listed in section 414(t)(2).

**Question 8**: How is the employee retention credit allocated to an eligible employer that is a member of an aggregated group?

**Answer 8**: The amount of the employee retention credit with respect to a member of the aggregated group is based on the member's proportionate share of the qualified wages giving rise to the credit for each calendar quarter (or other prescribed period for which a tax return is required to be filed) for which the credit is claimed.

**Question 9**: How do the aggregation rules apply to tribes and tribal entities?

**Answer 9**: In determining eligibility for the employee retention credit, all employers must apply the aggregation rules under section 52(a) and (b) and section 414(m) and (o) of the Code. For purposes of the employee retention credit, tribal governments and tribal entity employers (as defined in Q/A–3) should use a reasonable, good faith interpretation in determining how the aggregation rules apply.

### C. Governmental Orders

**Question 10**: What "orders from an appropriate governmental authority" may be taken into account by an employer for purposes of determining eligibility for the employee retention credit?

**Answer 10**: Orders, proclamations, or decrees from the Federal government or any State or local government may be taken into account by an employer as "orders from an appropriate governmental authority" only if they limit "commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the

coronavirus disease 2019 (COVID-19)" and relate to the suspension of an employer's operation of its trade or business. Orders that are not from the Federal government must be from a State or local government that has jurisdiction over the employer's operations. These orders are referred to as "governmental orders." Whether orders, proclamations or decrees are governmental orders is determined without regard to the level of enforcement of the governmental order.

Statements from a governmental official, including comments made during press conferences or in interviews with the media, do not rise to the level of a governmental order for purposes of the employee retention credit. Additionally, the declaration of a state of emergency by a governmental authority is not sufficient to rise to the level of a governmental order if it does not limit commerce, travel, or group meetings in any manner. Further, such a declaration that limits commerce, travel, or group meetings, but does so in a manner that does not relate to the suspension of an employer's operation of its trade or business does not rise to the level of a governmental order for purposes of the employer's determination of its eligibility for the employee retention credit.

Governmental orders include:

- An order from the city's mayor stating that all non-essential businesses must close for a specified period;
- A State's emergency proclamation that residents must shelter in place for a specified period, other than residents who are employed by an essential business and who may travel to and work at the workplace location;

- An order from a local official imposing a curfew on residents that impacts the operating hours of a trade or business for a specified period;
- An order from a local health department mandating a workplace closure for cleaning and disinfecting.

Whether the operations of a trade or business are considered essential or non-essential will often vary from jurisdiction to jurisdiction. An employer should determine whether it is operating an essential or non-essential business by referring to the governmental order affecting the employer's operation of its trade or business.

*Example 1*: Governor of State Y issues an order that all non-essential businesses must close from March 20, 2020, until April 30, 2020. The order provides a list of non-essential businesses, including gyms, spas, nightclubs, barber shops, hair salons, tattoo parlors, physical therapy offices, waxing salons, fitness centers, bowling alleys, arcades, racetracks, indoor children's play areas, theaters, chiropractors, planetariums, museums, and performing arts centers. The governor's order is a governmental order limiting the operations of non-essential businesses; therefore, employers with non-essential businesses to which the governmental order applies may be considered eligible employers for purposes of the employee retention credit.

*Example 2*: Mayor of City Y holds a press conference encouraging residents to practice social distancing to prevent the spread of COVID-19. The statement during the press conference is not an order limiting commerce, travel, or group meetings. Accordingly, the mayor's statement would not be a governmental order for purposes of the employee retention credit.

*Example 3*: A restaurant is ordered by a local health department to close due to a health code violation. Since the order is unrelated to COVID-19, it would not be considered a governmental order for purposes of the employee retention credit.

**D. Full or Partial Suspension of Trade or Business Operations**

**Question 11**: If a governmental order requires non-essential businesses to suspend operations but allows essential businesses to continue operations, is an essential business considered to have a full or partial suspension of operations due to a governmental order?

**Answer 11**: An employer that operates an essential business is not considered to have a full or partial suspension of operations if the governmental order allows all of the employer's operations to remain open. However, an employer that operates an essential business may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order. For example, an employer that maintains both essential and non-essential business operations, each of which are more than nominal portions of the business operations, may be considered to have a partial suspension of its operations if a governmental order restricts the operations of the non-essential portion of the business, even if the essential portion of the business is unaffected. In addition, an essential business that is permitted to continue its operations may, nonetheless, be considered to have a partial suspension of its operations if a governmental order requires the business to close for a period of time during normal working hours.

Solely for purposes of this employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).

**Question 12**: If a governmental order causes the suppliers to a business to suspend their operations, is the business considered to have a suspension of operations due to a governmental order?

**Answer 12**: An employer may be considered to have a full or partial suspension of operations due to a governmental order if, under the facts and circumstances, the business's suppliers are unable to make deliveries of critical goods or materials due to a governmental order that causes the supplier to suspend its operations. If the facts and circumstances indicate that the business's operations are fully or partially suspended as a result of the inability to obtain critical goods or materials from its suppliers because they were required to suspend operations, then the business would be considered an eligible employer for calendar quarters during which its operations are fully or partially suspended and may be eligible to receive the employee retention credit.

*Example*: Employer A operates an auto parts manufacturing business. Employer A's supplier of raw materials is required to fully suspend its operations due to a governmental order. Employer A is unable to procure these raw materials from an alternate supplier. As a consequence of the suspension of Employer A's supplier, Employer A is not able to perform its operations for a period of time. Under these facts and circumstances, Employer A would be considered an eligible employer during this period because its operations have been suspended due to the governmental order that suspended operations of its supplier.

**Question 13**: If a governmental order causes the customers of a business to stay at home, or otherwise causes a reduction in demand for its products or services, and the business responds to the lack of demand by suspending some or all of its operations, is the business considered to have a suspension of operations due to a governmental order?

**Answer 13**: No. An employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its products or services is not considered to have a full or partial suspension of its operations due to a governmental order.

If an employer's operations are not suspended due to a governmental order but the employer experiences a reduction in demand, the employer may be considered an eligible employer if it experiences a significant decline in gross receipts.

*Example*: Employer B, an automobile repair service business, is an essential business and is not required to close its locations or suspend its operations. Due to a governmental order that limits travel and requires members of the community to stay at home except for certain essential travel, such as going to the grocery store, Employer B's business has declined significantly. Employer B suspends its operations due to the lack of demand. Employer B is not considered to have a full or partial suspension of operations due to a governmental order.

**Question 14**: If an employer voluntarily suspends operation of a trade or business or voluntarily reduces hours due to COVID-19, but the suspension or reduction in hours is not due to a governmental order, may the employer qualify as an eligible employer solely on the basis of the voluntary suspension or reduction in hours?

**Answer 14**: No. An employer that voluntarily suspends operation of a trade or business or voluntarily reduces hours due to COVID-19 is not eligible for the employee retention credit on the basis of a full or partial suspension of its operations.

**Question 15**: If a governmental order requires an employer to close its workplace, but the employer is able to continue operations comparable to its operations prior to the closure by requiring employees to telework, is the employer considered to have a suspension of operations?

**Answer 15**: No. If an employer's workplace is closed by a governmental order, but the employer is able to continue operations comparable to its operations prior to the closure, including by requiring its employees to telework, the employer's operations are

not considered to have been fully or partially suspended as a consequence of a governmental order.

However, if the closure of the workplace causes the employer to suspend business operations for certain purposes, but not others, it may be considered to have a partial suspension of operations due to the governmental order.

*Example 1*: Employer C, a software development company, maintains an office in a city where the mayor has ordered that only essential businesses may operate. Employer C's business is not essential under the mayor's order, and therefore Employer C is required to close its office. Prior to the governmental order, all employees at the company teleworked once or twice per week, and business meetings were held at various locations. Following the governmental order, the company ordered mandatory telework for all employees and limited client meetings to telephone or video conferences. Employer C's business operations are not considered to be fully or partially suspended due to the governmental order because the employer is able to continue its business operations in a comparable manner.

*Example 2*: Employer D operates a physical therapy facility in a city where the mayor has ordered that only essential businesses may operate. Employer D's business is not considered essential under the mayor's order, and therefore Employer D is required to close its workplace. Prior to the governmental order, none of Employer D's employees provided services through telework and all appointments, administration, and other duties were carried out at Employer D's workplace. Following the governmental order, Employer D moves to an online format and is able to serve some

clients remotely, but employees cannot access specific equipment or tools that they typically use in therapy and not all clients can be served remotely. Employer D's business operations are considered to be partially suspended due to the governmental order because Employer D's workplace, including access to physical therapy equipment, is central to its operations, and the business operations cannot continue in a comparable manner.

*Example 3*: Employer E, a scientific research company with facilities in a state in which the governor has ordered that only essential businesses may operate, conducts research in a laboratory setting and through the use of computer modeling. Employer E's business is not essential under the governor's order, and therefore Employer E is required to close its workplace. Prior to the governmental order, Employer E's laboratory-based research operations could not be conducted remotely (other than certain related administrative tasks) and employees involved in laboratory-based research worked on-site. Employer E's computer modeling research operations could be conducted remotely, and employees who engaged in this portion of the business often teleworked. Following the governmental order, the employees engaged in the laboratory-based research cannot perform their work while the facility is closed and are limited to performing administrative tasks during the closure. In contrast, all employees engaged in computer modeling research are directed to telework, and those business operations are able to continue in a comparable manner. Employer E's business operations are considered to be partially suspended due to the governmental order

because Employer E's laboratory-based research business operations cannot continue in a comparable manner.

**Question 16**: What factors should be considered in determining if an employer is able to continue operations comparable to its operations prior to closure such that the employer's operations are not considered to have been fully or partially suspended due to a governmental order?

**Answer 16**: The following factors should be considered in determining if an employer is able to continue comparable operations, although additional factors may be considered as well if relevant:

(1) Employer's telework capabilities. Determine whether an employer has adequate support (IT and otherwise) such that operations can continue via work from another location.

(2) Portability of employees' work. Determine the amount of portable work, or work otherwise adaptable to be performed from a remote location, within an employer's trade or business operations.

(3) Need for presence in employee's physical work space. Evaluate the role that the employer's physical work space plays in an employer's trade or business (may be critical and necessary, beneficial but not necessary, or merely convenient). If the employer's physical work space is so critical to its trade or business operations that tasks central to the trade or business's operations are unable to be performed remotely, then this factor alone indicates that the employer is not able to continue comparable operations. Examples of work

space that is critical include laboratories or manufacturing involving special equipment or materials that cannot be accessed or operated remotely.

(4) Transitioning to telework operations. If an employer can conduct comparable operations via telework, but the employer's operations did not previously allow for telework, or allowed for only minimal telework, then some adjustment period is expected, and, generally, the employer's operations are not considered partially suspended during that period. However, if an employer incurs a significant delay (for example, beyond 2 weeks) in moving operations to comparable telework (for example, implementing telework policies or providing employees with equipment to telework), then the employer's trade or business operations may be deemed subject to a partial suspension during that transition period.

**Question 17**: If a governmental order requires an employer to close its workplace for certain purposes, but the workplace may remain operational for other limited purposes, is the employer considered to have a suspension of operations due to the governmental order?

**Answer 17**: If an employer's workplace is closed due to a governmental order for certain purposes, but the employer's workplace may remain open for other limited purposes, the employer's operations would be considered to be partially suspended if, under the facts and circumstances, the operations that are closed are more than a nominal portion of its business operations and cannot be performed remotely in a comparable manner. If all, or all but a nominal portion, of an employer's business

operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances. See Q/A 18 for a description of factors that may be used for determining if a modification required by a governmental order has more than a nominal effect on business operations.

*Example 1*: Employer F, a restaurant business, must close its restaurant to on-site dining due to a governmental order closing all restaurants, bars, and similar establishments for sit-down service. Employer F is allowed to continue food or beverage sales to the public on a carry-out, drive-through, or delivery basis. On-site dining is more than a nominal portion of Employer F's business operations. Employer F's business operations are considered to be partially suspended because, under the facts and circumstances, more than a nominal portion of its business operations—its indoor and outdoor dining service—is suspended due to the governmental order.

*Example 2*: Same facts as Example 1, except that two months later, under a subsequent governmental order, Employer F is permitted to offer sit-down service in its outdoor space, but its indoor dining service continues to be closed. During this period, Employer F is allowed to operate only its outdoor sit-down and carry-out service in accordance with the order. Indoor dining is more than a nominal portion of Employer F's business operations. Employer F's business operations are considered to be

partially suspended because, under the facts and circumstances, more than a nominal portion of its business operations – its indoor dining service – is suspended due to a governmental order. The following month, under a further governmental order, Employer F is permitted to offer indoor dining service, in addition to outdoor sit-down and carry-out service, provided that all tables in the indoor dining room must be spaced at least six feet apart. This spacing constraint has more than a nominal effect on Employer F's business operations. During this period, even though Employer F resumed all categories of its business operations, Employer F's business operations continue to be partially suspended because, under the facts and circumstances, the governmental order restricting its indoor dining service has more than a nominal effect on its operations.

*Example 3*: Employer G, a retail business, must close its retail storefront locations due to a governmental order. The retail business also maintains a website through which it continues to fulfill online orders; the retailer's online ordering and fulfillment system is unaffected by the governmental order. The retail storefront locations are more than a nominal portion of Employer G's business operations. Employer G's business operations are considered to have been partially suspended due to the governmental order requiring it to close its retail storefront locations, which are more than a nominal portion of its business operations.

*Example 4*: Employer H, a hospital, is considered to be operating an essential business under a governmental order with respect to its emergency department, intensive care, and other services for conditions requiring urgent medical care.

However, the governmental order treats Employer H's elective and non-urgent medical procedures as non-essential business operations and prevents Employer H from performing these services. Employer H suspends operations related to elective and non-urgent medical procedures, which are more than a nominal portion of Employer H's business operations. Although Employer H is an essential business, Employer H is considered to have a partial suspension of operations due to the governmental order that prevents Employer H from performing elective and non-urgent medical procedures, which are more than a nominal portion of its business operations under the facts and circumstances.

*Example 5*: Employer I, a grocery store, is considered to be operating an essential business under a governmental order. However, the governmental order requires grocery stores to discontinue their self-serve offerings, such as salad bars, though they may offer prepared or prepackaged food. Employer I modifies its operations to close its salad bar and other self-serve offerings and instead offers prepackaged salads and other items. The salad bar and other self-serve offerings are not more than a nominal portion of Employer I's business operations. Further, the governmental order requiring Employer I to discontinue its self-serve offerings does not have more than a nominal effect on Employer I's business operations under the facts and circumstances, even though Employer I was required to modify its business operations. Accordingly, Employer I's business operations are not considered to be partially suspended due to a governmental order.

*Example 6*: Employer J, a large retailer, is required to close its storefront location due to a governmental order, but is permitted to provide customers with curbside service to pick up items ordered online or by phone. The retail storefront location is more than a nominal portion of Employer J's business operations. During this period, Employer J's business operations are considered to have been partially suspended due to the governmental order requiring it to close its storefront location. Two months later, under a subsequent governmental order, Employer J is permitted to reopen its storefront location. Under the subsequent governmental order, however, Employer J must enforce social distancing guidelines that require Employer J to admit only a specified number of customers into the store per 1,000 square feet. While the governmental order results in customers waiting in line for a short period of time to enter the store during certain busy times of the week, the size of Employer J's storefront is large enough that it is able to accommodate all of its customers after these short waits outside the store. The governmental order requiring Employer J to enforce social distancing guidelines does not have more than a nominal effect on Employer J's business operations under the facts and circumstances, even though Employer J is required to modify its business operations. During this period, Employer J's business operations are not considered to be partially suspended due to the governmental order because the governmental order requiring enforcement of social distancing guidelines does not have more than a nominal effect on its operations.

**<u>Question 18</u>**: What factors should be taken into account in determining whether a modification required by a governmental order has more than a nominal effect on business operations for purposes of Q/A–17?

**<u>Answer 18</u>**: The types of modifications that are contemplated by Q/A–17 are those required by a governmental order as a condition of reopening a physical space for business or service to the public. Examples of these modifications include: limiting occupancy to provide for social distancing, requiring services to be performed only on an appointment basis (for businesses that previously offered walk-in service), changing the format of service (for example, restrictions on buffet or self-serve, but not prepackaged or carry-out), or requiring employees and customers to wear face coverings.

The mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations. Whether a modification required by a governmental order has more than a nominal effect on the business operations is based on the facts and circumstances. A governmental order that results in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations. For example, occupancy restrictions at a restaurant with indoor dining service may result in an actual, and more than nominal, reduction of the restaurant's ability to service customers; however, an occupancy restriction at a retailer with

sufficient physical space to accommodate its customers regardless of the restriction will likely not result in an actual, and more than nominal, reduction of the retailer's ability to provide goods to its customers.

Modifications altering customer behavior (for example, mask requirements or making store aisles one way to enforce social distancing) or that require employees to wear masks and gloves while performing their duties will not result in more than a nominal effect on the business operations.

**Question 19**: Are an employer's operations considered to be partially suspended for purposes of the employee retention credit if the employer is required to reduce its operating hours by a governmental order?

**Answer 19**: Yes. An employer that reduces its operating hours due to a governmental order is considered to have partially suspended its operations since the employer's operations have been limited by a governmental order.

*Example*: Employer K operates a food processing facility that normally operates 24 hours a day. A governmental order issued by the local health department requires all food processing businesses to deep clean their workplaces once every 24 hours in order to reduce the risk of COVID-19 exposure. In order to comply with the governmental order, Employer K reduces its daily operating hours by five hours per day so that a deep cleaning may be conducted within its workplace once every 24 hours. Employer K is considered to have partially suspended its operations due to the governmental order requiring it to reduce its hours of operation.

**<u>Question 20</u>**: Is an employer that operates a trade or business in multiple locations and is subject to governmental orders requiring full or partial suspension of its operations in some jurisdictions, but not in others, considered to have a partial suspension of operations?

**<u>Answer 20</u>**: Yes. Employers that operate a trade or business in multiple locations and are subject to State and local governmental orders requiring full or partial suspension of operations in some, but not all, jurisdictions are considered to have a partial suspension of operations. Employers that operate a trade or business on a national or regional basis may be subject to governmental orders requiring closure of their locations in certain jurisdictions, but may not be subject to a governmental order in other jurisdictions. To operate in a consistent manner in all jurisdictions, these employers may establish a policy that complies with the local governmental orders, as well as the Center for Disease Control and Prevention (CDC) recommendations and the Department of Homeland Security (DHS) guidance; in this case, even though the employer may not be subject to a governmental order to suspend operations of its trade or business in certain jurisdictions, and may merely be following CDC or DHS guidelines in those jurisdictions, the employer would still be considered to have partially suspended operations due to the governmental orders requiring closure of its business operations in certain jurisdictions. Therefore, the employer would be an eligible employer with respect to all of its operations in all locations for calendar quarters during which the employer's operations are partially suspended whether or not the employer voluntarily adopts consistent measures for its business operations in other jurisdictions.

*Example*: Employer L is a national retail store chain with operations in every state in the United States. In some jurisdictions, Employer L is subject to a governmental order to close its stores to customers, but is permitted to provide customers with curbside service to pick up items ordered online or by phone. In these jurisdictions, Employer L determines that it is not continuing comparable operations and that the stores that are closed to customers are more than a nominal portion of its business operations. In other jurisdictions, Employer L is not subject to any governmental order to close its stores to customers or is considered an essential business permitting its stores to fully remain open. Employer L establishes a company-wide policy, in compliance with the local governmental orders and consistent with the CDC and DHS recommendations and guidance, requiring the closure of all stores and operating with curbside pick-up only, even in those jurisdictions where the business was not subject to a governmental order. As a result of the governmental orders requiring closure of Employer L's stores to customers in certain jurisdictions, Employer L has a partial suspension of operations of its trade or business whether or not Employer L chooses to take consistent measures for stores in other jurisdictions. The partial suspension results in Employer L being an eligible employer nationwide for calendar quarters during which the employer's operations are partially suspended.

**Question 21**: If the operations of a trade or business of one member of an aggregated group are fully or partially suspended due to a governmental order, are the operations of the trade or business of the other members of the aggregated group

considered to be fully or partially suspended for purposes of the employee retention credit?

**Answer 21**: Yes. All members of an aggregated group that are treated as a single employer under the aggregation rules are treated as a single employer for purposes of the employee retention credit. If a trade or business is operated by multiple members of an aggregated group, and if the operations of one member of the aggregated group are suspended due to a governmental order, then all members of the aggregated group are considered to have their operations partially suspended, even if another member of the group is in a jurisdiction that is not subject to a governmental order.

*Example*: Employer Group M is a restaurant chain that operates a single trade or business through multiple subsidiary corporations located in various jurisdictions. Employer Group M is treated as a single employer under the aggregation rules for purposes of the employee retention credit. Certain members of Employer Group M's operations are fully suspended due to a governmental order, while other members of Employer Group M's operations are not subject to a governmental order and remain open. Because Employer Group M is treated as a single employer for purposes of the employee retention credit, the operations of all members of Employer Group M are treated as fully or partially suspended due to governmental orders suspending the operations of certain of Employer Group M members.

**Question 22**: If an employer is subject to a governmental order to fully or partially suspend its business operations and the order is subsequently lifted in the

middle of a calendar quarter, is the employer an eligible employer for the entire calendar quarter?

**<u>Answer 22</u>**: Yes. An employer with business operations that are fully or partially suspended due to a governmental order during a portion of a calendar quarter is an eligible employer for the entire calendar quarter. However, only wages paid with respect to the period during which the employer is fully or partially suspended due to a governmental order may be considered qualified wages.

*<u>Example</u>*: State Y issued a governmental order for all non-essential businesses to close from March 10, 2020, through April 30, 2020, and the governmental order was not extended. Pursuant to the order, Employer N, which operates a non-essential business in State Y, closes from March 10 through April 30. Employer N is a large eligible employer in the first quarter and second quarter of 2020, but may claim the credit only for qualified wages paid from March 13, 2020, the effective date of section 2301 of the CARES Act, through April 30, 2020, with respect to employees who were not providing services during this period because of the suspension of operations due to State Y's governmental order.

### E. Significant Decline in Gross Receipts

**<u>Question 23</u>**: How is the period during which there is a significant decline in gross receipts determined?

**<u>Answer 23</u>**: The period during which there is a significant decline in gross receipts is determined by identifying the first calendar quarter in 2020 (if any) in which an employer's gross receipts are less than 50 percent of its gross receipts for the same

calendar quarter in 2019. The period during which there is a significant decline in gross receipts ends with the earlier of January 1, 2021, or the calendar quarter that follows the first calendar quarter in which the employer's 2020 quarterly gross receipts are greater than 80 percent of its gross receipts for the same calendar quarter in 2019

*Example*: Employer A's gross receipts were $100,000, $190,000, and $230,000 in the first, second, and third calendar quarters of 2020, respectively. Its gross receipts were $210,000, $230,000, and $250,000 in the first, second, and third calendar quarters of 2019, respectively. Thus, Employer A's 2020 first, second, and third quarter gross receipts were approximately 48 percent, 83 percent, and 92 percent of its 2019 first, second, and third quarter gross receipts, respectively. Accordingly, Employer A experienced a significant decline in gross receipts commencing on the first day of the first calendar quarter of 2020 (the calendar quarter in which gross receipts were less than 50 percent of those in the same quarter of 2019) and ending on the first day of the third calendar quarter of 2020 (the quarter following the first quarter in which the gross receipts were more than 80 percent of those in the same quarter of 2019). Thus, Employer A is an eligible employer during the first and second calendar quarters of 2020.

**Question 24**: What are "gross receipts" for an employer other than a tax-exempt organization?

**Answer 24**: "Gross receipts" for purposes of the employee retention credit, for an employer other than a tax-exempt organization, has the same meaning as when used under section 448(c) of the Code. Under the section 448(c) regulations, "gross receipts"

means gross receipts of the taxable year and generally includes total sales (net of returns and allowances) and all amounts received for services. In addition, gross receipts include any income from investments, and from incidental or outside sources. For example, gross receipts include interest (including original issue discount and tax-exempt interest within the meaning of section 103 of the Code), dividends, rents, royalties, and annuities, regardless of whether those amounts are derived in the ordinary course of the taxpayer's trade or business. Gross receipts are generally not reduced by cost of goods sold, but are generally reduced by the taxpayer's adjusted basis in certain property used in a trade or business or capital assets sold. Gross receipts do not include the repayment of a loan, or amounts received with respect to sales tax if the tax is legally imposed on the purchaser of the good or service, and the taxpayer merely collects and remits the sales tax to the taxing authority.

**Question 25**: What are "gross receipts" for a tax-exempt employer?

**Answer 25**: "Gross receipts" for purposes of the employee retention credit, for a tax-exempt organization, has the same meaning as under section 6033 of the Code. Under the section 6033 regulations, "gross receipts" means the gross amount received by the organization from all sources without reduction for any costs or expenses including, for example, cost of goods or assets sold, cost of operations, or expenses of earning, raising, or collecting such amounts. Thus, gross receipts includes, but is not limited to, the gross amount received as contributions, gifts, grants, and similar amounts without reduction for the expenses of raising and collecting such amounts, the gross amount received as dues or assessments from members or affiliated organizations

without reduction for expenses attributable to the receipt of such amounts, gross sales or receipts from business activities (including business activities unrelated to the purpose for which the organization qualifies for exemption), the gross amount received from the sale of assets without reduction for cost or other basis and expenses of sale, and the gross amount received as investment income, such as interest, dividends, rents, and royalties.

To determine whether there has been a significant decline in gross receipts, a tax-exempt employer computes its gross receipts received from all of its operations during the calendar quarter and compares those gross receipts to the gross receipts received for the same calendar quarter in 2019.

**Question 26**: For members of an aggregated group, is a significant decline in gross receipts determined based on the entire group?

**Answer 26**: Yes. All entities that are treated as a single employer under the aggregation rules are treated as a single employer for purposes of determining whether the employer experienced a significant decline in gross receipts.

To be an eligible employer on the basis of a significant decline of gross receipts, the employer must take into account the gross receipts of all members of the aggregated group. If the aggregated group does not experience a significant decline in gross receipts, then no member of the group may claim the employee retention credit on that basis.

*Example*: Employer B and Employer C are members of a section 52(a) controlled group of corporations and are treated as a single employer under the aggregation rules.

Because Employer B and Employer C are treated as a single employer under the aggregation rules, they must be treated as a single employer for purposes of determining whether there has been a significant decline in gross receipts. Neither Employer B nor Employer C is subject to a governmental order suspending business operations. Employer B has gross receipts of $1,000,000 in the second quarter of 2019 and $400,000 in the second quarter of 2020. Employer C has gross receipts of $1,000,000 in second quarter of 2019 and $750,000 in second quarter of 2020. Although Employer B's gross receipts in the second quarter of 2020 were 40 percent of its 2019 second quarter gross receipts, neither Employer B nor Employer C can claim the employee retention credit due to a significant decline in gross receipts. This is because Employers B and C are treated as a single employer for purposes of the employee retention credit and had combined gross receipts of $2,000,000 in the second quarter of 2019 and $1,150,000 in the second quarter of 2020. Their combined gross receipts for the second quarter of 2020 would have had to be less than $1,000,000 (50 percent of $2,000,000) for Employers B and C to have experienced a significant decline in gross receipts for the second quarter of 2020.

**Question 27**: How does an employer that started its business in 2019 determine whether it experienced a significant decline in gross receipts for purposes of the employee retention credit?

**Answer 27**: An employer that started its business in the first quarter of 2019 should use the gross receipts for the applicable quarter of 2019, as described below, for

comparison to the gross receipts for the same quarter in 2020 to determine whether it experienced a significant decline in gross receipts in any quarter of 2020.

An employer that started its business in the second quarter of 2019 should use that quarter as the base period to determine whether it experienced a significant decline in gross receipts for the first two quarters in 2020 and should use the third and fourth quarters of 2019 for comparison to the third and fourth quarters of 2020, respectively, to determine whether it experienced a significant decline in gross receipts for those quarters.

An employer that started its business in the third quarter of 2019 should use that quarter as the base period to determine whether it experienced a significant decline in gross receipts for the first three quarters in 2020 and should use the fourth quarter of 2019 for comparison to the fourth quarter of 2020 to determine whether it experienced a significant decline in gross receipts for that quarter.

An employer that started its business in the fourth quarter of 2019 should use that quarter as the base period to determine whether it experienced a significant decline in gross receipts for any quarter in 2020.

If an employer commenced business in the middle of a quarter in 2019, the employer should estimate the gross receipts it would have had for the entire quarter based on the gross receipts for the portion of the quarter that the business was in operation. To calculate this amount, the employer may use any reasonable method, including extrapolating the gross receipts for the quarter based on the gross receipts for the number of days its business was operating during the quarter.

**<u>Question 28</u>**: How does an employer that acquires a trade or business during the 2020 calendar year determine if the employer experienced a significant decline in gross receipts?

**<u>Answer 28</u>**: For purposes of the employee retention credit, to determine whether an employer experiences a significant decline in gross receipts, an employer that acquires (in an asset purchase, stock purchase, or any other form of acquisition) a trade or business during 2020 (an acquired business) is required to include the gross receipts from the acquired business in its gross receipts computation for each calendar quarter that it owns and operates the acquired business. Solely for purposes of the employee retention credit, when an employer compares its gross receipts for a 2020 calendar quarter when it owns an acquired business to its gross receipts for the same calendar quarter in 2019, the employer may, to the extent the information is available, include the gross receipts of the acquired business in its gross receipts for the 2019 calendar quarter. Under this safe harbor approach, the employer may include these gross receipts regardless of the fact that the employer did not own the acquired business during that 2019 calendar quarter.

An employer that acquires a trade or business in the middle of a calendar quarter in 2020 and that chooses to use this safe harbor approach must estimate the gross receipts it would have had from that acquired business for the entire quarter based on the gross receipts for the portion of the quarter that it owned and operated the acquired business. However, an employer that chooses not to use this safe harbor approach is

required to include only the gross receipts from the acquired business for the portion of the quarter that it owned and operated the acquired business.

*Example*: Employer D acquired all of the assets of a trade or business in a taxable transaction on January 1, 2020. The gross receipts of the acquired business were $50,000 for the quarter beginning January 1, 2020, and ending March 31, 2020, and $200,000 for the quarter beginning January 1, 2019, and ending March 31, 2019. Employer D has access to the books and records from the prior owner of the acquired trade or business and can determine the amount of gross receipts attributable to the trade or business for the quarter beginning January 1, 2019, and ending March 31, 2019. For purposes of the employee retention credit, Employer D must include $50,000 in its gross receipts computation for the quarter beginning January 1, 2020, and ending March 31, 2020 (because Employer D actually owned the trade or business) and may include $200,000 in its gross receipts computation for the quarter beginning January 1, 2019, and ending March 31, 2019.

### F. Maximum Amount of Employer's Employee Retention Credit

**Question 29**: How is the maximum amount of the employee retention credit available to eligible employers determined?

**Answer 29**: The credit equals 50 percent of qualified wages (including allocable qualified health plan expenses) that an eligible employer pays in a calendar quarter. The maximum amount of qualified wages (including allocable qualified health plan expenses) taken into account with respect to each employee for all calendar quarters in

2020 is $10,000, which means that the maximum credit for qualified wages (including allocable qualified health plan expenses) paid to any employee in 2020 is $5,000.

If an employee is employed by two or more entities treated as a single employer under the aggregation rules, the maximum amount of qualified wages for all calendar quarters that may be taken into account with respect to that employee is $10,000 in the aggregate; thus, an aggregated group treated as a single employer may not claim more than the maximum credit of $5,000 with respect to any one individual employed by the members of the aggregated group. With respect to such an employee, the amount of the employee retention credit that may be claimed by any member of an aggregated group is based on the member's proportionate share of qualified wages giving rise to the credit per the return period for which the credit is claimed.

*Example 1*: Employer A is an eligible employer and pays $10,000 in qualified wages to Employee B in the second quarter of 2020. The employee retention credit available to Employer A for the qualified wages paid to Employee B is $5,000.

*Example 2*: Employer C is an eligible employer and pays $8,000 in qualified wages to Employee D in the second quarter 2020 and $8,000 in qualified wages in the third quarter 2020. The credit available to Employer C for the qualified wages paid to Employee D is equal to $4,000 in the second quarter and $1,000 in the third quarter due to the overall limit of 50 percent of $10,000 of qualified wages per employee for all calendar quarters.

*Example 3*: Employer E and Employer F are members of an aggregated group treated as a single employer and together are an eligible employer. Employee G is

employed by both Employer E and Employer F. Employee G received $10,000 in qualified wages from each employer during the second quarter of 2020, for a total of $20,000. Because Employers E and F are treated as a single employer under the aggregation rules, the total amount of qualified wages that may be taken into account for determining the employee retention credit with respect to Employee G is limited to $10,000, and the maximum credit available for qualified wages paid to Employee G is $5,000. Employers E and F can claim their proportionate share of the $5,000 credit. Since Employers E and F paid equal amounts of qualified wages to Employee G, they can each claim $2,500. Additionally, because Employers E and F each paid the maximum amount of qualified wages ($10,000) to Employee G during the second quarter, Employers E and F are not entitled to the employee retention credit for wages paid to Employee G in any remaining quarter in 2020.

### G. Qualified Wages

**Question 30**: What are “qualified wages”?

**Answer 30**: Qualified wages are generally limited to wages (as defined in section 3121(a) of the Code) and compensation (as defined in section 3231(e) of the Code), both determined without regard to the social security wage base, paid by an eligible employer to some or all of its employees after March 12, 2020, and before January 1,

2021.[15] Section 2301(c)(5)(B) of the CARES Act provides that “wages” include amounts paid by an eligible employer to provide and maintain a group health plan (as defined in section 5000(b)(1) of the Code), but only to the extent that the amounts are excluded from the gross income of employees by reason of section 106(a) of the Code. Amounts treated as wages under section 2301(c)(5)(B) of the CARES Act are treated as paid with respect to any employee (and with respect to any period) to the extent the amounts are properly allocable to the employee (and to the period), and, except as otherwise provided by the Secretary, the allocation will be treated as proper if made on the basis of being pro rata among periods of coverage. See Q/As 41 and 42. Qualified wages do not include qualified sick leave wages and qualified family leave wages taken into account under sections 7001 and 7003 of the FFCRA.

The specific circumstances in which wage payments by an eligible employer will be considered qualified wages depend, in part, on the average number of full-time employees the eligible employer employed during 2019. For a large eligible employer (more than 100 employees), qualified wages are the wages paid to an employee for time that the employee is not providing services due to either (1) a full or partial suspension of the employer's business operations due to a governmental order, or (2) the business experiencing a significant decline in gross receipts. For a small eligible

[15] As noted above, this notice does not provide guidance with respect to the extension of the credit for qualified wages paid after December 31, 2020, and before July 1, 2021.

employer (100 or fewer employees), qualified wages are the wages paid with respect to an employee during any period in the calendar quarter in which the business operations are fully or partially suspended due to a governmental order or during any calendar quarter in which the business is experiencing a significant decline in gross receipts.

*Example*: Employer A is a small eligible employer that has had a partial suspension of its business operations due to a governmental order. Employer A offers its employees various benefits that provide for pre-tax salary reduction contributions, including a qualified section 401(k) plan, a fully-insured group health plan, a dependent care assistance program satisfying the requirements of section 129 of the Code, and qualified transportation benefits satisfying the requirements of section 132(f) of the Code. Employer A also makes matching and nonelective contributions to the qualified section 401(k) plan and pays the portion of the cost of maintaining the group health plan remaining after the employees' share. None of these amounts are wages taken into account for purposes of the credits claimed under sections 7001 and 7003 of the FFCRA.

Employer A may treat as qualified wages the amounts its employees contribute as pre-tax salary reduction contributions to the qualified section 401(k) plan with respect to the period of the partial suspension of operations because those amounts are wages within the meaning of section 3121(a).

Employer A may also treat all amounts paid toward maintaining the group health plan (including any employee pre-tax salary reduction contribution) with respect to the

period of the partial suspension of operations as qualified health plan expenses and thus as qualified wages.

Employer A may not treat as qualified wages the amounts Employer A contributes as matching or nonelective contributions to the qualified section 401(k) plan, nor may it treat as qualified wages any employee pre-tax salary reduction contributions toward the dependent care assistance program or qualified transportation benefits. These amounts do not constitute wages within the meaning of section 3121(a) and therefore are not qualified wages for purposes of the employee retention credit.

**Question 31**: How does an eligible employer identify the average number of full-time employees employed during 2019?

**Answer 31**: The term "full-time employee" means an employee who, with respect to any calendar month in 2019, had an average of at least 30 hours of service per week or 130 hours of service in the month (130 hours of service in a month is treated as the monthly equivalent of at least 30 hours of service per week), as determined in accordance with section 4980H of the Code. An employer that operated its business for the entire 2019 calendar year determines the number of its full-time employees by taking the sum of the number of full-time employees in each calendar month in 2019 and dividing that number by 12.

An employer that started its business operations during 2019 determines the number of its full-time employees by taking the sum of the number of full-time employees in each full calendar month in 2019 in which the employer operated its

business and dividing that sum by the number of full calendar months in 2019 in which the employer operated its business.

An employer that started its business operations during 2020 determines the number of its full-time employees by taking the sum of the number of full-time employees in each full calendar month in 2020 in which the employer operated its business and dividing by that number of months, consistent with the approach described above for employers that began business operations during 2019.

**Question 32**: For members of an aggregated group, is the average number of full-time employees determined based on the entire group?

**Answer 32**: Yes. All entities that are treated as a single employer under the aggregation rules are treated as a single employer for purposes of determining the employer's average number of employees.

*Example*: Employers B and C each averaged 75 full-time employees in 2019. Employers B and C are treated as a single employer under the aggregation rules and therefore are treated as a single employer for purposes of determining the employee retention credit; they are an eligible employer. Employers B and C together averaged 150 full-time employees in 2019. Because Employers B and C are a large eligible employer, each employer is eligible for the employee retention credit only for wages paid to an employee that is not providing services due to either (1) a full or partial suspension of operations by governmental order, or (2) a significant decline in gross receipts.

**Question 33**: What wages may a small eligible employer treat as qualified wages?

**Answer 33**: Small eligible employers may treat all wages (other than any wages taken into account under sections 7001 and 7003 of the FFCRA) paid after March 12, 2020, and before January 1, 2021, with respect to their employees during any period in the calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or during a calendar quarter in which the employer experiences a significant decline in gross receipts as qualified wages. Only $10,000 of qualified wages may be taken into account for the employee retention credit per employee for all calendar quarters.

**Question 34**: What wages may a large eligible employer treat as qualified wages?

**Answer 34**: Large eligible employers may treat wages (other than any wages taken into account under sections 7001 and 7003 of the FFCRA) paid to employees after March 12, 2020, and before January 1, 2021, only for the time they are not providing services during the period in the calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or during a calendar quarter in which the employer experiences a significant decline in gross receipts as qualified wages. Large eligible employers may not treat wages as qualified wages if they were paid to employees for the time that they provide services to the employer. Also, only $10,000 of qualified wages may be taken into account for the employee retention credit per employee for all calendar quarters.

*Example 1*: Employer D, a large eligible employer operating a local chain of full service restaurants in State X, is subject to a governmental order for restaurants to discontinue sit-down service to customers inside the restaurant, but may continue food or beverage sales to the public on a carry-out, drive-through, or delivery basis. Employer D continues to pay wages to kitchen staff and certain waitstaff needed to facilitate fulfillment of carry-out orders. Wages paid to these employees for the time that they provide carry-out service are not qualified wages.

*Example 2*: Employer E is a large eligible employer and was forced to suspend operations at the end of the first calendar quarter in 2020. Its employees performed services during the first part of the calendar quarter but then stopped due to the suspension of operations; however, Employer E continued to pay the employees' normal wages for the entire quarter, including the period during which they were not providing services. None of the wages were taken into account under sections 7001 and 7003 of the FFCRA. The wages paid during the period when employees were not providing services are qualified wages.

**Question 35**: May a large eligible employer claim an employee retention credit for an increase in the amount of wages it paid its employees during the time that employees are not providing services?

**Answer 35**: No. For large eligible employers, qualified wages paid to an employee may not exceed what the employee would have been paid for working an equivalent duration during the 30 days immediately preceding the commencement of the full or partial suspension of the operation of the trade or business or the first day of

the calendar quarter in which the employer experienced a significant decline in gross receipts. For a variable hour employee, the amount paid for working an equivalent duration during that 30-day period may be determined using any reasonable method. The method(s) that the Department of Labor has prescribed to determine the amount to pay an employee with an irregular schedule who is eligible for paid sick leave under the FFCRA would be considered reasonable for this purpose.

*Example*: Employer F, a large eligible employer operating a grocery store chain, is subject to a governmental order limiting store hours. In response, Employer F has reduced the hours its employees work, but increases the rate of pay for those employees who continue to provide services by $2 an hour. Only the amounts paid to employees for time they are not providing services, and at the rate of pay in effect prior to the increase, would be considered qualified wages.

**Question 36**: May a large eligible employer treat the wages paid to hourly and non-exempt salaried employees for hours for which they are not providing services as qualified wages for purposes of the employee retention credit?

**Answer 36**: Yes, assuming the wages otherwise satisfy the requirements to be qualified wages. For a large eligible employer, wages paid to hourly and non-exempt salaried employees for hours that the employees were not providing services may be considered qualified wages for purposes of the employee retention credit. For an employee who does not have a fixed schedule of work, the hours for which the employee is not providing services may be determined using any reasonable method. The method that the large eligible employer would use to determine the employee's

entitlement to leave under the Family and Medical Leave Act would be a reasonable method for this purpose. Similarly, the method(s) that the Department of Labor has prescribed to determine the number of hours for which an employee with an irregular schedule is eligible for paid sick leave under the FFCRA would be considered reasonable for this purpose.

It is not reasonable for the employer to treat an employee's hours as having been reduced based on an assessment of the employee's productivity levels during the hours the employee is working.

Wages paid by a large eligible employer to its employees for hours for which they provided services are not considered qualified wages for purposes of the employee retention credit.

*Example 1*: Employer G, a large eligible employer operating a manufacturing business, has several locations the operations of which are fully suspended during the second quarter of 2020 due to a governmental order. Employer G continues to pay hourly employees who are not providing services at the closed locations 50 percent of their normal hourly wage rates. Employer G also reduced headquarters' administrative staff hours by 40 percent, but continues to pay them at 100 percent of their normal hourly wage rates. Employer G does not take the wages into account under sections 7001 and 7003 of the FFCRA. For employees who are not providing services due to the closure of their location, but are receiving 50 percent of their normal hourly wage rates, Employer G may treat the wages paid as qualified wages for purposes of the employee retention credit. For the administrative staff whose hours were reduced by 40

percent, but who are paid for 100 percent of the normal wage rate, Employer G may treat the 40 percent of wages paid for time that these employees are not providing services as qualified wages for purposes of the employee retention credit. The 60 percent of wages that Employer G pays the administrative staff for hours during which the employees are actually providing services is not considered qualified wages for purposes of the employee retention credit.

*Example 2*: Employer H is a large eligible employer in the business of staging homes that are for sale. Employer H's non-exempt salaried employees cannot perform their usual services of delivering and installing furniture to be used in staging houses because open houses are prohibited in its service area during the second quarter of 2020. However, the employees are required to provide Employer H with periodic status updates about furniture that has been leased out and other administrative matters. Employer H continues to pay wages to employees as if they continued to work their typical work hours even though the employees cannot provide their normal services. Using a reasonable method, Employer H has determined that its employees are working 20 percent of their typical work hours. Employer H does not take the wages into account under sections 7001 and 7003 of the FFCRA. Employer H may treat 80 percent of the wages paid as qualified wages for purposes of the employee retention credit.

**Question 37**: May a large eligible employer treat wages paid to exempt salaried employees for time for which they are not providing services as qualified wages for purposes of the employee retention credit?

**Answer 37**: Yes, provided the wages paid to the exempt salaried employees are for the time that they are not providing services due to either a full or partial suspension of operations (due to a governmental order) or a significant decline in gross receipts. An eligible employer may use any reasonable method to determine the number of hours that a salaried employee is not providing services, but for which the employee receives wages either at the employee's normal wage rate or at a reduced wage rate. Reasonable methods include the method (or methods) the employer uses to measure exempt employees' entitlement to leave on an intermittent or reduced leave schedule under the Family and Medical Leave Act, or the method the employer uses to measure exempt employees' entitlement to and usage of paid leave under the employer's usual practices. It is not reasonable for the employer to treat an employee's hours as having been reduced based on an assessment of the employee's productivity levels during the hours the employee is working.

*Example 1*: Employer I, a large eligible employer operating a fitness club business, closed all of its locations in City B due to a governmental order issued by City B's mayor. Employer I continues to pay its exempt managerial employees their regular salaries. While the clubs are closed and there is not sufficient administrative work to occupy the managerial employees full-time, they continue to perform some accounting and similar administrative functions. Employer I has determined, based on the time records maintained by employees, that they are providing services for 10 percent of their typical work hours. Employer I does not take the wages into account under

sections 7001 and 7003 of the FFCRA. In this case, 90 percent of wages paid to these employees during the period the clubs were closed are qualified wages.

*Example 2*: Employer J, a large eligible employer operating a consulting firm, closed its offices due to various governmental orders and required all employees to telework. Although Employer J believes that some of its employees may not be as productive while working remotely, employees are working their normal business hours. Because employees' work hours have not changed, no portion of the wages paid to the employees by Employer J are qualified wages.

**Question 38**: May an eligible employer treat wages paid to employees pursuant to a pre-existing vacation, sick and other personal leave policy as qualified wages for purposes of the employee retention credit?

**Answer 38**: A large eligible employer may not treat as qualified wages amounts paid to employees for paid time off for vacations, holidays, sick days and other days off. These wages are paid pursuant to existing leave policies that represent benefits accrued during a prior period in which the employees provided services and are not wages paid for time in which the employees are not providing services.

However, a small eligible employer may treat all wages paid with respect to employees during the period of the full or partial suspension of operations or a calendar quarter in which it has a significant decline in gross receipts, even if under a pre-existing vacation, sick and other leave policy, as qualified wages for purposes of the employee retention credit, assuming the wages are not taken into account under sections 7001 and 7003 of the FFCRA.

**<u>Question 39</u>**: May an eligible employer treat payments made to former employees who have terminated employment as qualified wages for purposes of the employee retention credit?

**<u>Answer 39</u>**: Payments, including severance payments or other post-termination payments, made to a former employee following termination of employment are not considered qualified wages for purposes of the employee retention credit. Payments may be considered qualified wages only if the payments are made to an employee while employed by the eligible employer. Payments made in connection with a former employee's termination of employment are not qualified wages because they are payments for the past employment relationship and thus are not payments made with respect to an employee during the time for which the employee retention credit may be claimed. Whether an employee has terminated employment is based on all of the facts and circumstances, including whether the employer has treated the employment relationship as terminated for purposes other than the continuation of wage payments.

### H. Allocable Qualified Health Plan Expenses

**<u>Question 40</u>**: Do qualified health plan expenses include both the portion of the cost paid by the eligible employer and the portion of the cost paid by the employee?

**<u>Answer 40</u>**: Yes. However, amounts that the employee paid for with after-tax contributions are not considered qualified health plan expenses. The amount of qualified health plan expenses taken into account in determining the amount of qualified wages generally includes both the portion of the cost paid by the eligible employer and the portion of the cost paid by the employee with pre-tax salary reduction contributions.

**Question 41**: May a small eligible employer treat its health plan expenses as qualified wages for purposes of the employee retention credit?

**Answer 41**: A small eligible employer may treat its health plan expenses paid or incurred, after March 12, 2020, and before January 1, 2021, with respect to any employee during any period in a calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or during a calendar quarter in which the employer experiences a significant decline in gross receipts as qualified wages, although only $10,000 per employee for all calendar quarters can be taken into account for the employee retention credit. Small eligible employers may treat health plan expenses allocable to the applicable periods as qualified wages even if the employees are not working and the eligible employer does not pay the employees any wages for the time they are not working.

*Example 1*: Employer A is a small eligible employer subject to a governmental order that partially suspends the operation of its trade or business. In response to the governmental order, Employer A reduces all employees' hours by 50 percent. It pays wages to the employees only for the time the employees are providing services, but Employer A continues to provide the employees with full health care coverage. Employer A's health plan expenses allocable to wages paid during the period its operations were partially suspended may be treated as qualified wages for purposes of the employee retention credit.

*Example 2*: Employer B is a small eligible employer subject to a governmental order that suspends the operation of its trade or business. In response to the

governmental order, Employer B lays off or furloughs all of its employees (but does not treat these employees as terminated for employment tax purposes). It does not pay wages to its employees for the time they are laid off or furloughed and not working, but it continues the employees' health care coverage. Employer B's health plan expenses allocable to the period its operations were partially suspended may be treated as qualified wages for purposes of the employee retention credit.

**Question 42**: May a large eligible employer treat its health plan expenses as qualified wages for purposes of the employee retention credit if the expenses are allocable to the time that employees were not providing services?

**Answer 42**: A large eligible employer may treat as qualified wages health plan expenses paid or incurred, after March 12, 2020, and before January 1, 2021, allocable to the time that the employees are not providing services during any period in a calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or a calendar quarter in which the employer experiences a significant decline in gross receipts, although only $10,000 per employee for all calendar quarters can be taken into account for the employee retention credit. However, a large eligible employer may not treat as qualified wages health plan expenses allocable to the time the employees are providing services.

*Example 1*: Employer C is a large eligible employer subject to a governmental order that partially suspends the operation of its trade or business. In response to the governmental order, Employer C reduces all employees' hours by 50 percent and pays wages to its employees only for the time that the employees are providing services, but

Employer C continues to provide the employees with full health care coverage. The 50 percent of Employer C's health plan expenses allocable to the time that employees are not providing services may be treated as qualified wages. Employer C may not treat the other 50 percent of health plan expenses allocable to the time the employees are providing services as qualified wages.

*Example 2*: Employer D is a large eligible employer subject to a governmental order that partially suspends the operations of its trade or business. In response to the governmental order, Employer D reduces its employees' hours by 50 percent, but it reduces its employees' wages by only 40 percent, so that the employees receive 60 percent of their wages for 50 percent of their normal hours. Employer D continues to cover 100 percent of the employees' health plan expenses. Employer D may treat as qualified wages: (i) the 10 percent of the wages that it pays employees for time the employees are not providing services, plus (ii) 50 percent of the health plan expenses, because these health plan expenses are allocable to the time that employees were not providing services.

*Example 3*: Employer E is a large eligible employer subject to a governmental order that fully suspends the operations of its trade or business. Employer E lays off or furloughs its employees (but does not treat these employees as terminated for employment tax purposes) and does not pay wages to the employees, but does continue to cover 100 percent of the employees' health plan expenses. Employer E may treat as qualified wages the health plan expenses that are allocable to the time that the employees are not providing services.

**<u>Question 43</u>**: For an eligible employer that sponsors more than one plan for its employees (for example, both a group health plan and a health flexible spending arrangement (health FSA)), or more than one plan covering different employees, how are the qualified health plan expenses for each employee determined?

**<u>Answer 43</u>**: The qualified health plan expenses are determined separately for each plan. For each plan, those expenses are allocated to the employees who participate in that plan. In the case of an employee who participates in more than one plan, the allocated expenses of each plan in which the employee participates are aggregated for that employee.

**<u>Question 44</u>**: For an eligible employer that sponsors a fully-insured group health plan, how are the qualified health plan expenses of that plan allocated on a pro rata basis?

**<u>Answer 44</u>**: An eligible employer who sponsors a fully-insured group health plan may use any reasonable method to determine and allocate the plan expenses, including (1) the COBRA applicable premium for the employee typically available from the insurer, (2) one average premium rate for all employees, or (3) a substantially similar method that takes into account the average premium rate determined separately for employees with self-only and other than self-only coverage.

If an eligible employer chooses to use one average premium rate for all employees, the allocable amount for each day an employee covered by the insured group health plan is entitled to qualified wages could be determined using the following steps:

(1) The eligible employer's overall annual premium for the employees covered by the policy is divided by the number of employees covered by the policy to determine the average annual premium per employee.

(2) The average annual premium per employee is divided by the average number of work days during the year for all covered employees (treating days of paid leave as a work day and a work day as including any day on which work is performed) to determine the average daily premium per employee. For example, a full-year employee working five days per week may be treated as working 52 weeks x 5 days or 260 days. Calculations for part-time and seasonal employees who participate in the plan should be adjusted as appropriate. Eligible employers may use any reasonable method for calculating work days for part-time and seasonal employees.

(3) The resulting premium should be adjusted to reflect any portion that employees contribute after-tax.

(4) The resulting amount is the amount allocated to each day of qualified wages.

*Example*: Employer F sponsors an insured group health plan that covers 400 employees, some with self-only coverage and some with family coverage. Each employee is expected to have 260 work days a year (i.e., five days a week for 52 weeks). The employees contribute a portion of their premium by pre-tax salary reduction, with different amounts for self-only and family coverage. The total annual premium for the 400 employees is $5.2 million (this includes both the amount paid by the eligible employer and the amounts paid by employees through salary reduction).

For an eligible employer using one average premium rate for all employees, the average annual premium rate is $5.2 million divided by 400, or $13,000. For each employee expected to have 260 work days a year, this results in a daily average premium rate equal to $13,000 divided by 260, or $50. This $50 is the amount of qualified health plan expenses allocated to each day of qualified wages per employee.

**Question 45**: For an eligible employer that sponsors a self-insured group health plan, how are the qualified health plan expenses of that plan allocated on a pro rata basis?

**Answer 45**: An eligible employer who sponsors a self-insured group health plan may use any reasonable method to determine and allocate the qualified health plan expenses, including (1) the COBRA applicable premium for the employee typically available from the administrator, or (2) any reasonable actuarial method to determine the estimated annual expenses of the plan.

If the eligible employer uses a reasonable actuarial method to determine the estimated annual expenses of the plan, then rules similar to the rules for insured plans are used to determine the amount of qualified health plan expenses allocated to an employee. That is, the estimated annual expense is divided by the number of employees covered by the plan, and that amount is divided by the average number of work days during the year for all covered employees (treating days of paid leave as work days and any day on which an employee performs any work as a work day). The resulting premium should then be adjusted to reflect any portion that employees

contribute after-tax. The resulting amount is the amount allocated to each day of qualified wages.

**<u>Question 46</u>**: For an eligible employer who contributes to a health savings account (HSA), or Archer Medical Saving Account (Archer MSA) and sponsors a high deductible health plan (HDHP), are contributions to the HSA or Archer MSA included in the qualified health plan expenses?

**<u>Answer 46</u>**: The amount of qualified health plan expenses does not include an eligible employer's contributions to an HSA or Archer MSA. An eligible employer who sponsors an HDHP should calculate the amount of qualified health plan expenses in the same manner as an insured group health plan, or a self-insured plan, as applicable.

**<u>Question 47</u>**: For an eligible employer who sponsors a health reimbursement arrangement (HRA), a health flexible spending arrangement (health FSA), or a qualified small employer health reimbursement arrangement (QSEHRA), are contributions to the HRA, health FSA, or QSEHRA included in the qualified health plan expenses?

**<u>Answer 47</u>**: The amount of qualified health plan expenses may include contributions to an HRA (including an individual coverage HRA), or a health FSA, but not contributions to a QSEHRA. To allocate contributions to an HRA or a health FSA, eligible employers should use the amount of contributions made by or on behalf of the particular employee.

**<u>Question 48</u>**: Are health plan expenses that are allocable to qualified sick leave wages and qualified family leave wages for purposes of credits available under sections

7001 and 7003 of the FFCRA excluded from the definition of qualified wages for purposes of the employee retention credit?

**Answer 48**: Yes. Wages for which an eligible employer may claim the employee retention credit do not include the qualified sick leave wages and qualified family leave wages for which it claims credits under sections 7001 and 7003 of the FFCRA. This exclusion also applies to the health plan expenses that are allocable to these qualified sick leave wages and qualified family leave wages paid under sections 7001 and 7003 the FFCRA.

### I. Interaction with Paycheck Protection Program (PPP) Loans

**Question 49**: May an employer that received a PPP loan be eligible for the employee retention credit?

**Answer 49**: Yes. An employer that received a PPP loan may claim the employee retention credit for any qualified wages paid to employees if the employer is an eligible employer that meets the requirements for the credit.[16] However, qualified wages for which the employer claims the employee retention credit are excluded from payroll costs paid during the covered period (payroll costs) that qualify for forgiveness

---

[16] Section 206(c)(2)(B)(i) of the Relief Act struck section 2301(j) of the CARES Act, effective retroactive to March 27, 2020, the date of enactment of the CARES Act. As originally enacted, section 2301(j) of the CARES Act provided that an employer that received a PPP loan would not be eligible for the employee retention credit. With the elimination of this provision, an eligible employer is no longer prohibited from both claiming the employee retention credit and receiving a PPP loan.

under the PPP. See section 7A(a)(12) of the Small Business Act, as amended by section 206(c)(1) of the Relief Act.

Section 2301(g)(1) of the CARES Act, as amended by the Relief Act, permits an eligible employer to elect not to take into account certain qualified wages for purposes of the employee retention credit. An eligible employer generally makes the election by not claiming the employee retention credit for those qualified wages on its federal employment tax return. However, an eligible employer that received a PPP loan is deemed to have made the election under section 2301(g)(1) of the CARES Act for those qualified wages included in the amount reported as payroll costs on a Paycheck Protection Program Loan Forgiveness Application (PPP Loan Forgiveness Application). Specifically, the amount for which the eligible employer is deemed to have made the election is the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven. The employee retention credit does not apply to the qualified wages for which the election or deemed election is made. An eligible employer is not deemed to have made an election for any qualified wages paid by the eligible employer that are not included in the payroll costs reported on the PPP Loan Forgiveness Application. Notwithstanding a deemed election, if an eligible employer reports any qualified wages as payroll costs on a PPP Loan Forgiveness Application to obtain forgiveness of the PPP loan amount, but the loan amount is not forgiven by reason of a decision under

section 7A(g) of the Small Business Act, those qualified wages may subsequently be treated as subject to section 2301 of the CARES Act and may be taken into account for purposes of the employee retention credit. If an eligible employer obtains forgiveness of only a portion of the PPP loan amount, then the employer is deemed to have made an election for the minimum amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application necessary to obtain the forgiveness of that amount of the PPP loan.

*Example 1*: Employer A received a PPP loan of $100,000. Employer A is an eligible employer and paid $100,000 in qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020. In order to receive forgiveness of the PPP loan in its entirety, Employer A was required, under the Small Business Administration (SBA) rules, to report a total of $100,000 of payroll costs and other eligible expenses (and a minimum of $60,000 of payroll costs). Employer A submitted a PPP Loan Forgiveness Application and reported the $100,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan. Employer A received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $100,000.

Employer A is deemed to have made an election not to take into account $100,000 of the qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness

Application, sufficient to support the amount of the PPP loan that is forgiven. It may not treat that amount as qualified wages for purposes of the employee retention credit.

*Example 2*: Employer B received a PPP loan of $200,000. Employer B is an eligible employer and paid $250,000 of qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020. In order to receive forgiveness of the PPP loan in its entirety, Employer B was required, under the SBA rules, to report a total of $200,000 of payroll costs and other eligible expenses (and a minimum of $120,000 of payroll costs). Employer B submitted a PPP Loan Forgiveness Application and reported the $250,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan. Employer B received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer B is deemed to have made an election not to take into account $200,000 of the qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven. It may not treat that amount as qualified wages for purposes of the employee retention credit. Employer B is not treated as making a deemed election with respect to $50,000 of the qualified wages ($250,000 reported on the PPP Loan Forgiveness Application, minus $200,000 reported on the PPP Loan Forgiveness Application up to the amount of the

loan that is forgiven), and it may treat that amount as qualified wages for purposes of the employee retention credit.

*Example 3*: Employer C received a PPP loan of $200,000. Employer C is an eligible employer and paid $200,000 of qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020. Employer C also paid other eligible expenses of $70,000. In order to receive forgiveness of the PPP loan in its entirety, Employer C was required, under the SBA rules, to report a total of $200,000 of payroll costs and other eligible expenses (and a minimum of $120,000 of payroll costs). Employer C submitted a PPP Loan Forgiveness Application and reported the $200,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan, but did not report the other eligible expenses of $70,000. Employer C received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer C is deemed to have made an election not to take into account $200,000 of qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven. Although Employer C could have reported $70,000 of eligible expenses (other than payroll costs) and $130,000 of payroll costs, Employer C reported $200,000 of qualified wages as payroll costs on the PPP Loan Forgiveness Application. As a result, no portion of those

qualified wages reported as payroll costs may be treated as qualified wages for purposes of the employee retention credit. Employer C cannot reduce the deemed election by the amount of the other eligible expenses that it could have reported on its PPP Loan Forgiveness Application.

*Example 4*: Same facts as Example 3, except Employer C submitted a PPP Loan Forgiveness Application and reported the $200,000 of qualified wages as payroll costs, as well as the $70,000 of other eligible expenses, in support of forgiveness of the PPP loan. Employer C received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000. In this case, Employer C is deemed to have made an election not to take into account $130,000 of qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with the $70,000 of other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that was forgiven. As a result, $70,000 of the qualified wages reported as payroll costs may be treated as qualified wages for purposes of the employee retention credit.

*Example 5*: Same facts as Example 4, except Employer C paid $90,000 of other eligible expenses, and reported the $200,000 of qualified wages as payroll costs, as well as the $90,000 of other eligible expenses, in support of forgiveness of the entire PPP loan. In this case, Employer C is deemed to have made an election not to take into account $120,000 of qualified wages for purposes of the employee retention credit,

which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with the $90,000 of other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that was forgiven. As a result, $80,000 of the qualified wages reported as payroll costs may be treated as qualified wages for purposes of the employee retention credit.

*Example 6*: Employer D received a PPP loan of $200,000. Employer D is an eligible employer and paid $150,000 of qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020. In addition to the qualified wages, Employer D had $100,000 of other payroll costs that are not qualified wages and $70,000 of other eligible expenses.[17] In order to receive forgiveness of the PPP loan in its entirety, Employer D was required, under the SBA rules, to report $200,000 of payroll costs and other eligible expenses (and a minimum of $120,000 of payroll costs).

Employer D submitted a PPP Loan Forgiveness Application and reported $130,000 of payroll costs and $70,000 of other eligible expenses, in support of forgiveness of the entire PPP loan. Employer D can demonstrate that the payroll costs reported on the PPP Loan Forgiveness Application consist of $100,000 of payroll costs

[17] Employer D may have payroll costs that are not qualified wages for various reasons. For example, Employer D may be a large eligible employer that paid wages to employees who continued to provide services during the period of a partial suspension of business operations.

that are not qualified wages and $30,000 of payroll costs that are qualified wages. Employer D received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer D is deemed to have made an election not to take into account $30,000 of qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven. It may not treat that amount as qualified wages for purposes of the employee retention credit. Employer D is not deemed to have made an election with respect to the $120,000 of qualified wages that are not included in the payroll costs reported on the PPP Loan Forgiveness Application. Accordingly, Employer D may take into account the $120,000 of qualified wages ($150,000 of qualified wages paid minus $30,000 of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application) for purposes of the employee retention credit.

*Example 7*: Same facts as Example 6 except Employer D's PPP loan is not forgiven by reason of a decision under section 7A(g) of the Small Business Act. Employer D may treat the full $150,000 as qualified wages (the $30,000 of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application, plus the additional $120,000 of qualified wages not included in the payroll costs) as qualified wages for purposes of the employee retention credit.

### J. Claiming the Employee Retention Credit

**Question 50**: How does an eligible employer claim the employee retention credit for qualified wages?

**Answer 50**: An eligible employer claims the employee retention credit for qualified wages by reporting its qualified wages and the amount of the credit to which it is entitled on the designated lines of its federal employment tax return(s). Employers also report any qualified sick leave wages and qualified family leave wages and claim the credit under sections 7001 or 7003 of the FFCRA on the designated lines on their federal employment tax returns. For most employers, Form 941 is used to report income and social security and Medicare taxes withheld by the employer from employee wages, as well as the employer's share of social security and Medicare tax.

In anticipation of receiving the employee retention credit, eligible employers can (1) reduce their deposits of federal employment taxes, including withheld taxes, that would otherwise be required up to the amount of the anticipated credit, and (2) request an advance of the amount of the anticipated credit that exceeds the reduced federal employment tax deposits by filing Form 7200.

*Example*: Employer A paid $10,000 in qualified wages (including allocable qualified health plan expenses), among other wages. After deferral of the employer's share of social security tax under section 2302 of the CARES Act, Employer A is otherwise required to deposit $8,000 in federal employment taxes for all of its employees for all wage payments made during the same quarter as the $10,000 in qualified wages. Employer A did not choose to use the relief under Notice 2020-65 to

defer the employee's share of social security tax. Employer A has no credits under sections 7001 and 7003 of the FFCRA. Employer A is not a tax-exempt organization eligible for the credit under section 303(d) of the Relief Act. In anticipation of the employee retention credit, Employer A may keep up to $5,000 of the $8,000 of taxes Employer A was otherwise required to deposit, and it will not owe a failure to deposit penalty for keeping the $5,000. Employer A will later account for the $5,000 it retained when it files Form 941 for the quarter.

**Question 51**: Can an eligible employer receive an advance payment of the employee retention credit if the eligible employer does not have sufficient federal employment taxes set aside for deposit to cover the amount of the anticipated credit?

**Answer 51**: Yes. If an eligible employer does not have sufficient federal employment taxes set aside for deposit to cover the amount of the anticipated credit, the eligible employer may request an advance payment of the credit. The amount of the advance payment will depend on the application of other relief provisions to the employer. For example, eligible employers are permitted to defer the deposit and payment of the employer's share of social security tax under section 2302 of the CARES Act and the employee's share of social security tax under Notice 2020-65 and may do so prior to reducing any deposits in anticipation of the credit. Therefore, assuming an employer defers deposit of social security tax under section 2302 of the CARES Act and Notice 2020-65, the employer should take into account any permitted reduction in employment tax deposits due to (1) deferral under section 2302 of the CARES Act, (2) deferral under Notice 2020-65, (3) any anticipated credits under

sections 7001 and 7003 of the FFCRA related to qualified sick leave wages and qualified family leave wages that the employer paid, and (4) for any tax-exempt organization employer, any credit under section 303(d) of the Relief Act, before determining the amount that it should request as an advance payment of the employee retention credit. If the remaining employment tax deposits set aside are less than the anticipated credit for the qualified wages, the eligible employer can file a Form 7200 to request an advance payment of the credit for the remaining amount of the anticipated credit.

If an eligible employer fully reduces its required deposits of federal employment taxes otherwise due on wages paid in anticipation of receiving the credit, and that reduction covers the full amount of the anticipated credit, it should not file a Form 7200.

*Example*: Employer B paid $20,000 in qualified wages to two employees (each employee was paid $10,000 in qualified wages) and is therefore entitled to a credit of $10,000. Employer B is otherwise required to deposit $8,000 in federal employment taxes on all wages paid to all employees, after deferring its employer's share of social security tax under section 2302 of the CARES Act. Employer B did not choose to use the relief under Notice 2020-65 to defer the employee's share of social security tax. Employer B has no credits under sections 7001 and 7003 of the FFCRA. Employer B is not a tax-exempt organization eligible for the credit under section 303(d) of the Relief Act. Employer B can keep the entire $8,000 of taxes that Employer B was otherwise required to deposit without penalty as a portion of the credit it is otherwise entitled to

claim on the Form 941. Employer B may make a request for an advance payment of the credit for the remaining $2,000 by submitting Form 7200.

**<u>Question 52</u>**: Is there a minimum advance amount that can be claimed on a Form 7200?

**<u>Answer 52</u>**: After July 2, 2020, the minimum advance amount that can be claimed on a Form 7200 is $25. A Form 7200 requesting an advance of less than $25 will not be processed. Taxpayers can claim credits of less than $25 on their federal employment tax returns.

**<u>Question 53</u>**: What is the last day eligible employers may submit a Form 7200 requesting an advance payment of the employee retention credit for qualified wages paid in 2020?

**<u>Answer 53</u>**: Eligible employers that filed quarterly federal employment tax returns for 2020 had the ability to submit a Form 7200 to request an advance for each calendar quarter before the earlier of (1) the date the employer filed the Form 941 for the relevant quarter or (2) the due date for filing the quarterly employment tax return, as provided below:

- For the second quarter of 2020: July 31, 2020;
- For the third quarter of 2020: November 2, 2020;
- For the fourth quarter of 2020: February 1, 2021.

At the date of publication of this notice, the due dates for the quarterly federal employment tax returns for 2020 have passed, and Forms 7200 submitted after the due dates for credits claimed in the relevant quarters in 2020 will not be processed.

Eligible employers filing a Form 943 or Form 944 for 2020 had the ability to submit a Form 7200 up to the earlier of February 1, 2021 or the date they filed the applicable employment tax return for 2020. At the date of publication of this notice, the due date for Form 943 and Form 944 for 2020 has passed, and Forms 7200 submitted after February 1, 2021 for credits claimed in 2020 will not be processed.

Eligible employers filing a Form CT-1 for 2020 may submit a Form 7200 up to the earlier of March 1, 2021 or the date they file the Form CT-1, Employer's Annual Railroad Retirement Tax Return for 2020.

**Question 54**: Who can sign a Form 7200? Should a taxpayer submit additional documents to confirm that a person is authorized to sign a Form 7200?

**Answer 54**: For corporations, the president, vice president, or other principal officer who is duly authorized may sign a Form 7200. For partnerships (including an LLC treated as a partnership) or unincorporated organizations, a responsible and duly authorized partner, member, or officer having knowledge of the entity's affairs may sign a Form 7200. For a single-member LLC treated as a disregarded entity for federal income tax purposes, the instructions provide that the owner or a principal officer who is duly authorized may sign the Form. For trusts or estates, the fiduciary may sign the Form 7200. Additionally, a Form 7200 may be signed by a duly authorized agent of the taxpayer if a valid power of attorney has been filed.

In many circumstances, whether the person signing the Form 7200 is duly authorized or has knowledge of the partnership's or unincorporated organization's affairs is not apparent on the Form 7200. To help expedite and ensure proper processing of Forms 7200, if a taxpayer has duly authorized an officer, partner, or member to sign Form 7200 (and that person is not otherwise explicitly permitted to sign the Form 7200 by nature of their job title), the taxpayer should submit a copy of the Form 2848, *Power of Attorney and Declaration of Representative*, authorizing the person to sign the Form 7200 with the Form 7200.

**Question 55**: For eligible employers that include multiple entities treated as a single employer for purposes of the employee retention credit under the aggregation rules, will the individual entities separately report their credit on their federal employment tax returns?

**Answer 55**: Yes. Each eligible employer will report its employee retention credit on its federal employment tax return (or on its third-party payer's federal employment tax return) without regard to its aggregation with other entities as a single employer for purposes of the credit. Each eligible employer's credit will be the amount of the credit apportioned among the members of the aggregated group on the basis of each member's proportionate share of the qualified wages giving rise to the credit per the return period for which the credit is claimed.

**Question 56**: May an eligible employer elect to not take into account qualified wages for purposes of the employee retention credit?

**<u>Answer 56</u>**: Yes. Any eligible employer may elect to not take certain qualified wages into account for purposes of the employee retention credit by not claiming the credit for those qualified wages on its federal employment tax return. In addition, an eligible employer that received a PPP loan is deemed to have made an election to not take qualified wages into account for purposes of the employee retention credit if those qualified wages are included in the payroll costs reported on a PPP Loan Forgiveness Application, up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven. See Q/A–49.

*<u>Example</u>*: Employer C paid $10,000 of wages in the second quarter of 2020. The wages are not paid pursuant to a pre-existing vacation, sick and other personal leave policy. The wages may be treated as either qualified sick leave wages under section 7001 of the FFCRA or as qualified wages for purposes of the employee retention credit. Employer C may elect to not take into account any amount of the $10,000 of wages as qualified wages for purposes of the employee retention credit.

**<u>Question 57</u>**: May an eligible employer that files quarterly federal employment tax returns take into account qualified wages paid in a past calendar quarter in which the eligible employer may have been entitled to claim the credit, but elected not to do so?

**<u>Answer 57</u>**: Yes. An eligible employer may file a claim for refund or make an interest-free adjustment by filing Form 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund*, for a past calendar quarter to claim the employee

retention credit to which it was entitled on qualified wages paid in that past calendar quarter, following the rules and procedures for making those claims or adjustments.

An eligible employer that received a PPP loan and did not claim the employee retention credit may file a Form 941-X for the relevant calendar quarters in which the employer paid qualified wages, but only for qualified wages for which no deemed election was made. See Q/A–49.

A special fourth quarter rule, provided by section 206(e)(2) of the Relief Act, is also available for any qualified wages paid in the second or third quarters of 2020 that were reported as payroll costs on a PPP Loan Forgiveness Application if the loan amount was not forgiven by reason of a decision under section 7A(g) of the Small Business Act.

*Example 1*: Employer D is an eligible employer and paid qualified wages during the second quarter of 2020 but did not claim an employee retention credit on its second quarter 2020 Form 941. Employer D did not receive a PPP loan. If Employer D subsequently decides to claim the credit to which it is entitled for the second quarter of 2020, Employer D should file a Form 941-X for the previously filed second quarter 2020 Form 941 within the appropriate timeframe to make an interest-free adjustment or claim a refund. Employer D should not use a subsequent Form 941 to claim an employee retention credit for qualified wages paid in the second quarter of 2020.

*Example 2*: Employer E received a PPP loan of $200,000. Employer E is an eligible employer and paid $250,000 of qualified wages that would qualify for the employee retention credit during the second quarter of 2020. Employer E submitted a

PPP Loan Forgiveness Application and reported the $250,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan. Employer E received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer E is not deemed to have made an election with respect to the excess $50,000 of qualified wages that are included in the payroll costs reported on the PPP Loan Forgiveness Application. Accordingly, Employer E may take into account the $50,000 of qualified wages for purposes of the employee retention credit. If Employer E decides to take the $50,000 into account to claim the credit to which it is entitled for 2020, Employer E should file a Form 941-X for the previously filed second quarter 2020 Form 941 within the appropriate timeframe to make an interest-free adjustment or claim a refund for the second quarter, as appropriate. Under these facts, Employer E should not use a subsequent Form 941 to claim an employee retention credit for qualified wages paid in the second quarter of 2020.

*Example 3*: Same facts as Example 2, except that Employer E's PPP loan is not forgiven by reason of a decision under section 7A(g) of the Small Business Act. If Employer E decides to claim the credit to which it is entitled for 2020 with regard to the $250,000 of qualified wages, Employer E may file a Form 941-X for the previously filed second quarter Form 941 within the appropriate timeframe to make an interest-free adjustment or claim a refund for the second quarter in 2020. Alternatively, Employer E may use the special fourth quarter rule with respect to the $200,000 of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application since

the PPP loan was not forgiven, but not with respect to the excess $50,000 of qualified wages even though those amounts were included in the payroll costs reported on the PPP Loan Forgiveness Application.

**Question 58**: How does an eligible employer use the special fourth quarter rule in section 206(e)(2) of the Relief Act?

**Answer 58**: If an eligible employer received a PPP loan, and reported qualified wages paid in the second and/or third quarter of 2020 as payroll costs on its PPP Loan Forgiveness Application, but the loan was not forgiven by reason of a decision under section 7A(g) of the Small Business Act, then the eligible employer may take the qualified wages reported as payroll costs on its PPP Loan Forgiveness Application into account for purposes of the employee retention credit and claim the employee retention credit on those qualified wages on the fourth quarter Form 941. An eligible employer may also claim the employee retention credit on the fourth quarter Form 941 with respect to any qualified health plan expenses paid in the second and/or third quarter of 2020, for which the employer had not claimed the employee retention credit.

If an eligible employer elects to use this special fourth quarter rule, the eligible employer should add the employee retention credit attributable to the second and/or third quarter qualified wages and qualified health plan expenses on line 11c or line 13d (as relevant) of the original fourth quarter Form 941 (along with any other employee retention credit for qualified wages paid in the fourth quarter). The eligible employer should also:

- Include the amount of these qualified wages paid during the second and/or third quarter (excluding qualified health plan expenses) on line 21 of the original fourth quarter Form 941 (along with any qualified wages paid in the fourth quarter);
- Enter the same amount on Worksheet 1, Step 3, line 3a;
- Include the amount of these qualified health plan expenses from the second and/or third quarter on line 22 of the fourth quarter Form 941 (along with any qualified health plan expenses for the fourth quarter);
- Enter the same amount on Worksheet 1, Step 3, line 3b.

Eligible employers are not required to use this special fourth quarter rule. Eligible employers may instead choose the regular process of making an interest-free adjustment or filing a claim for refund for the appropriate quarter to which the additional employee retention credit relates using Form 941-X for the previously filed Form 941.

### K. Special Issues for Employees: Income and Deduction

**Question 59**: Are qualified wages excluded from gross income as "qualified disaster relief payments"?

**Answer 59**: No. Section 139 of the Code excludes from a taxpayer's gross income certain payments to individuals to reimburse or pay for expenses incurred as a result of a qualified disaster (qualified disaster relief payments). Although the COVID-19 pandemic is a "qualified disaster" for purposes of section 139, qualified wages are not excludible qualified disaster relief payments, because qualified wages are what an individual would otherwise earn as compensation, rather than payment or reimbursement of expenses incurred as a result of a qualified disaster. Therefore,

qualified disaster relief payments do not include qualified wages paid by an employer, including those that are paid when an employee is not providing services.

### L. Special Issues for Employers: Income and Deduction

**Question 60**: Does the employee retention credit reduce the expenses that an eligible employer could otherwise deduct on its federal income tax return?

**Answer 60**: Yes. Section 2301(e) of the CARES Act provides that rules similar to section 280C(a) of the Code shall apply for purposes of applying the employee retention credit. Section 280C(a) generally disallows a deduction for the portion of wages or salaries paid or incurred equal to the sum of certain credits determined for the taxable year. Accordingly, a similar deduction disallowance applies under section 2301(e) of the CARES Act with regard to the employee retention credit, such that an employer's deduction for qualified wages, including qualified health plan expenses, is reduced by the amount of the employee retention credit. (An employer does not, however, reduce its deduction for the employer’s share of social security and Medicare taxes by any portion of the credit).

**Question 61**: Does an eligible employer receiving an employee retention credit for qualified wages need to include any portion of the credit in income?

**Answer 61**: No. An employer receiving a tax credit for qualified wages, including allocable qualified health plan expenses, does not include the credit in gross income for federal income tax purposes. Neither the portion of the credit that reduces the employer's applicable employment taxes, nor the refundable portion of the credit, is included in the employer's gross income.

### M. Special Issues for Employers: Use of Third-Party Payers

**Question 62**: Can an eligible common law employer that uses a third-party to report and pay employment taxes to the IRS get the employee retention credit?

**Answer 62**: Yes. If a common law employer is otherwise eligible to receive the employee retention credit, it is entitled to the credit, regardless of whether it uses a third-party payer (such as a reporting agent, payroll service provider, PEO, CPEO, or 3504 agent) to report and pay its federal employment taxes. The third-party payer is not entitled to the employee retention credit with respect to the wages it remits on the common law employer's behalf (regardless of whether the third-party is considered an "employer" for other purposes of the Code). If a common law employer uses a third-party to file, report, and pay employment taxes, different rules will apply depending on the type of third-party payer the common law employer uses for claiming/reporting the employee retention credit.

If an eligible common law employer uses a reporting agent to file its federal employment tax returns, the reporting agent will need to reflect the employee retention credit on the federal employment tax returns it files on the common law employer's behalf.

If an eligible common law employer uses a CPEO or a 3504 agent that received its designation as an agent by submitting Form 2678, *Employer/Payer Appointment of Agent*, to report its federal employment taxes on an aggregate Form 941, the CPEO or 3504 agent will report the employee retention credit on its aggregate Form 941 and Schedule R, *Allocation Schedule for Aggregate Form 941 Filers*, that it already files. An

eligible common law employer can submit its own Form 7200 to claim the advance payment of the credit. The eligible common law employer will need to provide a copy of the Form 7200 to the CPEO or 3504 agent so the CPEO or 3504 agent can properly report the employee retention credit on the Form 941.

If an eligible common law employer uses a non-certified PEO or other third-party payer (other than a CPEO or section 3504 agent that submitted Form 2678) that reports and pays the common law employer client's federal employment taxes under the third-party's Employer Identification Number (EIN), the PEO or other third-party payer will need to report the employee retention credit on an aggregate Form 941 and separately report the employee retention credit allocable to the common law employers for which it is filing the aggregate Form 941 on an accompanying Schedule R. The PEO or other third-party payer does not have to complete Schedule R with respect to any common law employer for which it is not claiming an employee retention credit. The eligible common law employer will need to provide a copy of any Form 7200 that it submitted for an advance payment of the credit to the PEO or other third-party payer so the PEO or other third-party payer can properly report the employee retention credit on the Form 941. These rules are similar to the rules that apply with respect to the payroll tax election available under section 41(h) of the Code for the credit for certain research and development expenses.

**Question 63**: May a payroll reporting agent sign and submit Form 7200 on behalf of a client employer?

**Answer 63**: Yes. A payroll reporting agent may sign Form 7200 for a client employer for which it has the authority, via Form 8655, *Reporting Agent Authorization*, to sign and file the federal employment tax return. The signatory must be the Principal or Responsible Official listed on the Reporting Agent's e-file application. The signatory may sign with ink on paper or may use the alternative signature method (rubber stamp, mechanical device, or computer software program; for details and required documentation, see Rev. Proc. 2005-39, 2005-28 I.R.B. 82). Consistent with Rev. Proc. 2005-39, an alternative signature must be in the form of a facsimile signature.

The reporting agent must obtain written authorization from the client employer (paper, fax, or e-mail) to perform these actions regarding the Form 7200. The reporting agent need not submit that authorization to the IRS, but should retain it in its files so that the reporting agent can furnish it to the IRS upon request. In the case of a client employer for which a third-party payer does not have a Reporting Agent Authorization, the third-party payer may complete and print the form, or it may provide the client employer a means to complete and print the form, but the client employer will have to sign it.

The signatory for the reporting agent must sign, date, and print his or her name in the relevant boxes on Form 7200. In the box “Printed Title,” the signatory must include the reporting agent company name or name of business as it appeared on line 9 of the Form 8655. If the reporting agent company name or name of business from the Form 8655 is missing, the Form 7200 cannot be processed.

**<u>Question 64</u>**: When should the name and EIN of a third-party payer be included on Form 7200?

**<u>Answer 64</u>**: Common law employers who file Form 7200 to claim an advance payment of credits are required to include on the form the name and EIN of the third-party payer they use to file their federal employment tax returns (such as the Form 941) if the third-party payer uses its own EIN on the federal employment tax returns. This will ensure advance payment of the credits received by the common law employer is properly reconciled to the federal employment tax return filed by the third-party payer for the calendar quarter for which the advance payment of the credits is received.

To help expedite and ensure proper processing of Form 7200 and reconciliation of advance payment of the credits to the federal employment tax return for the calendar quarter, only those third-party payers who will file a federal employment tax return on behalf of a common law employer using the third-party payer's name and EIN should be listed on the Form 7200. Typically, CPEOs, PEOs, and other 3504 agents fall into this category of third-party payers.

If a third-party payer will file the federal employment tax return on a common law employer's behalf using the common law employer's name and EIN and not the name and EIN of the third-party payer, the common law employer should not include the name and EIN of the third-party payer on the Form 7200. Typically, reporting agents and payroll service providers fall into this category of third-party payers.

**<u>Question 65</u>**: If a common law employer uses a third-party payer for only a portion of their workforce, should the employer list the third-party payer on the Form 7200?

**<u>Answer 65</u>**: In some cases, a common law employer may use the services of a third-party payer (such as a CPEO, PEO, or other section 3504 agent) to pay wages for only a portion of its workforce. In those circumstances, the third-party payer files a federal employment tax return for the wages it paid to the common law employer's employees under its name and EIN , and the common law employer files a federal employment tax return for wages it paid directly to employees under its own name and EIN.

If the common law employer is claiming advance payments of credits for both wages paid directly to employees that will be reported on its own federal employment tax return and wages paid to other employees by a third-party payer that will be reported on the third-party payer's federal employment tax return, two separate Forms 7200 should be filed: one for the wages paid by the common law employer with the name and EIN of the common law employer, and one for the wages paid by the third-party payer with the name and EIN of both the common law employer and the third-party payer.

To help expedite and ensure proper processing of Form 7200 and reconciliation of advance payment of the credits to the federal employment tax return when a common law employer uses a third-party payer such as a CPEO, PEO, or other section 3504 agent for only a portion of its workforce, a common law employer should include the

name and EIN of the third-party payer only on the Form 7200 for advance payment of the credits for wages paid by the third-party payer and reported on the third-party payer's federal employment tax return. The common law employer should not include the name and EIN of the third-party payer on the Form 7200 for advance payments of the credits claimed for wages paid by the common law employer and reported on the common law employer's federal employment tax return.

**Question 66**: What information must third-party payers obtain from their client employers to claim the employee retention credit on their client employer's behalf?

**Answer 66**: If a third-party payer (such as a CPEO, PEO, or other section 3504 agent) is claiming the employee retention credit on behalf of the client employer, it must collect from the client employer any information necessary to accurately claim the employee retention credit on its client employer's behalf. This includes obtaining information with respect to the client employer's claims for credits under sections 7001 and 7003 of the FFCRA and under section 45S of the Code, as well as whether the client employer has received a Paycheck Protection Program loan authorized under the CARES Act.

**Question 67**: May third-party payers rely on client employer information regarding the employee retention credit?

**Answer 67**: Yes. If a third-party payer (such as a CPEO, PEO, or other section 3504 agent) is claiming the employee retention credit on behalf of the client employer, the third-party payer may rely on the client employer's information regarding the client employer's eligibility to claim the employee retention credit.

Either the third-party payer or the client employer may maintain all records which substantiate the client employer's eligibility for the employee retention credit. However, if the client employer maintains the records, upon request by the IRS, the third-party payer must obtain from the client employer and provide to the IRS records that substantiate the client employer's eligibility for the employee retention credit. The client employer and the third-party payer will each be liable for employment taxes that are due as a result of any improper claim of the employee retention credit amounts that are improperly claimed in accordance with their liability under the Code and applicable regulations for the employment taxes reported on the federal employment tax return filed by the third-party payer on which the credit was claimed.

**Question 68**: Upon request by the IRS, what records must third-party payers obtain from their client employers to substantiate the client employer's eligibility for the employee retention credit?

**Answer 68**: If a third-party payer is claiming the employee retention credit on behalf of the client employer, it must, at the IRS's request, be able to obtain from the client employer and provide to the IRS records that substantiate client employer's eligibility for the employee retention credit.

**Question 69**: Are client employers responsible for avoiding a "double benefit" with respect to the employee retention credit and the credit under section 45S of the Code?

**Answer 69**: Yes. The client employer is responsible for avoiding a “double benefit” with respect to the employee retention credit and the credit under section 45S

of the Code. The client employer cannot use wages that were used to claim the employee retention credit and reported by the third-party payer on the client employer's behalf to claim the section 45S credit on its income tax return.

### N. Substantiation Requirements

**<u>Question 70</u>**: What records should an eligible employer maintain to substantiate eligibility for the employee retention credit?

**<u>Answer 70</u>**: An eligible employer will adequately substantiate eligibility for the employee retention credit if the employer creates and maintains records that include the following information:

- Documentation to show how the employer determined it was an eligible employer that paid qualified wages, including:
  - any governmental order to suspend the employer's business operations;
  - any records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order or whether a governmental order had more than a nominal effect on its business operations;
  - any records the employer used to determine it had experienced a significant decline in gross receipts;
  - any records of which employees received qualified wages and in what amounts; and

  - in the case of a large eligible employer, work records and documentation showing that wages were paid for time an employee was not providing services.
- Documentation to show how the employer determined the amount of allocable qualified health plan expenses.
- Documentation related to the determination of whether the employer is a member of an aggregated group treated as a single employer for purposes of the employee retention credit and, if so, how the aggregation affects the determination and allocation of the credit.
- Copies of any completed Forms 7200 that the employer submitted to the IRS.
- Copies of the completed federal employment tax returns that the employer submitted to the IRS (or, for employers that use third-party payers to meet their employment tax obligations, records of information provided to the third-party payer regarding the employer's entitlement to the credit claimed on the federal employment tax return).

**Question 71**: How long should an eligible employer maintain records to substantiate eligibility for the employee retention credit?

**Answer 71**: An eligible employer should keep all records of employment taxes for at least 4 years after the date the tax becomes due or is paid, whichever comes later. These should be available for IRS review.

IV. PAPERWORK REDUCTION ACT

Any collection of information associated with this notice has been submitted to the Office of Management and Budget for review under OMB control number 1545-0029 in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)). An agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a valid OMB control number.

V. DRAFTING INFORMATION

The principal authors of this notice are Dixie Pond and Danchai Mekadenaumporn, Office of the Associate Chief Counsel (Employee Benefits, Exempt Organizations, and Employment Taxes), although other Treasury and IRS officials participated in its development. For further information on the provisions of this notice, please contact Ms. Pond or Mr. Mekadenaumporn at 202-317-6798 (not a toll-free call).

ArrowPoint
TAX SERVICES

October 14th, 2025
Mr. Jerry Tung
Department of the Treasury
Internal Revenue Service

CC:
Barrett Business Services Inc.
8100 NE Parkway Drive, Suite 200
Vancouver, WA 98662

Holland and Knight LLP
Daniel Strickland
800 17th Street N.W. Suite 1100
Washington, District of Columbia 20006

1011 2nd St, Suite 100
Santa Rosa, CA 95404

(800) 241-9876

Re: BBSI & Daniel Strickland – IRS Rejection Response LTR 937
Reference: LTR 937
Notice date: 07/01/2025 – Shared via Barrett Business Services Inc (BBSI) 10/14/2025
Agent: Mr. Jerry Tung
Taxpayer Name: JOHNSON POOLS INC – Represented through Barrett Business Services Inc (BBSI)
Taxpayer (BBSI) EIN: 68-0173856
Tax Periods: June 30th, 2020 (2020 Q2) | September 30th, 2020 (2020 Q3) | December 31st, 2020 (2020 Q4) | March 31st, 2021 (2021 Q1) | June 30th, 2021 (2021 Q2) - (Actual Qualification March 13th, 2020 – June 15th, 2021)
Type of Tax: Employment Tax

Dear Respected Agent Tung,

In reference to the above Letter ("Letter"), JOHNSON POOLS INC (the "Company") – represented by Barrett Business Services Inc. (the "Professional Services Organization" aka "PEO") is supplying additional details related to their Employee Retention Tax Credit ("ERC") claim. The Company formally wishes to appeal the findings. The Company firmly believes that it was eligible for a period of March 13th, 2020 – June 15th 2021.

ArrowPoint
TAX SERVICES

The Company wishes to formally appeal the rejection reason of *"Disallowed Evidence does not show a shut down or Decrease in Gross Receipts (c,d)."* Also, the Company would like to call out that the taxpayer reason section is incorrect. The Company never claimed eligibility past June 15th, 2021 which clearly is before 2021 Q3. The fact that the below two sentences is the only response received, and that the "Taxpayer Reason" section is clearly incorrect, shows that this case deserves a more detailed review.

| Client Name | C.FEIN | Taxpayer Reasons | Allow/Disallow |
|---|---|---|---|
| JOHNSON POOLS INC | 68-0173856 | The company qualifies for the Employee Retention Credit for the following quarters: Q2 2020 – Q3 2021 through partial suspension | Disallowed Evidence does not show a shut down or Decrease in Gross Receipts (c,d). |

1011 2nd St, Suite 100
Santa Rosa, CA 95404

(800) 241-9876

Responding to the "allow/Disallow section, the Company never claimed to have qualified through gross receipts. Rather, the Company believes that the threshold set by IRS Notices 2021-20, 2021-23, and 2021-49 for partial suspension of a "material" portion of business operations impacted was met and exceeded for the period of March 13th, 2020 – June 15th, 2021. Thus qualifying the Company for the below periods:

- Period ending June 30th, 2020
- Period ending September 30th, 2020
- Period ending December 31st 2020
- Period ending March 31st, 2021
- Period ending June 30th, 2021*

**With eligibility ending June 15th, 2021. The Company only used eligible wages up to June 15th, 2021 to calculate and claim the ERC.*

Below is a list of the orders the Company believes qualifies them from March 13th, 2020 – June 15th, 2021

- C19-01 — Moratorium on Large Gatherings
- C19-03 — Shelter-in-Place
- Executive Order N-33-20 — Statewide Stay-at-Home
- C19-04 — Order Closing Parks

ArrowPoint
TAX SERVICES

- C19-05 — SIP Extended; Social Distancing Protocol (Appendix A)
- C19-09 — SIP Extended with Limited Additions (Superseding)
- C19-14 — “Stay Well Sonoma County” (Protocols Required)
- C19-15 — Updated Stay-Well Order
- Blueprint for a Safer Economy — Color-Tier Framework
- Beyond the Blueprint — Retirement of Color Tiers

| County | 30-Aug | 7-Sep | 14-Sep | 21-Sep | 28-Sep | 5-Oct | 12-Oct | 20-Oct | 26-Oct | 2-Nov | 9-Nov | 16-Nov | 24-Nov | 28-Nov | 1-Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contra Costa | Purple | Purple | Purple | Purple | Red | Red | Red | Red | Orange | Orange | Red | Purple | Purple | Purple | Purple |
| Marin | Purple | Purple | Red | Red | Red | Red | Red | Red | Orange | Orange | Orange | Red | Red | Red | Red |
| Napa | Red | Red | Red | Red | Red | Red | Red | Orange | Orange | Orange | Orange | Purple | Purple | Purple | Purple |
| Sacramento | Purple | Purple | Purple | Purple | Red | Red | Red | Red | Red | Red | Purple | Purple | Purple | Purple | Purple |
| San Francisco | Red | Red | Red | Red | Orange | Orange | Orange | Yellow | Yellow | Yellow | Yellow | Red | Red | Purple | Purple |
| Santa Clara | Purple | Red | Red | Red | Red | Red | Orange | Orange | Orange | Orange | Orange | Purple | Purple | Purple | Purple |
| Solano | Purple | Purple | Purple | Red | Red | Red | Red | Red | Red | Red | Red | Purple | Purple | Purple | Purple |
| **Sonoma** | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple |

1011 2nd St, Suite 100
Santa Rosa, CA 95404

(800) 241-9876

| County | 8-Dec | 15-Dec | 22-Dec | 29-Dec | 4-Jan | 11-Jan | 19-Jan | 25-Jan | 2-Feb | 9-Feb | 16-Feb | 23-Feb | 2-Mar | 9-Mar | 13-Mar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contra Costa | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | red |
| Marin | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red | Red | Red |
| Napa | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | red | red | Red |
| Sacramento | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple |
| San Francisco | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red | Red |
| Santa Clara | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red | Red |
| Solano | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red | Red |
| **Sonoma** | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Purple | Red |

| County | 16-Mar | 23-Mar | 30-Mar | 6-Apr | 13-Apr | 20-Apr | 27-Apr | 4-May | 11-May | 18-May | 25-May | 1-Jun | 8-Jun | 15-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contra Costa | Red | Red | Red | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | orange | orange | orange |
| Marin | Red | Orange | Orange | orange | orange | orange | orange | Orange | Orange | Orange | Orange | yellow | yellow | yellow |
| Napa | Red | Red | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | orange | yellow | yellow |
| Sacramento | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | orange | orange | orange |
| San Francisco | Red | Orange | Orange | Orange | Orange | Orange | Orange | Yellow | Yellow | Yellow | Yellow | yellow | yellow | yellow |
| Santa Clara | Red | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Orange | Yellow | Yellow | yellow | yellow | yellow |
| Solano | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | Red | orange | orange | orange |
| **Sonoma** | Red | Red | Red | Orange | Orange | Orange | Orange | Orange | orange | Orange | Orange | Orange | Orange | Orange |

*Above is a visual timeline of the color impacting Sonoma County and thus the level of restrictions. Sonoma can be found at the bottom of each picture.*

The Company is enclosing a detailed summary with links of the orders that materially impacted the Company’s operations during this time. The Form Letter 937 sites that evidence for general submissions site OSHA and other loose masking orders. Given this is the same document and language shared with all of BBSI’s clients, it seems that this is simply a blanket review and not reflective of an honest Company specific claim review. We would like to formally emphasize that this is not the evidence being supplied by the Company, and we fear that through the PEO, and more specifically, the BBSI process, the Company is being unjustly reviewed through blanket analysis and processing.

ArrowPoint
TAX SERVICES

1011 2nd St, Suite 100
Santa Rosa, CA 95404

(800) 241-9876

The Company welcomes the opportunity to discuss their specific case as it relates to eligibility and qualification of the ERC for tax periods impacted. Should this be a challenge under the current workload, then the Company formally requests a different agent be assigned to directly work through the case and appeal process. If at all possible to remove BBSI from the process and allow the Company to directly interact with the IRS, the Company would also like to formally request this.

We sincerely appreciate your assistance with this matter and look forward to the next step in the appeals process.

I as the submitter am including that *"Under penalties of perjury, I declare that I submitted the protest and accompanying documents, and to the best of my personal knowledge and belief, the information stated in the protest and accompanying documents is true, correct, and complete."*

Yours Sincerely,

Duncan Kelm
Authorized Person
Arrow Point Tax Services
1011 2nd St, Ste 100
Santa Rosa, CA 95404
Day time phone: (800) 241-9876
Email: Duncan@arrowpointtaxes.com
PTIN: P02259619
Enclosure:
    Copy of LTR 937
    List of Government Orders Impacting the Company